1

2

3

4

5

6

7

8                **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 PULSE ELECTRONICS, INC., a    )  Case No.:  3:18-cv-00373-BEN-MSB
Delaware corporation,              )

12                 Plaintiff,    )  **ORDER:**
                     )

13 v.                      )

14                      )  **(1)  DENYING PLAINTIFF'S**
                     )       **MOTION FOR SUMMARY**

15 U.D. ELECTRONIC CORP., a Taiwan  )       **JUDGMENT**
corporation,                )

16                      )  **(2)  GRANTING DEFENDANT'S**
           Defendant.    )       **MOTION FOR SUMMARY**

17 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯)       **JUDGMENT AND *DAUBERT***
                     )       **MOTION**

18 U.D. ELECTRONIC CORP., a Taiwan  )
corporation,                )

19                      )  **(3)  REQURING PLAINTIFF TO**
                     )       **SHOW CAUSE AS TO WHY**

20                      )       **DEFENDANT SHOULD NOT BE**

21           Counterclaimant,  )       **GRANTED SUMMARY**
                     )       **JUDGMENT**

22 v.                      )

23 PULSE ELECTRONICS, INC., a    )  **[ECF Nos. 143, 144, 150, 151, 154, 157]**
Delaware corporation,              )

24                      )

25          Counterdefendant.  )

26 **I.    INTRODUCTION**

27       Plaintiff/Counterdefendant PULSE ELECTRONICS, INC., a Delaware corporation

28 ("Plaintiff" or "Pulse") brings this action for a patent infringement against

-1-

Defendant/Counterclaimants Defendant U.D. Electronic Corp., a Taiwan corporation ("Defendant" or "UDE").  Second Amended Complaint, ECF No. 106 ("SAC").

Before the Court are (1) Plaintiff's Motion for Partial Summary Judgment, ECF No. 143 ("Pltff. Mot."), and (2) Defendant's Motion for Summary Judgment and *Daubert* Motion, ECF No. 144 ("Def. Mot.").  The Motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF No. 158.

After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 143, and (2) **GRANTS** Defendant's Motion for Summary Judgment and *Daubert* Motion, ECF No. 144.  Additionally, as outlined below, the Court, *sua sponte*, orders Plaintiff to show cause as to why summary judgment should not be granted in Defendant's favor by submitting briefing within seven (7) days of this order setting forth Plaintiff's evidence of infringing activities within the United States ("U.S.").

## II.     BACKGROUND

This matter arises out of a dispute over whether Defendant is infringing on the claims of U.S. Patent Nos. (1) 7,959,473 (the "'473 Patent"), (2) 9,178,318 (the "'318 Patent"), and (3) 6,593,840 (the "'840 Patent") (collectively, the "Patents-in-Suit").  *See generally* SAC.  Plaintiff contends that Defendant directly and indirectly infringes the Patents-in-Suit including by making, using, selling, importing, and/or offering for sale—including through the sale and importation by Defendant's customers, rather than Defendant itself—multigig (e.g., 2.5G, 5G, 10G) 2xN[1] integrated connector modules ("ICMs") or products that contain the aforementioned ICMs, including Defendant's four ICM series products: (1) the G series; (2) the GX-X series; (3) the S Series; and (4) the N Series.  November 10, 2020

---

[1]     As will be addressed, 2xN refers to the number of ports on the ICM and "means that there are two rows of ports, one on top of the other."  Def. Mot. at 8:22-23.  All accused products in this case have the "2xN" designation, and as such, this case involves only multi-port, rather than single port, ICMs.

Infringement Report of Plaintiff's Expert, Lex Baxter, Exhibit 5 to Def. Mot., ECF No. 142-4 ("Baxter Report") at 7[2]; December 8, 2020, Rebuttal Expert Report of Defendant's Expert, Justin R. Blok, Exhibit 10 to Def. Mot., ECF No. 142-9 ("Blok Report") at 5.

### A.    <u>Statement of Facts</u>

The accused products in this case relate to ICMs that connect electronic devices across local area networks ("LANs").  Blok Report at 9.  In the 1960s, LANs originally developed as a way to connect multiple computers to each other but until the invention and standardization of Ethernet and Wi-Fi technology, they were not widely used by consumers.  *Id.* at 9-10.  Ethernet technology "sends its communications through radio frequency signals carried by a coaxial cable."  David F. Norden, *Filtering Out Protection: The Law, the Library, and Our Legacies*, 53 Case W. Res. L. Rev. 767, 814, n.41 (2003).

In the 1970s, Ethernet became the most widely used LAN technology.  Blok Report at 10.  Eventually, Ethernet cables evolved becoming faster and covering a variety of distances.  *Id.*  Today, most Ethernet cables use "twisted pair cabling" with a new standard connector: the Registered-Jack 45 ("RJ-45").  *Id.* at 10-11.  The RJ-45 ICM, which is at issue in this case, is an electrical connector module used for Ethernet networking, which resembles a telephone jack but consists of Ethernet cable ports that can be embodied either as a single or multi-port device and that are incorporated into computer networking devices.  SAC at 3:11-13; *see also* Def. Mot. at 5:2-5.  The "ICM has ports into which an ethernet cable can be plugged, providing a connection between the cable and the motherboard of an electronic device, such as a laptop computer or a network switch."  Def. Oppo. at 6:26-7:2.  Single port and multiport ICMs are pictured below:



---

[2]    Unless otherwise indicated, all page number references are to the ECF generated page number contained in the header of each ECF-filed document.

*See* SAC at 3:14-22.

A common problem with Ethernet network infrastructures is electromagnetic interference ("EMI"), which is the disruption of the operation of an electronic product due to electromagnetic waves. Blok Report at 13. However, the industry has developed two primary methods for managing EMI: shielding and filtering. *Id.* First, through shielding, various forms of protection, such as metal plates, block electromagnetic fields, protecting the devices from external radiation and keeping other devices from emitting radiation that can cause interference with devices. *Id.* An example of shielded twisted pair Ethernet cables is shown below, which incorporate a thin foil around the wires to mitigate EMI:



*Id.* Second, "[f]iltering targets specific sources of noise and can divert it to the ground, absorb it, or return it to where it was emitted." Blok Report at 14. Filtering can be accomplished through two different electronic components: (1) "[c]apacitors, which can inhibit direct current and allow alternating current to pass, reducing EMI," and (2) "[i]nductors, which are small electromagnets that hold energy in a magnetic field as electric current passes through it, reducing EMI." *Id.* In this case, "[t]he Patents-in-Suit generally teach physical arrangement used to suppress noise caused by EMI when connectors are positioned in close proximity." *Id.* at 7.

ICMs are generally low margin products, meaning they are relatively inexpensive to manufacture, and as a result, pricing of ICMs heavily drives competition in the industry. Defendant's Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 151 ("Def.

Oppo.") at 7:2-3.  Because ICMs, including the RJ-45 ICMs, are assembled with other components to make consumer electronics, sales of RJ-45 products directly correlated with sales of consumer and commercial electronics.  *Id.* November 10, 2020 Report of Plaintiff's Expert, Arthur H. Cobb, ECF No. 142-5 ("Cobb Report") at 3.  In this case, both Plaintiff and Defendant manufacture ICMs to sell to Electronics Manufacturing Services ("EMS") "companies, which combine the ICMs with other components (e.g., motherboard, power supply) to create an electronic device on a contract basis for a 'brand' company," such as Hewlett-Packard Enterprises ("HPE") or Cisco.  Def. Mot. at 7:4-7; *see also* Def. Oppo. at 7:6-7.  "EMS companies almost exclusively manufacture outside the U.S., such as [in] Asia, where labor cost is low and raw materials are available."  Def. Oppo. at 7:7-9; Def. Mot. at 7:8-9.  Meanwhile, the brand companies save money by purchasing their components from EMS companies because the brand companies do not have to maintain their own factories and workforce.  Def. Mot. at 7:9-10; Def. Oppo. at 7:9-10

Founded in 1947, Plaintiff designs and manufactures electronic components, including RJ-45 ICMs, which are intended for use with electronics.  SAC at 3:6-10; 144-1 at 5:2-5.  Defendant admits that Plaintiff "has been in the electronics industry for many years, while UDE is a relative newcomer that has grown rapidly."  Def. Oppo. at 7:17-18.  Plaintiff maintains its headquarters in San Diego, California but operates engineering design centers, manufacturing facilities, and sales offices throughout North America, Europe, and Asia.  *Id.*; *see also* SAC at 2:5-7, 3:6-10.  Plaintiff owns more than 100 United States and international patents dealing with RJ-45 ICM technology, four of which are at issue in this case and cover various methods for limiting EMI.  SAC at 3:23-25.  These Patents-in-Suit are summarized below:

| Patent No. | Title | Description | Issue Date | Expiration Date |
|---|---|---|---|---|
| 6,593,**840** | Electronic Packaging Device with Insertable | The 840 Patent covers "a device for electrically interconnecting and packaging electronic components which utilize a series retainer or retention | 7/15/2003 | 3/18/2021 |

-5-

| | | | | |
|---|---|---|---|---|
| | Leads and Method of Manufacturing | elements associated with certain of the sidewalls of the base member to retain the lead terminals laterally."  Pltff. Mot. at 3:5-11. | | |
| 7,959,**473** | Universal Connector Assembly and Method of Manufacturing | This "Patent generally describes a technique for routing wire from electronic components to conductive terminals, and in particular to routing wires within the periphery of two insert bodies when assembled together (using 'slots' in some claims)." Blok Report at 18. | 6/14/2011 | 6/28/2025 |
| 9,178,**318** | Shielded Integrated Connector Modules and Assemblies and Methods of Manufacturing the Same | This Patent covers ICMs "that provide enhanced external and intra-connector noise suppression, including suppressing noise between integral electronic components and the substrate to which the assembly is mounted." Pltff. Mot. at 2:24-28.  This noise suppression is accomplished in part through a claimed "shielding tab, which is a sort of protrusion from the front of a printed circuit board."  *Id.* | 11/3/2015 | 3/12/2033 |

*See* Blok Report at 16, 18; *see also* SAC at 4:8-19; *see also* Exhibit B to SAC, ECF No. 106-3 at 2; Exhibit D to SAC, ECF No. 106-5 at 2; Pltff. Mot. at 3:5-11.

Founded in 2005, Defendant is a Taiwan corporation that manufactures and supplies communications equipment, including RJ-45 ICMs, for integration into computer networking devices overseas.  SAC at 2:8-10, 3:26-27; *see also* Answer, ECF No. 108 at 2:8; Def. Mot. at 5:2-5; *see also* Blok Report at 5.  "Defendant is currently headquartered in Taoyuan City, Taiwan, and operates two factories in Guandong and Sichuan, China." Blok Report, at 5.  As of May 2018, Defendant held a 9% market share (by volume) of the global copper ICM market and was the second largest manufacturer of the RJ-45 ICM

connectors in the world (by revenue), with Plaintiff being the fifth largest manufacturer. *See* Exhibit "M" to SAC, ECF No. 106-14 at 4, 8; *see also* Blok Report at 8.

In a typical sales transaction, Defendant receives a purchase order from an EMS company at its headquarters in Taiwan. Def. Oppo. at 7:11-12. Then, Defendant manufactures the ICMs in China and ships them "to the EMS company outside the United States, typically in Asia." *Id.* at 7:12-14. After Defendant ships the ICMs to the purchaser, Defendant asserts that it "does not have knowledge or control over where the ICMs go." *Id.* at 7:14-15. Defendant claims "[t]he EMS company and the brand company control where the electronic devices will be distributed." *Id.* at 7:15-16. Both parties agree that "in some instances," ICMs are "multi-sourced," which means that even if Defendant supplies ICMs for a certain brand company's products, that brand company will also generally rely on anywhere from one to four additional suppliers when manufacturing that product. Pltff. Oppo.at 19:13.

Defendant claims that its "competitive advantage is (1) proprietary technology that automates ICM manufacturing, and (2) flexibility to customize ICM designs with short lead time." Def. Oppo. at 7:18-20. On February 24, 2016, Defendant "proposed at one point a joint venture that would use UDE's superior manufacturing capabilities with Pulse's better known name in the electronics industry." Def. Oppo. at 7:23-26; *see also* SAC at 5:17-26. However, Defendant argues that instead, Plaintiff used a visit to Defendant's factory to gather intelligence and conspire with one of Defendant's competitors to slow down Defendant's growth. Def. Oppo. at 7:26-8:1; *see also* Exhibit 1 to Def. Mot., ECF No. 142-1 at 2.

While the parties disagree as to whether Defendant makes any direct sales within the U.S., both parties agree that if the invoices for Defendant's worldwide sales evidence any U.S. sales, those sales are at most twelve percent (12%) of Defendant's worldwide sales. Pltff. Oppo. at 4:3-6; Def. Reply at 5:21-28 (arguing the 12% incorrectly includes invoices for non-accused products, and when limited to accused products, the figure is 7.8%). However, Plaintiff argues that even if Defendant manufactures and sells its ICMs outside

the U.S., it induces direct infringement by the branded companies or their consumers because Defendant allegedly knows and even hopes its ICMs will eventually end up in products that make their way into the U.S. *Id.* at 9:12-17. In that vein, Plaintiff alleges Defendant substantially used the Accused Products in the U.S. for sales, including but not limited to by (1) providing samples and/or prototypes of the Accused Products to potential customers for evaluation; (2) securing "design wins" with potential customers resulting in large volume orders of the Accused Products; and (3) negotiating and entering into sales contracts involving the Accused Products. SAC at 5:2-10. Plaintiff argues that "[b]ut for this U.S.-based infringing activity by Defendant, such design wins would not have been achieved and Defendant would not have benefited from the resulting sales and associated revenue and profit." *Id.* at 5:10-12.

The instant cross-motions for summary judgment relate to the below series and Patents-in-Suit:

| UDE Multi-Gig 2xN ICMs with MPNs that Start with: | Plaintiff's *Claimed[3]* Representative Model Product Number "MPN" | Plaintiff's Asserted | | |
|---|---|---|---|---|
| | | 473 Patent Claims Involved: | 318 Patent Claims Involved: | 840 Patent Claims Involved: |
| **"G"** | GMD-AA-0002 | 1, 16, 18, 33, 37, 39, and 41 | N/a | 1, 7, 10, 11, and 12 |
| **"GX-X"** | GM-41000VJ84-1 | | ~~1, 3, 4, 5, 6, 7, and 11[4]~~ | |

---

[3]     The Court notes which MPNs Plaintiff claims are representative for reference only and does not accept those designations as true. As addressed within the context of Plaintiff's Motion for Summary Judgment, while Plaintiff claims certain MPNs are representative of the Accused Products, the Joint Stipulation Regarding Representative Accused Products, ECF No. 124 (the "Representative Product Stipulation"), only addresses the G Series of Accused Products.

[4]     As discussed in this order, Plaintiff's SAC and original Infringement Contentions only asserted Claims 14 and 17, and those claims were also the only claims at issue when this Court undertook Claim Construction. Any additional claims asserted pursuant to Plaintiff's Amended Infringement Contentions are not properly at issue in this case.

| **"N"** | N42-ZT-0001 | | N/a | |
| **"S"** | S3Y-HP-0001 | N/a | 14 and 17 | |

*See* Baxter Report at 7; *see also See* SAC at 4:2-28, 8:5-9, 38:16-20.

### B. Procedural History[5]

On February 16, 2018, Plaintiff filed this lawsuit against Defendant, based on the three Patents-in-Suit as well as U.S. Patent No. 6,773,302 ("the 302 Patent"). *See* ECF. No. 25-1 ¶ 14. On June 11, 2018, UDE filed its Answer along with eight counterclaims for non-infringement and invalidity of the 302, 473, 318, and 840 Patents. ECF. No. 13.

On January 17, 2020, Plaintiff filed a First Amended Complaint ("FAC"). ECF No. 61. However, on July 6, 2020, the Court granted Defendant's motion to dismiss the FAC *without prejudice* and granted leave to amend. Order, ECF No. 100. The Court found Plaintiff did not allege sufficient facts to establish a plausible claim for relief under the *Twombly/Iqbal* standard as to both induced and contributory infringement. *Id.* at 4-5.

On December 17, 2018, the Court granted Defendant's motion to stay this case pending *inter partes* review of all four Patents-in-Suit. Order, ECF No. 28 at 6-7. Later that month, the Patent Trial and Appeal Board ("PTAB") granted *inter partes* review of the 302 Patent. ECF No. 45 at 4:20-28. As such, on February 14, 2020, this Court granted a joint motion for dismissal of the claims related to the 302 Patent *without prejudice*.[6] ECF No. 72. As to the other patents, however, the PTAB denied institution of a trial. ECF No. 46 at 5:23-27. Thus, on November 18, 2019, this Court granted Plaintiff's Motion to Lift

---

[5] Due to the issues raised in both parties' briefs arising out of Plaintiff's service on Defendant of Amended Infringement Contentions in violation of the Local Patent Rules and various court orders, a detailed recitation of the procedural history is appropriate.

[6] As Defendant notes, the 302 Patent was the only patent asserted against Defendant's single-port and lower speed (e.g., 1G) ICMs, meaning that after the dismissal of the claims pertaining to the 302 Patent, only Defendant's multi-gigabit (i.e., high speed) 2xn ICMs remain at issue. Def. Mot. at 8:19-22. In other words, according to Defendant, Plaintiff may "only accuse ICMs for the niche market of high-speed networking devices," which reduces the number of accused ICMs from thousands, down to about 185 UDE product numbers." *Id.* at 8:23-26 (citing Baxter Report at 28-29, ¶¶ 95-108).

-9-

the Stay that had been in place during the *inter partes* review.  Order, ECF No. 52.  As a result, the stay has been lifted for well over one year.

On January 14, 2020, Magistrate Judge Daniel Butcher issued the Amended Case Management Order ("CMO") Regulating Discovery and Other Pretrial Proceedings, providing that "[t]he deadline for filing, as of right, Amended Infringement Contentions by a party claiming infringement is February 13, 2020."  Order, ECF No. 58 at 2:1-2; *see also* Patent L. R. 3.6 (providing that "[a]s a matter of right, a party asserting infringement may serve Amended Infringement Contentions no later than the filing of the parties' Joint Claim Construction Chart," which in this case was filed on February 14, 2020, ECF No. 70).

On July 16, 2020, Plaintiff filed the SAC, which is the operative complaint and alleges three claims for relief for direct, induced, and contributory infringement of the 473, 318, and 840 Patents.  SAC.  Shortly thereafter, on July 30, 2020, Defendant filed another answer and counterclaims.  Answer, ECF No. 108.  Defendant's operative counterclaims allege non-infringement and invalidity of the 473, 318, and 840 Patents.  *Id.*  Plaintiff filed an Answer to those counterclaims, denying the majority of the claims.  ECF No. 110.

On July 30, 2020, this Court issued its Claim Construction Order.  ECF No. 107.  On August 27, 2020, the Case Management Conference ("CMC") took place in this matter.  ECF No. 112.  Because Local Patent Rule 3.1 requires a party claiming patent infringement to serve "Disclosure of Asserted Claims and Infringement Contentions," fourteen (14) days after the CMC, Plaintiff had until September 10, 2020 to serve its Original Infringement Contentions.

Following the CMC, Judge Butcher issued another CMO, providing that all "[a]ll discovery, including expert discovery, shall be completed by all parties on or before December 8, 2020," defining "completed" as meaning "that interrogatories, requests for production, and other discovery requests must be served at least thirty (30) days *prior to* the established cutoff date so that responses thereto will be due on or before the cutoff date."  Order, ECF No. 113 at 1:23-28 (emphasis added).

On September 23, 2020, Defendant's counsel sent Plaintiff's counsel an e-mail,

-10-

stating "[f]or purposes of this litigation, UDE identified the following representative MPNs and design files for the 2xN multi-gig ICM products." Exhibit 1 to Pltff. Mot. at 2. This e-mail elaborated that Defendant believed the following design files contained the level of detail that Plaintiff had requested:

| MPNs | Representative MPN | Representative Design File |
|---|---|---|
| MPNs with first letter "G" | GMD-AA-0002 | UDE0022608 |
| MPNs with first letter "S" | S3Y-HP-0001 | UDE0022600 |
| MPNs with first letter "M" | M4-ZZ-0047 | UDE0031378 |
| MPNs with first letter "N" | N6-AT-0006 | UDE0024316 |
| MPNs with first letters "RM" | RM7-ZZ-0012 | UDE0024287 |
| MPNs with first letters "RN" | RN6-DA-0004 | UDE0024296 |

*See* Exhibit 1 to Pltff. Mot. at 2; *see also* Pltff Mot. at 2:16-18.

On October 14, 2020, a Status Conference took place in this case, at which point the Court set trial in this matter for February 17, 2021 at 9:30 a.m.[7] ECF No. 123. During this hearing, Plaintiff made no mention of seeking to amend infringement contentions. Shortly thereafter, on October 30, 2020, the Parties entered into the Representative Product Stipulation, pursuant to which both parties agreed Plaintiff could "use certain

---

[7] As will be addressed later on in this order, Plaintiff makes reference to the "highly accelerated trial schedule" and asserts that "[t]he Court further accelerated the schedule by setting a Jury Trial for February 17, 2021." Pltff. Reply at 6:14-18. Under the Civil Justice Reform Act of 1990, introduced by then-Senator, now President Joseph Biden, district courts are encouraged to ensure timely termination of all cases within three years of filing. *See* 28 U.S.C. § 471; H.R. REP. NO. 101-732 (1990); *see also* 28 U.S.C. § 476(a)(3) (requiring "[t]he Director of the Administrative Office of the United States Courts [to] prepare a semiannual report, available to the public, that discloses for each judicial officer . . . the number and names of cases that have not been terminated within three years after filing"). This case was filed on February 16, 2018. *See* ECF No. 1. By setting a trial date in February 2021, this Court was making every effort to adhere to the Legislature's mandate to district courts to "ensure just, speedy, and inexpensive resolutions of civil disputes," 28 U.S.C. § 471, by ensuring trial of this matter within three years of the date of filing. To the extent Plaintiff complains of the previously set trial date, this date was not "accelerated," and the Court finds three years to be ample time for any case, even a patent case, to proceed to trial.

representative products to prove structure and operation of a broader set of UDE products strictly for the purposes of proving, as to products accused of infringing the Patents-in-Suit, the structure and operation of the products in the 'Representative MPN' for all other products in the 'Represented Product' column of the same row in the table below":

| Representative MPN | Represented Products |
| --- | --- |
| GMD-AA-0002 | MPNs with first letter "G" not including MPNs with first four characters "GX-X" |

ECF No. 124 at 2-3.

On November 4, 2020, almost three years after filing this case, Plaintiff "attempted to seek leave from the Court to amend the infringement contentions but was informed by the Court . . . that such a motion would not be heard." Proposed Pretrial Order Attached as Exhibit 7 to Def. Oppo., ECF No. 151-9 at 7, 27-28. Despite the fact that the Court denied Plaintiff leave to amend its infringement contentions and even though the Parties entered into the Representative Product Stipulation governing representative products, which did not include the S3Y-HP-0001 product as representative of the S Series, on November 10, 2020, Plaintiff served Amended Infringement Contentions on Defendant. These Amended Contentions asserted (1) the S3Y-HP-0001 as representative of the S Series and (2) new claims pertaining to the 318 Patent not previously asserted or discussed in the SAC. *See* Pltff. Mot. at 2:18-21. Forty-two days after service of these contentions, on December 22, 2020, discovery concluded in this case. ECF No. 119.

On December 29, 2020, Plaintiff filed for partial summary judgment as to direct infringement pertaining to claims (1) 1, 3-7, and 11 of the 318 Patent and (2) 1, 7, and 10-12 of the 840 Patent for Defendant's S Series Accused Products. *See* Pltff. Mot. That same day, Defendant filed a motion for summary judgment and *Daubert* motion. *See* Def. Mot. Defendant asks the Court to grant summary judgment of non-infringement in Defendant's favor as to (1) all of Plaintiff's claims on the issue of indirect or induced infringement and (2) as to Plaintiff's claims of infringement pertaining to the GX-X, N, and S-Series of Products. Def. Mot. at 5-6. Defendant also asks the Court to exclude various opinions provided by Plaintiff's expert as unreliable and speculative. *Id.* at 6.

-12-

1
2
3
4

On January 6, 2021, the Final Pretrial Conference took place in this case, ECF No. 125, as trial in this case had been scheduled for February 17, 2021, ECF No. 123.  However, due to the COVID-19 pandemic, and Orders of the Chief Judge Nos. 56, 60, this Court vacated the jury trial indefinitely until one could be safely conducted.  *See* ECF No. 145.

5
6
7

On January 15, 2020, both parties opposed each other's motions and filed related motions to seal.  *See* ECF No. 146-151.  On January 25, 2020, both parties riled reply briefs along with additional motions to seal.  *See* ECF Nos. 152-157.

8
9

## III.   LEGAL STANDARD
### A.   Summary Judgment

10
11
12
13
14
15
16

Where a moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court must grant summary judgment.  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party."  *Id*.

17
18
19
20
21
22
23
24
25
26
27
28

If the moving party has the burden of proof at trial on an issue, like Plaintiff, that party must affirmatively show that no reasonable jury could find other than in the moving party's favor.  *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).  The moving party may make this showing by identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. If the moving party will not bear the burden of proof at trial, like Defendant, that party may "after adequate time for discovery," show that the opposing party who will bear the burden of proof at trial cannot "make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex*, 477 U.S. at 322.  If the moving party makes such a showing, then, "the plain language of Rule 56(c) mandates the entry of summary judgment."  *Celotex*, 477 U.S. at 322; *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Thus, the party moving for summary judgment bears the initial burden

-13-

1  of identifying those portions of the pleadings, discovery, and affidavits that demonstrate
2  the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

3       If a moving party carries its burden of showing the absence of evidence as to an
4  essential element of the opposing party's case (e.g., a genuine issue of material fact), "the
5  burden then shifts to the non-moving party to designate specific facts demonstrating the
6  existence of genuine issues for trial." *Oracle*, 627 F.3d at 387; *see also Fed. Trade*
7  *Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009).  "This burden is not a light
8  one." *Oracle*, 627 F.3d at 387.  The party opposing the motion for summary judgment
9  "must show more than the mere existence of a scintilla of evidence" by coming forward
10  "with evidence from which a jury could reasonably render a verdict in the non-moving
11  party's favor." *Oracle*, 627 F.3d at 387.  The nonmoving party must go beyond the
12  pleadings and designate facts showing a genuine issue for trial. *Bias v. Moynihan*, 508
13  F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).  It can do this by citing
14  to specific parts of the materials in the record or by showing that the materials cited by the
15  moving party do not compel a judgment in the moving party's favor. FED. R. CIV. P. 56(c).

16       In ruling on a motion for summary judgment, the substantive law governing a claim
17  determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir.
18  2009).  The court also draws inferences from the facts in the light most favorable to the
19  nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir.
20  2011); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587
21  (1986).  However, the nonmoving party's mere allegation that factual disputes exist
22  between the parties will not defeat an otherwise properly supported motion seeking
23  summary judgment. *See* FED. R. CIV. P. 56(c).  Further, if the factual context makes the
24  nonmoving party's claim as to the existence of a material issue of fact implausible, that
25  party must come forward with more persuasive evidence to support his claim than would
26  otherwise be necessary. *Matsushita*, 475 U.S. at 587.

27       For motions for summary judgment involving patent infringement, the party
28  claiming patent infringement must prove infringement "by a preponderance of the

-14-

1  evidence, which simply requires proving that infringement was more likely than not to

2  have occurred," *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341, n.15

3  (Fed. Cir. 2005) (internal citations omitted).  Because the ultimate issue of infringement is

4  a question of fact, *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,

5  942 F.3d 1119, 1129 (Fed. Cir. 2019), infringement issues that require courts to draw

6  inferences from the known facts are not well-suited to summary judgment because all such

7  inferences must be drawn against the moving party, *Matsushita*, 475 U.S. at 587.  A moving

8  party seeking a judgment of non-infringement, however, does not "have to support its

9  motion [for summary judgment] with evidence of non-infringement."  *Exigent Tech., Inc.*

10  *v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006).

11  ### B.   Motion to Exclude Expert Opinions

12  Federal Rule of Evidence 702 establishes the following requirements for

13  admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as

14  an expert by knowledge, skill, experience, training, or education; (2) the scientific,

15  technical, or other specialized knowledge must assist the trier of fact" either "to understand

16  the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on

17  sufficient facts and data"; (4) the testimony must be "the product of reliable principles and

18  methods"; and (5) the expert must reliably apply the principles and methods to the facts of

19  the case. FED. R. EVID. 702.

20  Under *Daubert* and its progeny, the district court must assure expert testimony "both

21  rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow*

22  *Pharm., Inc.*, 509 U.S. 579, 597 (1993).  "Expert opinion testimony is relevant if the

23  knowledge underlying it has a valid connection to the pertinent inquiry."  *Primiano v.*

24  *Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  Courts will find expert opinion testimony

25  "reliable if the knowledge underlying it has a reliable basis in the knowledge and

26  experience of the relevant discipline."  *Id.*  However, parties should attack shaky but

27  admissible evidence by cross-examination, contrary evidence, and careful instruction on

28  the burden of proof, not outright exclusion. *Daubert*, 509 U.S. at 596.  The judge is "to

-15-

1   screen the jury from unreliable nonsense opinions, but not exclude opinions merely because

2   they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960,

3   969 (9th Cir. 2013).

4       The Supreme Court has requires courts to consider several factors when evaluating

5   the reliability of expert testimony: (1) whether a theory or technique is testable; (2) whether

6   it has been published in peer reviewed literature; (3) the error rate of the theory or

7   technique; and (4) whether it has been generally accepted in the relevant scientific

8   community. *Mukjtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002), *overruled

9   on other grounds by Estate of Barabin v. Asten Johnson, Inc.*, 740 F.3d 457, 460 (9th Cir.

10  2014). These factors are meant to be "helpful, not definitive." *Kumho Tire Co. v.

11  Carmichael*, 526 U.S. 137, 151 (1999). The Court retains "discretion to decide how to test

12  an expert's reliability as well as whether the testimony is reliable, based on the particular

13  circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation

14  marks omitted). "[T]he test under *Daubert* is not the correctness of [experts'] conclusions

15  but the soundness of [their] methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

16  43 F.3d 1311, 1318 (9th Cir. 1995).

## IV.   **DISCUSSION**

18      A patent is defined as "[t]he right to exclude others from making, using, marketing,

19  selling, offering for sale, or importing an invention for a specified period (20 years from

20  the date of filing), granted by the federal government to the inventor if the device or process

21  is novel, useful, and nonobvious." Garner, Brian A., *Black's Law Dictionary* (11th ed.

22  2019) (citing 35 U.S.C. §§ 101-103). The Patent Act of 1952, which was later revised by

23  the Leahy-Smith America Invents Act ("AIA"), provides for the granting and issuance of

24  patents; sets out the requirements and procedures for securing a patent; and provides a

25  federal cause of action for patent infringement. *See* 35 U.S.C. § 1, *et seq.* The AIA grants

26  protection for three types of patents, one of which includes utility patents. *R.R. Donnelley

27  & Sons, Co. v. United States*, 40 Fed. Cl. 277, 279, n.6 (1998). Utility patents protect new,

28  nonobvious, and useful products, processes, machines, devices, and/or other inventions and

-16-

"comprise the vast majority (approximately 95%) of all issued patents."  35 U.S.C. § 101; *see also R.R. Donnelley*, 40 Fed. Cl. at 279, n.6.

This case involves Plaintiff's allegations of infringement of its utility patents. Section 271 of the AIA defines infringement to include (1) direct infringement, 35 U.S.C. § 271(a), and (2) indirect infringement arising out of either induced infringement, where a party actively induces a third-party to infringement a patent, 35 U.S.C. § 271(b), or contributory infringement, where the accused party supplies a component or material used to infringe on a patent, 35 U.S.C. 271(c).  Plaintiff's SAC claims Defendant committed acts of direct infringement, induced infringement, and contributory infringement.

Plaintiff's Motion for Summary Judgment raises the issue of direct infringement while Defendant's Motion for Summary Judgment addresses both direct and induced infringement.  Neither party moved on the grounds of contributory infringement.  Both direct and indirect patent infringement require a two-step analysis.  *Grober v. Mako Prod., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012).  First, courts determine "the scope and meaning of the patent claims asserted."  *Id.* Having already undertaken a claim construction in this case, *see* Order, ECF No. 107, the Court has completed this step.  Second, courts compare the asserted patent claims to the allegedly infringing devices.  *Id.*  However, infringement of a patent only becomes relevant if the infringing acts fall within the purview of the AIA by taking place within the U.S. in some manner.

"It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) ("*Power Integrations I*").  Thus, the AIA's definition of direct patent infringement only applies to acts taking place within the country by providing: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, **within the United States** or **imports into the United States** any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271(a) (emphasis added).  Consequently, "purely extraterritorial conduct cannot constitute *direct* infringement of a U.S. patent, as § 271(a) includes express

-17-

language limiting its scope to domestic acts." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302 (Fed. Cir. 2012).  In sum, direct infringement occurs where the accused party commits one of the following acts within the U.S.: making, using, offering to sell, selling, or importing the patented invention.  35 U.S.C. § 271(a).

"Unlike direct infringement under 35 U.S.C. § 271(a), which must occur in the United States, liability for induced infringement under § 271(b) can be imposed based on extraterritorial acts, provided that the patentee proves the defendant possessed the requisite knowledge and specific intent to induce direct infringement in the United States." *See, e.g.*, *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (finding substantial evidence the plaintiff intended to induce infringement because the plaintiff did not dispute that it (1) knew of the patents in suit, (2) was informed the product it manufactured, co-developed, and sold was covered by the patents, (3) had a 50% worldwide market share, and (4) had customers that sold televisions in the U.S.). Thus, in this case, Plaintiff must, at a bare minimum, prove that an EMS or brand company sold or imported a device containing Defendant's ICMs.  Plaintiff must also prove that Defendant both knew and intended the EMS or brand company would sell its product in the U.S.  *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033-34 (Fed. Cir. 2002).

Plaintiff moves for summary judgment as to its claims for relief pertaining to the S Series of Accused Products only, seeking a judgment that the S Series of Accused Products directly infringe the 318 and 840 Patents.  *See* Pltff. Mot.  In order to secure summary judgment, even before establishing whether Defendant's products infringe on Plaintiff's Patents-in-Suit, Plaintiff must show there is no genuine issue of fact that Defendant makes, uses, offers to sell, or sells the Accused Products in the U.S.  Def. Oppo. at 7:3-5. Defendant, on the other hand, seeks summary judgment that Defendant did not induce infringement of any of Plaintiff's Patents-in-Suit.  *See* Def. Mot.  Defendant also seeks a summary judgment of non-infringement on the issue of direct infringement of the S, GX-X, and N Series of Accused Products by claiming Plaintiff lacks evidence creating a

1   genuine issue of material fact as to infringement of those products.  *See* Def. Mot.

2       As discussed below, the Court denies Plaintiff's motion for summary judgment as

3   to direct infringement for the S Series of Products.  The Court grants Defendant's motion

4   for summary judgment on the basis that Defendant has shown the absence of evidence in

5   the record showing induced infringement.  The Court also grants Defendant's motion for

6   summary judgment on the issue of direct infringement as to the GX-X Series, S Series, and

7   N Series of Accused Products—with the exception of MPNs S3H-HP-0001 and N42-ZT-

8   0001—also due to the absence of evidence in the record showing infringing acts within the

9   U.S.  While neither party moved for summary judgment as to the G Series of Accused

10  Products, the Court orders Plaintiff to show cause as to why the Court should not grant

11  summary judgment, *sua sponte*, in Defendant's favor as to all claims in this case by

12  providing evidence of infringing acts within the U.S. sufficient to substantiate the

13  remaining claims of direct and contributory infringement Plaintiff pursues in this case.

14  **A.    <u>Plaintiff's Motion for Summary Judgment as to Direct Infringement of</u>**

15  **<u>the 318 and 840 Patents by Defendant's S Series of Products</u>**

16      Plaintiff seeks partial summary judgment by arguing that the undisputed facts in this

17  case show Defendant's MPN S3Y-HP-0001 (1) directly infringes claims 1, 3-7, and 11 of

18  the 318 Patent and claims 1, 7, and 10-12 of the 840 Patent as outlined in Pulse's Amended

19  Infringement Contentions and the Expert Report of Mr. Les Baxter and (2) is representative

20  of MPNs with first letter "S" for purposes of this litigation. Pltff. Mot. at 2:16-25.  Plaintiff

21  argues Defendant has not identified any claim element from the 318 Patent or 840 Patent

22  allegedly missing from the representative S Series MPN S3Y-HP-0001.  *Id.* at 2:7-9.

23      To prevail on its motion for summary judgment, Plaintiff must prove that

24  Defendant's Accused Products literally infringe all limitations of the asserted claims for

25  Plaintiff's Patents-in-Suit.  *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347,

26  1360 (Fed. Cir. 2019).  Thus, even though a court will find patent infringement if only a

27  single claim is infringed, *Grober v. Mako Prod., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012),

28  if even a single limitation from that one claim is absent from the accused product, "there is

-19-

no literal infringement as a matter of law." *Amgen Inc. v. F. Hoffman—LA Roche, Ltd.,* 580 F.3d 1340, 1374 (Fed. Cir. 2009).

Plaintiff argues that (1) "it detailed every asserted claim element of direct infringement in its Amended Infringement Contentions," (2) its "expert provided detailed charts of UDE's infringement, including additional rationale that UDE's 'S3Y-HP-0001' is representative of UDE's 'S' Series Accused Products," and (3) once it detailed the direct infringement, Defendant and its expert failed to rebut the infringement analysis by analyzing the S3D-AR-0001 instead of the S3Y-HP-0001. Ptff. Mot. at 5:1-9. Thus, Plaintiff argues the aforementioned facts along with the Court's Claim Construction and undisputed evidence as to the structural components of Defendant's S Series Accused Products entitle Plaintiff to summary judgment of direct infringement. *Id.* at 5:9-12.

In its Opposition, Defendant argues the Court should deny Plaintiff's Motion for three reasons: First, Plaintiff fails to present any admissible evidence that Defendant commits any of the five acts recited in 35 U.S.C. § 271(a) qualifying as direct infringement within the U.S., or that the S Series of Products ever even arrived in the U.S. Def. Oppo. at 5:6-12, 6:16-18. Second, Defendant contends that Plaintiff's mere e-mail from Defendant's counsel and expert testimony fail to show that the S3Y-HP-0001 is representative of the entire S Series of Products. *Id.* at 5:13-24, 6:18-20. Third, Defendant argues that the deposition testimony of Defendant's technical expert, Dr. Michael Lebby, opining that the S Series of Products do not infringe the Patents-in-Suit, at a minimum, creates a genuine issue of material fact as to whether the S Series of Products even practice the asserted Patents-in-Suit. *Id.* at 5:25-6:22.

In response, Plaintiff argues the Court should grant it summary judgment that the S Series of Accused Products directly infringe the asserted claims because (1) Plaintiff only seeks "partial summary judgment that UDE's 'S' Series Accused Products directly infringe," ***not*** "that UDE performs directly infringing acts in the United States"; (2) "the S3Y-HP-0001 is representative for 'MPNs with first letter 'S'"; and (3) Defendant's technical expert did not opine on the S3Y-HP-0001, and thus, partial summary judgment

-20-

for the S Series of Accused Products is warranted.  Reply at 2:21-28.

To support its Motion for Summary Judgment, Plaintiff primarily relies on two items: (1) Plaintiff's Amended Infringement Contentions and (2) the expert report prepared by its infringement expert, Les Baxter ("Mr. Baxter"), rather than his sworn deposition testimony.  This alone warrants denying this motion.  First, infringement contentions are not evidence.  *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11 Civ. 5341, 2014 WL 2859280, at *8 (N.D. Cal. June 20, 2014).  Second, the Court cannot rely on expert reports for conclusions of law.  *See, e.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) (holding "broad conclusory statements offered by Telemac's experts are not evidence and are not sufficient to establish a genuine issue of material fact").  For these reasons along with those outlined below, the Court **DENIES** Plaintiff's Motion for Summary Judgment on the grounds that (1) Plaintiff has failed to provide any admissible evidence showing that any of Defendant's products directly infringe claims 1, 3-7, and 11 of the 318 Patent[8] or claims 1, 7, and 10-12 of the 840 Patent; (2) a genuine issue of material fact exists as to whether the S3Y-HP-0001 is representative of the S Series Accused Products; and (3) expert opinions on legal conclusions may not defeat summary judgment.  *Telemac*, 247 F.3d at 1329.

### 1.   *Plaintiff Has Failed to Show the Absence of a Genuine Issue of Fact as to Direct Infringement of the "S" Series of Products*

Defendant argues that "in order to prevail on summary judgment, Pulse must show that there is no genuine dispute that UDE makes, uses, offers to sell, or sells in the United States, or imports into the United States the accused products."  Def. Oppo. at 7:3-5.  However, Defendant argues that Plaintiff cannot make this showing because it "fails to

---

[8]   As discussed, although Plaintiff seeks summary judgment by arguing Defendant's products directly infringe claims 1, 3, 4, 5, 6, 7, and 11 of the 318 Patent, the Court only considers Claims 14 and 17.  The Court finds consideration of the other claims mentioned improper as Claims 14 and 17 are the only claims alleged to infringe in the operative complaint, and Plaintiff admits it amended its infringement contentions in direct violation of the Court's instructions, Scheduling Order, and the Local Patent Rules.

present any admissible evidence that the S3Y-HP-0001 product, let alone any of the other 'S' Series products, ever enter the United States." *Id.* at 5:8-9.  Plaintiff responds that the S Series products directly infringe because Defendant's customers—not Defendant itself—"each make, use, offer to sell, or sell the 'S' Series products in the United States, or import the 'S' Series products into the United States."  Pltff. Reply at 3:2-4.

The Supreme Court has reiterated that "[t]he general rule under United States patent law is that no infringement occurs when a patented product is made and sold in another country."  *Microsoft Corp. v. AT & T Corp.,* 550 U.S. 437, 441 (2007).  Plaintiff tries to show direct infringement in this case by relying on (1) evidence of HPE's sales of its own products, (2) invoices from Defendant with a "Bill to" address in the U.S., and (3) the fact that Defendant provided Plaintiff with product samples in response to discovery requests and as required by a court order in this case.  *See* Def. Oppo. at 7:6-9.

Plaintiff argues that the relevant inquiry in this case is "whether UDE's end customers in the U.S. directly infringe."  Pltff. Mot. at 3:4-6.  The Court disagrees.  As discussed below, ample case law supports the Court concluding that Plaintiff's evidence fails to show the absence of a genuine issue of fact as to whether infringing acts took place within the U.S.  Thus, even if the Accused Products infringe on the Patents-in-Suit, a conclusion the Court has not drawn, the record indicates Plaintiff is not entitled to summary judgment on infringement because the evidence to date indicates the allegedly infringing acts (e.g., making, using, selling, or offering to sell) do not take place within the U.S.

a.   *Third-Party HPE's Sales of HPE's Own Products*

As stated, Plaintiff argues that Defendant commits direct infringement in the U.S. because third-party HPE sells and offers to sell HPE products in the U.S. that contain Defendant's ICMs.  Pltff. Mot. at 3:1-4.  Defendant responds that Plaintiff "makes no attempt to show how ***third-party HPE's*** sales or offers to sell ***HPE's own products*** is a sale or offer to sell ***by UDE***."  Def. Oppo. at 7:23-24 (original emphasis).  Defendant reiterates that it "does not sell or offer to sell HPE products" and only "sells components outside the United States to third-party manufacturing companies who then sell end-

-22-

customer products to brand companies (e.g., ███), which brand companies then sell those end-customer products (e.g., an ███ networking switch)." *Id.* at 7:24-8:1.   Plaintiff responds that Exhibits 7 and 8 submitted in support of its motion, show HPE JL-network switches that use the S3Y-HP-0001 shown in Exhibit 9 offered for sale (albeit by a third-party on the third-party's website) available to ship to a U.S. address.   Pltff. Reply at 3:21-26.   Thus, Plaintiff argues that "no genuine issue of material fact exists that the JL-series with infringing UDE 'S3Y-HP-0001' is offered for sale in the U.S." *Id.* at 3:26-27.   The Court finds that Plaintiff's evidence pertaining to third-party HPE shows a genuine issue of fact exists as to infringement for the below reasons.

First, the exhibits Plaintiff submits to prove Defendant or HPE sell products in the U.S.—namely, Exhibits 7 and 8—do not, in fact, prove either of HPE or UDE sells their products there, much less that HPE's products even contain Defendant's products.   *See* Def. Oppo. at 8:1-6.   Rather, those exhibits show that "third parties ServerSupply (Ex. 7) and ProVantage (Ex. 8) appear to be making the sales or offers to sell." *Id.* at 8:3-5.

Second, Exhibits 7 and 8 show, at a minimum, a genuine issue of fact exists as to whether the HPE products sold by Server Supply and ProVantage even contain Defendant's Accused Products.   Defendant argues that even if some of the identified product models use its Accused Products, Plaintiff "does not attempt to show that the ***specific products*** sold or offered for sale in the United States contain UDE's accused products." Def. Oppo. at 8:12-14.   Defendant states that a manufacturing company that uses its products typically sources ICMs from one to four other ICM manufacturers for the same end-product, meaning, *assuming arguendo*, any of Defendant's Accused Products were incorporated into third-party devices that arrived in the U.S., those Accused Products could be found in as few as 10% to as many as 50% of the units for a given networking device. *Id.* at 8:15-19.   Defendant also argues that the products shown in Exhibits 7 and 8 do not appear to contain the class of Accused Products much less the S Series of Products on which Plaintiff seeks summary judgment.   Def. Oppo. at 8:22-24.   Rather, Exhibit 7 shows a product described as having several single port ICMs and 1 Gigabit, but Plaintiff

-23-

"only accuses multi-port ICMs, i.e., 2xN **not** 1xN" that are multi-gigabit (e.g., 2.5G, 5G, 10G). *Id.* at 8:24-9:3. As for Exhibit 8, Defendant argues that it is unclear whether that product is relevant at all because Plaintiff only accuses ICM port products, but Exhibit 8 describes the product as having non-ICM ports with 25 GbE, 40 GbE, and 100 GbE speeds, and Defendant only sells ICM ports with speeds of 2.5G, 5G, and 10GbE speeds. *Id.* at 9:4-10. That being said, Exhibit 8 "does describe 10GbE speeds, which is accused, but there is no indication those are 10 GbE ICMs, as opposed to alternative and unaccused technology like discrete LAN or SFP/QSFP." *Id.* at 9:10-12.

Plaintiff responds by disputing Defendant's contention that the HPE switches offered for sale in the U.S. shown in Exhibits 7 and 8 contain other parts that are not the S3Y-HP-0001 "because the evidence shows 'S3Y-HP-0001' is included in the JL-series HPE switches." Pltff. Reply at 4:5-8. Plaintiff relies on Exhibit 9 to support this argument, but this exhibit merely shows Sanmina's product descriptions, Defendant's MPN, the Supplier Name, an HPE Product Number, and the quantity of Sanmina's—not Defendant's—products shipped to the U.S. from January 1, 2021 to June 18, 2020 along with the quantity shipped to non-U.S. locations. *See* ECF No. 153-1 at 3. Thus, this proves the quantity of Sanmina's products shipped to the U.S. However, even establishing Defendant supplies its ICMs to Sanmina, this evidence does not address the problem of multi-sourcing. In other words, unless Defendant supplied 100% of the Sanmina products incorporated into the HPE devices shipped to the U.S., it does not prove infringement. As long as HPE devices are distributed worldwide and use multiple suppliers for ICMs, Pulse's ICMs rather than Defendant's could feasibly be in all devices shipped to the U.S.

Finally, Plaintiff argues that Exhibit 12 submitted concurrently with its Reply Brief, contradicts Defendant's argument that it only sells to manufacturing companies rather than end customers. Pltff. Reply at 3:21-26 (citing to Exhibit 12 to its Reply Brief, ECF No. 153-4 at 5). However, Exhibit 12 is an e-mail from an ▮ employee to one of Defendant's employees, and the referenced price offering by Defendant is eligible and unreadable. *See id.* Assuming the e-mail is what Plaintiff represents it is (*i.e.*, a price offering to ▮), it

-24-

still would not prove direct infringement as Plaintiff provides no proof the sale or offer to sell took place was in the U.S.  This is especially true considering the ███ representative in the e-mail, ████████, has a signature block indicating she is located in Singapore.  ECF No. 153-4 at 5.  Plaintiff also argues that Defendant "knows the corresponding end customer part numbers for its ICMs," citing Exhibit 12, ECF No. 153-4 at 3-4, implying that knowing the corresponding ███ part numbers that incorporate Defendant's products somehow means Defendant knows its products will end up in the U.S.  However, as discussed in further detail later in this order, this proves nothing.  The evidence indicates ███ makes sales throughout the U.S. but also throughout other countries, and Plaintiff has offered no proof that the products discussed in Exhibit 12 were sold in the U.S.

Plaintiff's evidence, including but not limited to Exhibits 7-9 and 12 show a genuine issue of fact as to whether the S Series of Products infringe the 318 and 840 Patents.

### b.   *Invoices with a "Bill To" Address in the U.S.*

Plaintiff argues that Defendant also commits of direct infringement because two invoices show a "Bill to" address within the U.S.  Pltff. Mot. at 3:4-6.  Defendant argues that (1) Plaintiff "does not even bother to submit to the Court the evidence on which it relies" in violation of Local Rule 7.1(f)(2)(a),[9] Def. Oppo. at 9:23-10:28, and (2) invoices with a "Bill to" address do not establish direct infringement.  Def. Oppo. at 5:23-6:6.

_____

[9]   Local Rule 7.1(f)(2)(a) requires, "[i]n addition to the affidavits required or permitted by Fed. R. Civ. P. 6(d) and 56, copies of all documentary evidence which the movant intends to submit in support of the motion" to "be served and filed with the motion."  Plaintiff failed to submit the invoices on which it relied along with its moving papers and rather attempted to rely on the invoices once provided by Defendant in its opposition as well as by providing additional invoices in its reply brief.  Defendant contends that if Plaintiff attempts to submit the missing evidence with its reply brief, the Court should decline considering such evidence.  *Id.* at 10:24-28 (citing *Stickle v. SCI Western Market Support center, L.P.*, No. 08-083-PHX-MHM, 2009 WL 3241790, at *4 (D. Ariz. Sept. 30, 2009) ("The rule that a moving party must present all of its evidence or raise all of its legal arguments in a substantive brief, rather than in reply, is a rule rooted in the notion of fairness between parties.")).  However, given the outcome of the Court's ruling, the Court finds no prejudice to Defendant in considering the invoices.

Defendant points out that in another case in which Pulse was sued for patent infringement, Pulse advanced the same arguments Defendant advances in this case.  *See* Def. Oppo. at 11-12.  In *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1374, 1381 (Fed. Cir. 2014), *vacated and remanded,* 136 S. Ct. 1923 (2016) ("*Halo I*"), the Federal Circuit affirmed the district court's decision, holding that "the district court did not err in granting summary judgment that Pulse did not sell within the United States those products that Pulse manufactured, shipped, and delivered abroad."  In *Halo I*, the plaintiff-patent holder sued Pulse for patent infringement relating to surface mount electronic packages Pulse sold and manufactured in Asia.  *Id.* at 1375.  Pulse argued the majority of its products "were delivered outside the United States, for example, to contract manufacturers for companies such as Cisco," who then "incorporated the electronic packages supplied by Pulse into end products overseas, including internet routers manufactured for Cisco, which were then sold and shipped to consumers around the world."  *Id.*  The court noted that "[f]or those products that Pulse delivered abroad, all purchase orders were received at Pulse's sales offices abroad."  *Id.*

Like Defendant in this case, Pulse denied infringement and moved for summary judgment in *Halo I* on the grounds that it did not directly infringe the patents by selling or offering to sell products it manufactured, shipped, and delivered outside the U.S.  *Id.* at 1376.  On appeal, Pulse reiterated that its "products at issue were sold or offered for sale outside the United States because those products were manufactured, ordered, invoiced, shipped, and delivered abroad," and any "pricing discussions with Cisco in the United States were merely forecasts and were not a guarantee that Pulse would receive any actual order from any of Cisco's contract manufacturers."  *Id.* at 1377.  The Federal Circuit "agree[d] with Pulse that the district court did not err in granting summary judgment of no direct infringement with respect to those products that Pulse manufactured, shipped, and delivered outside the United States because those products were neither sold nor offered for sale by Pulse within the United States."  *Id.*  Although the parties petitioned for writ of certiorari to the Supreme Court, "[b]ecause the Supreme Court's review was limited to the

-26-

issue of enhanced damages," it "left undisturbed the judgments on other issues." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1373 (Fed. Cir. 2016) (reaffirming "the summary judgment of no direct infringement of the Halo patents by the accused products that Pulse manufactured, shipped, and delivered outside the United States").

Similarly, in *M2M Sols. LLC v. Motorola Sols., Inc.*, another case discussed by both parties, the court also granted the defendants' motion for summary judgment of non-infringement by products made and shipped outside the U.S.  No. CV 12-33-RGA, 2016 WL 70814, at *22 (D. Del. Jan. 6, 2016).  It reasoned that "because Plaintiff has failed to offer a shred of evidence that a single product shipped abroad, let alone all of them, made it into the U.S., the presumption against the extraterritorial application of U.S. patent law must govern."  *Id.*

Defendant argues that because in *Halo I*, the Federal Circuit found that there was no genuine issue of material fact as to the fact that Pulse's conduct did not qualify as direct infringement, this Court should likewise find there is no genuine issue of material fact by concluding Defendant's conduct, which is identical to Pulse's conduct in *Halo I*, is not infringement.  Def. Oppo. at 11:12-19.  Defendant also points out that Plaintiff "does not explain how the "Bill to' address in the United States somehow completely reverses this holding in its favor."  *Id.* at 11:15-17.  Defendant also posits that Plaintiff's "failure to even cite the caselaw that Pulse itself brought about is telling of the meritless nature of Pulse's case."[10]  *Id.* at 11:17-25 (arguing "[t]here is no good basis for Pulse failing to address this caselaw in the Motion," especially given Defendant has raised that legal authority multiple times throughout this case).

---

[10]    The Court reminds Plaintiff of its obligations under Rule 11 of the Federal Rules of Civil Procedure, which provides that "[b]y presenting to the court a . . . written motion, . . . an attorney . . . certifies that . . . . the . . . legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  *See also* Rule 3.3, Cal. Rules Prof. Conduct (prohibiting a lawyer from failing to disclose to the tribunal legal authority the lawyer knows to be directly adverse to the position of the client).

-27-

Plaintiff responds that Defendant's reliance on *Halo I* is misplaced because the quote on which Defendant relies "is limited to 'products that Pulse manufactured, shipped, and delivered outside the United States,'" but "[h]ere, the UDE 'S' Series ICMs are delivered within the United States by UDE and UDE's end customers." Pltff. Reply at 4:18-22. Plaintiff contends that Defendant produced eleven invoices showing the "S" Series Products were shipped and/or billed to addresses within the U.S., including eight invoices with a "Ship to" address within the U.S. *Id.* at 4:11-14 (citing Ex. 10 to Reply, ECF No. 153-2). Thus, Plaintiff argues that "even if the Court finds a 'Bill to' address is not sufficient for partial summary judgment, the invoices with a 'SHIP TO' address clearly evidence direct infringement by UDE and UDE's end customers." *Id.* at 4:14-17. However, as outlined below, Plaintiff's arguments misrepresent the legal significance of what the invoices prove. In that vein, Plaintiff's attempts to distinguish *M2M* by arguing, again, that Defendant made sales within the U.S. fail for the same reasons. *Id.* at 5:23-3.

Of the invoices produced in Exhibit 10 to Plaintiff's Reply brief, all of the invoices show the following[11]: (1) Defendant's place of business is listed as being in Taoyuan City,

---

[11] International sales contracts, like the invoices at issue, are ordinarily governed by a multilateral treaty, the United Nations Convention on Contracts for the International Sale of Goods ("C.I.S.G."), which applies to "contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States." C.I.S.G., art. 1(1)(a), 15 U.S.C. App., 52 Fed. Reg. 6262 (March 2, 1987). In this case, the United States and China are both contracting states to the C.I.S.G. *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003). Taiwan, however, is not. *See, e.g.*, *Golden-Legion Auto. Corp. v. LUSA Indus., Inc.*, No. CV-0905962-MMM-CWX, 2010 WL 11570941, at *4 (C.D. Cal. Oct. 4, 2010) (applying California law to a dispute between a Taiwanese company and California corporation).

Article 1 of the C.I.S.G. indicates that it applies "to sales contracts where the places of business of the parties are in different States, and either (a) both states are Contracting States, or (b) only one State is a Contracting State and private international law choice-of-law rules lead to the application of the law of a Contracting State." Folsom, Ralph H., 1 *International Business Transactions* § 1:4 (3d ed.) (Dec. 2020 Update). However, a contract of sale between a U.S. party and non-Contracting State, will not be governed by CISG, if U.S. law is applicable under usual choice-of-law rules. *Id.* "Instead of CISG,

-28-

Taiwan; (2) all goods were shown as being shipped from Hong Kong; (3) all goods were "Made in China"; and (4) the shipment method was "Shipped Per Truck," making it impossible for the goods to have been shipped from their place of manufacture (e.g., China) to the U.S. as any shipment would have needed to be by boat or plane.  At a minimum, the Court finds the invoices show the Accused Products were not "made" in the U.S.  While eight of the invoices show a "Forwarder" address in the U.S. and a different set of eight invoices show a "Bill to" address in the U.S., this does not prove direct infringement for the below reasons:

First, a freight forwarder is generally an agent that organizes shipments for corporations to get goods from a manufacturer, like Defendant, to a customer or final point of distribution.  *See, e.g.*, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1245 (9th Cir. 1982) ("As a freight forwarder, Clipper itself ships no goods, but rather assembles and consolidates small shipments into single lots for shipment by carrier companies.").  Even assuming the invoices show Defendant used a freight forwarder located in the U.S., because the goods would only be passing through the U.S. as part of the process of arriving at their final destination, which all invoices indicate was Hong Kong, passing through the U.S. would not qualify as a "sale," "offer to sell," or "use" *by Defendant* within the U.S.

Second, even if Plaintiff argues Defendant violated the provisions prohibiting importation[12] of infringing goods, Defendant is exporting the allegedly infringing goods

United States law for domestic sales transactions would govern, which means the Uniform Commercial Code (UCC) is applicable in forty-nine states (all but Louisiana)."  *Id.*

Despite providing the Court with over 1,777 pages of briefing and documents related to the instant cross-motions for summary judgment and motions to seal, neither party addressed what law should apply to the Court's determination of the place of sale.  Because neither party addresses this issue, the Court has requested briefing on it.

[12]   Throughout Plaintiff's Motion, Plaintiff argues the invoices show Defendant imported goods.  However, Plaintiff seems to confuse the significance of importing as opposed to exporting goods.  Importation has been widely defined as "the bringing of goods into the country."  *Largan Precision Co, Ltd v. Genius Elec. Optical Co.*, 86 F. Supp. 3d 1105, 1116 (N.D. Cal. 2015), *judgment entered,* No. 13-CV-02502-JD, 2015 WL 1940200

-29-

while the forwarder is importing the allegedly infringing goods.   As such, only the forwarder, rather than Defendant, could be liable for any allegedly unlawful importation.

Third, most of the invoices have a payment term of "Net 45 Days" or "Net 60 Days,[13]" and as to trade terms, five have the term "Collect,[14]" three have the term "F.O.B.," two have the term "F.O.B. HK,[15]" and one has the term "EXW.[16]" "'F.o.b' or 'free on board' is 'a method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer.'" *Litecubes, LLC v. N. Light Prod., Inc.*, 523 F.3d 1353, 1358, n. 1 (Fed.

---

(N.D. Cal. Apr. 29, 2015), and *aff'd sub nom. Largan Precision Co. v. Genius Elec. Optical Co.*, 646 F. App'x 946 (Fed. Cir. 2016).  Export, on the other hand, means "[t]he process of transporting products or services to another country."  Garner, Brian A., Black's Law Dictionary, EXPORT (11th ed. 2019).  In other words, if someone buys a product within the U.S. from Asia containing UDE's ICMs, the purchaser would be importing infringing goods, while the seller (whether the seller is a third-party or Defendant) would be exporting the goods.  *See, e.g.*, *Fellowes, Inc. v. Michilin Prosperity Co., Ltd.*, 491 F.Supp.2d 571, 584 (E.D. Va. 2007) (holding that where accused products were sold abroad by manufacturer "FOB China," meaning the manufacturer was an exporter and the buyers were importers).

[13]     "Net 30 Days" generally requires a purchaser to tender payment within however many number are days indicated of receiving the invoice.  *See, e.g.*, *Avery Dennison Corp. v. Home Tr. & Sav. Bank*, No. 02-2007 LRR, 2003 WL 22697175, at *1 (N.D. Iowa Nov. 7, 2003) (providing that "[t]erms of 'net 30 days' means that Group One was allowed 30 days from the invoice date to pay that invoice").  Courts have held that such payment terms can be relevant to the passing of title to goods and is another issue the parties may want to address in the requested briefing.

[14]     The term "Collect" is another trade term generally used to indicate that the receiver/purchaser is responsible for freight charges.

[15]     Because the two contracts that specify "F.O.B. HK" were shipped from Hong Kong to Hong Kong, the "HK" designation does not provide any clarity as to whether the contract is a shipment contract or destination contract.  In the absence of such clarity, if either the UCC or CISG apply, a shipment contract would be presumed.

[16]     "Under the Incoterms Ex Works (EXW) commercial term (including Ex Factory and Ex Warehouse), the seller needs only to 'tender' the goods to the buyer by placing them at the buyer's disposal at a named place of delivery and notifying the buyer of the time and place where the goods will be at its disposal."  Folsom, Ralph H., *supra*, § 2:25.  "The risk of loss transfers to the buyer at the time the goods are placed at its disposal."  *Id.*

-30-

Cir. 2008) (finding patent infringement despite defendant's argument that because its sales to U.S. customers were shipped f.o.b., the sales took place in Canada, and as a result, the customer imported the goods into the U.S.).  When the delivery term is F.O.B. the place of shipment, which is otherwise known as a "shipment contract," the seller must, at the seller's place of business, ship the goods by placing them into possession of a carrier while bearing the expense and risk of putting them into the possession of a carrier.  U.C.C. § 2509(1)(a); *see also* Anzivino, Ralph C., Lacy, Philip T., 1 *Uniform Commercial Code Transaction Guide*, § 7:17, (Oct. 2020 Update); *see also* C.I.S.G., art. 67(1), 52 Fed. Reg. 6262-02. When the delivery term is F.O.B. the place of destination, also known as a "destination contract," the seller must bear the risk and expense of transporting the goods to the place of destination and tender delivery along with documents of title at the destination.  U.C.C. § 2509(1)(b); *see also* Anzivino at § 7:17; *see also* C.I.S.G., art. 67(1), 52 Fed. Reg. 6262-02; *Wheeler Lumber Bridge & Supply Co. of Des Moines, Iowa, v. United States*, 281 U.S. 572, 578-79 (1930) (holding that where a seller "engages to deliver f. o. b., not at the place of shipment, but at the place of destination, which is the place of sale and delivery[,] [t]here is no delivery, and therefore no sale, until after the transportation is completed").

At the point that risk of loss passes to the buyer, so too does title to the goods, meaning that the sale has taken place.  *C.f.* C.I.S.G., art. 53, 66, 52 Fed. Reg. 6262-02. Under both the U.C.C. and C.I.S.G., "[i]f the parties fail to indicate clearly whether their agreement is a shipment contract or a destination contract, the court will assume that the parties intended a shipment contract."  Anzivino at § 7:17; *see also Urica, Inc. v. Pharmaplast S.A.E.*, No. CV 11-02476 MMM RZX, 2014 WL 3893372, at *2 (C.D. Cal. Aug. 8, 2014), *aff'd sub nom. Urica, Inc. v. Medline Indus., Inc.*, 669 Fed. App'x 421 (9th Cir. 2016) (applying the CISG while noting that the goods at issue were shipped to the plaintiff buyer F.O.B., meaning the plaintiff "paid the freight from Egypt to Los Angeles and assumed all risk of damage to the goods during shipment").

Here, three of the invoices show the goods are to be shipped to the buyer "F.O.B.," without specifying whether it is meant to be F.O.B., the place of shipment or destination,

meaning the term "F.O.B., the place of destination" is never used, and the "contract" is presumed to be a shipment contract.  The U.C.C. defines a "sale" as "the passing of title from the seller to the buyer for a price."  U.C.C. § 2-106(1).  Thus, under a shipment contract, where the contract requires the seller to send the goods to the buyer, "title passes to the buyer at the time and place of shipment."  U.C.C. § 2-401(2)(a).  In this case, title passed to the buyers of Defendant's products either at the place of destination (e.g., Hong Kong) or the place of shipment (also Hong Kong).  As a result, unless some other law applies, under the U.C.C. or C.I.S.G., the place of sale was in China, not the U.S., and Section 271 does not apply to create liability for Defendant for direct infringement.

In sum, even though Plaintiff argues that Defendant's reliance on *Halo I* is misplaced because in this case, Defendant's S Series ICMs are delivered within the U.S. by Defendant or its end customers, Pltff. Reply at 4:18-22, this is not the case.  Contrary to Plaintiff's argument, Defendant, like Pulse in *Halo I*, never delivered made, used, offered to sell, sold, or imported goods into the U.S.  *Accord MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1377 (Fed. Cir. 2005) (affirming the decision of the district court concluding the defendant's actions could not be construed by a reasonable jury to constitute a sale or offer to sell within the U.S. where the defendant manufactured accused chip wafers in Japan and sold the product to a Japanese company, who then, sold the products to its affiliate in Austin, Texas); *but see Litecubes,* , 523 F.3d at 1358, 1369-70 (holding that although the Canadian defendant did not have offices, facilities, or assets within the U.S., evidence at trial established the defendant "sold the accused products directly to customers located in the United States and . . . would ship the products, f.o.b., from its Canadian offices to its customers in the United States").

Finally, Plaintiff argues Defendant's damages expert, Justin Blok ("Mr. Blok"), opined "that UDE sells less than 30% of its products in the U.S., not that UDE does not sell its product in the U.S." Pltff. Reply at 5:12-13 (citing Blok Report at 3, ¶ 86).  However, an examination of the Mr. Blok's report reveals he did not, in fact, testify to this fact:

**In the absence of evidence of UDE's actual sales of Accused**

**Products in the U.S.**, I have conservatively adopted the assumption that 30% of UDE's Accused Product revenues were generated from end-products that were sold in the U.S., as provided by the Cobb report.  As discussed in greater detail below, there is substantial evidence that the 30% figure is not representative of the percentage of UDE's Accused Products that are sold in the U.S., and in fact, may be much lower.

. . . .

As of the date of this report, **UDE has produced information pertaining to the sale of Accused Products worldwide** for the period from January 16, 2015 through September 30, 2020.

*See* Blok Report at 3, ¶ 86, 4, ¶ 111.  In other words, Mr. Blok's testimony establishes that there is no evidence, whatsoever, of Defendant's actual sales of products in the U.S., and that any figures he mentions are estimates based on sales of Defendant's products worldwide.  *But see Halo*, 769 F.3d at 1379 (holding that direct infringement will not be found for products made and sold abroad).  Plaintiff also argues that Mr. Blok "cites evidence from two of UDE's customers that reflect U.S. Sales between 7.2% and 15.4%." Pltff. Reply at 5:14-15 (citing Blok Report at 5-6, ¶ 167).  Again, an examination of Mr. Blok's report reveals he did not testify that Defendant had U.S. sales in that amount; rather, he testified that Defendant's customers, who incorporate Defendant's products into their own products, have sales in those amounts.  *See* Blok Report at 5-6, ¶ 167.  Similarly, Exhibit 14, on which Plaintiff also relies to establish U.S. sales, only establishes Defendant's worldwide sales from 2015 through September 30, 2020 and does not offer a way for the Court to decipher whether any of those sales were made within the U.S.  ECF No. 142-10 at 1-42.

In sum, Plaintiff's evidence fails to establish the absences of a genuine issue of fact as to whether Defendant makes sales within the U.S., as is required for direct infringement.

        c.   *Defendant's provision of produced samples in compliance with the Court's order is not direct infringement*

Plaintiff argues that direct infringement is satisfied because its expert, Mr. Baxter, obtained the S3Y-HP-0001 from its counsel, who received it "from UDE's counsel that originally imported the 'S3Y-HP-0001.'"  Pltff. Mot. at 4:6-11.  In other words, Plaintiff

-33-

contends that when Defendant provided a sample of the S3Y-HP-0001 product to Plaintiff as part of discovery, Defendant committed an act of infringement. *Id.* Defendant responds that it only produced the sample pursuant to the Court's June 16, 2020 order, Def. Oppo. at 13:5-7, which provided: "Defendant is **ORDERED** to produce a sample for inspection of the requested products, to the extent Defendant possesses such sample(s), at a reasonable cost to Plaintiff." Order, ECF No. 97 at 1:25-27. In compliance with this order, Defendant shipped samples of the S3Y-HP-0001 to San Diego, California for inspection by Plaintiff, which Plaintiff argues constitutes infringement. Def. Oppo. at 13:7-10.

While some cases have held that providing samples constitutes infringement, *Largan*, 86 F. Supp. 3d at 1117, Defendant correctly points out the absurdity of applying Plaintiff's argument in this case, where the samples were provided pursuant to court order:

> If Pulse's theory were correct, then literally every defendant in every patent infringement lawsuit in the United States would always be liable for a directly infringing act: plaintiff need only serve a request for inspection of the accused product and defendant is automatically liable. The only alternative would be to not comply with discovery obligations and be held in contempt of court. So, Pulse's view of direct infringement means every defendant is either automatically liable or must violate the Federal Rules of Civil Procedure and be held in contempt of court. For what it is worth, under Pulse's theory, it would also seem that the Court itself is liable for induced infringement for inducing UDE to commit an act of direct infringement through the above referenced Order compelling the production of samples.

Def. Oppo. at 13:11-21. The Court agrees with Defendant and rejects any argument that Defendant committed direct infringement by complying with a court ordered requiring it to product a sample of the product.

In sum, Plaintiff fails to overcome the presumption against extraterritoriality by relying on (1) products sold by non-parties that Plaintiff has not proven contained Defendant's ICMs, (2) invoices with a "Bill to" address in the U.S., or (3) samples provided by Defendant pursuant to Court order. The Court denies Plaintiff's motion for summary

-34-

judgment as to direct infringement as to the "S" Series of Products.

### 2. *A Genuine Issue of Fact Exists as to Whether the MPN Is Representative*

Where a patent holder accuses multiple models of a defendant's accused product of infringing on the patented product, the patent holder must prove that each and every accused model contains every limitation. *Duncan*, 914 F.3d at 1360. However, a patent holder may carry its burden of proof by showing that (1) a representative example infringes and (2) every accused model conforms to that representative example. *Accord Infineon Techs. AG v. Volterra Semiconductor*, No. C-11-06239 MMC (DMR), 2013 WL 5366131, at *4 (N.D. Cal. July 31, 2013) ("A patentee is not required to provide a claim chart for each accused product if the chart provided is representative of the other accused products."). "Courts have previously held that the representative method of disclosing infringement contentions is appropriate, provided the infringement contentions provide reasonable notice of the patent owner's theories of infringement." *ASUS Computer Int'l v. Round Rock Research, LLC*, No. 12-CV-02099-JST, 2013 WL 5545276, at *3 (N.D. Cal. Oct. 8, 2013). Absent evidence provided by such a representative example, the patent holder must provide proof for each accused product.

Plaintiff argues that the Court should grant it summary judgment of direct infringement because (1) S3Y-HP-0001 is representative of MPNs with the first letter "S," (2) Pulse amended its infringement contentions to include the S3Y-HP-0001 model as representative of the S Series, and (3) Defendant failed to identify any claim element from the 318 and 840 Patents missing from the representative "S" Series MPN S3Y-HP-0001. Mot. at 2:2-21. The Court denies Plaintiff's Motion for Partial Summary Judgment on the basis that the record in this case clearly indicates that a genuine issue of fact exists as to whether S3Y-HP-0001 is representative of the "S" Series Products. To the extent Plaintiff argues that infringement is established because Defendant "provided no evidence to rebut the direct infringement of the representative 'S3Y-HP-0001' ICM," so "no genuine issue of material fact precludes Pulse from partial summary judgment for direct infringement of

-35-

the '840 patent and '318 patent for UDE's 'S' Series ICMs," the Court disagrees.  This argument disregards the fact that Defendant rescinded its comments regarding the S3Y-HP-0001 as being representative, and the only stipulation on record is as to another product. Further, because Plaintiff improperly amended its infringement contentions, Defendant was not required to respond to those amended contentions.

a.   *The Parties Did Not Enter a Binding Stipulation as to Representativeness for the S Series of Products*

Plaintiff's primary basis for alleging that S3Y-HP-0001 is representative of the S Series is an e-mail from Defendant's counsel, presented without context, that asserts the parties reached an agreement to stipulate to this issue. Def. Oppo. at 14:21-24 (citing ECF No. 143-4).  Defendant contends that this was merely an initial proposal.  *Id*. at 14:24-15:4.

Rule 29 of the Federal Rules of Civil Procedure allows parties to stipulate to "other procedures governing or limiting discovery."  FED. R. CIV. P. 29(b).  Stipulations as to an issue of fact will generally be treated as binding and conclusive.  *Leuhsler v. Comm'r*, 963 F.2d 907, 911 (6th Cir. 1992) (reiterating that "narrowing disputes to the essential disputed issues is the primary function of stipulations").  "A stipulation is treated as a conclusive admission by the parties to the stipulation unless otherwise permitted by the court or agreed upon by those parties."  *Olsen v. Comm'r*, 2 F. App'x 795, 796 (9th Cir. 2001).

Plaintiff's reliance on an e-mail between counsel discussing a proposal to compromise on an issue is inappropriate in light of Defendant's rescission of the offer, which would make such evidence inadmissible at trial.  *See, e.g.*, FED. R. EVID. 408(a) (prohibiting evidence of statements made during compromise negotiations about a claim); *see also Rose v. Saginaw Cty.*, 353 F. Supp. 2d 900, 917 (E.D. Mich. 2005) (holding the plaintiffs were not entitled to judgment as a matter of law because their "reliance on letters between counsel discussing settlement proposal is inappropriate, as such evidence would not be admissible at trial").  Defendant asserts that "[t]he parties began discussing a stipulation as to representative products on September 17, 2020."  Def. Oppo. at 15:5-6 (Canavera Decl. at ¶ 15).  However, significant changes occurred between the initial

discussions and final agreement.  As a result, "[t]he parties ultimately entered into the Representative Products Stipulation containing the terms the parties could agree to: a representative for the 'G' Series of products, which would be representative of only the 'structure and operation of a broader set of UDE products.'"  *Id.* at 16:14-17 (citing Representative Products Stipulation at 1).  Defendant also argues that "there is a significant question about the admissibility of the September 23 email and its contents," and thus, the Court should not rely on it when considering Plaintiff's Motion.  *Id.* at 17:8-11.  Defendant contends that the email is inadmissible because it (1) is not a stipulation entered by the Court and binding on the parties, (2) is hearsay,[17] and (3) even if admissible, should be

---

[17]     Defendant objects to the exhibits submitted by Plaintiff in support of its Motion for Summary Judgment as well as in Opposition to Defendant's Motion for Summary Judgment on the grounds that many of the exhibits are inadmissible hearsay, cannot be authenticated, or lack foundation.  *See, e.g.*, Def. Reply at 9:1-6 (objecting that many of documents on which Plaintiff "relies on are inadmissible hearsay lacking foundation and authentication, which will be excluded at trial") (citing Fed. R. Evid. 802, 901).  The Court addresses all arguments raised by Defendant in both motions as follows:

Defendant correctly notes that "hearsay evidence 'is inadmissible and may not be considered by this court on review of a summary judgment.'"  *Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 681 (Fed. Cir. 1997); *see also* FED. R. EVID. 801 (defining hearsay); FED. R. CIV. P. 56(c)(1)(B).  However, under the business records exception to the hearsay rule, certain business records are excluded from the rule against hearsay, where a "custodian or another qualified witness" certifies that the records meet various conditions that show the reliability of the records, and "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  *See* FED. R. EVID. 803(g).  Where a copy of business records meets the aforementioned requirements, "as shown by a certification of the custodian or another qualified person," the records are self-authenticating.  FED. R. EVID. 902(11).  Nonetheless, the 2017 Advisory Committee Notes to Rule 902 of the Federal Rules of Evidence indicate that while "the expense and inconvenience of producing an authenticating witness for this evidence is often unnecessary," the adverse party may still challenge such evidence, in which case an authenticating witness may be necessary.

Here, many of the exhibits on which Plaintiff relies did not include a declaration or affidavit from a custodian of records authenticating and laying the foundation for Plaintiff to rely on the records, and Defendant objects to Plaintiff's reliance on these records.  FED. R. CIV. P. 56(c)(2).  That being said, the Court must also draw all plausible inferences in favor of the non-moving party when ruling on a motion for summary judgment.  *Earl*, 658

-37-

excluded as prejudicial under Rule 403 of the Federal Rules of Evidence. *Id.* at 17:11-21.

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (affirming the district court's decision to exclude the plaintiff's exhibits submitted in opposing the defendant's motion for summary judgment because the exhibits are inadmissible due to inadequate authentication or hearsay, and as such, did not present a triable issue of material fact). A party, like Defendant, "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). The Court agrees with Defendant that not only does the September 23 e-mail fail to show the absence of a genuine dispute on the issue of whether the S3Y-HP-0001 is representative of the "S" Series of Products, but Plaintiff has also failed to show that it is admissible. As a result, it does not show the absence of a genuine issue of fact as to whether the S3Y-HP-0001 is representative.

   b.   *Plaintiff's Expert's Testimony Also Creates a Genuine Issue of Fact as to Whether the S3Y-HP-0001 Is Representative.*

Plaintiff's other basis for alleging that S3Y-HP-0001 is representative of the S Series is Mr. Baxter's analysis, and more particularly, the two claim construction charts attached to his expert report. Def. Oppo. at 17:26-18:2 (citing Pltff. Mot. at 4:3-5). However, the basis for Mr. Baxter's opinion that the S3Y-HP-0001 is representative of all products in the S Series is unfounded given he testified during his deposition that the S3Y-HP-0001 was the only product he ever examined. *Id.* at 18:28-19:5. In other words, if he never examined any other products in the series, how could he know whether one product was representative of another product in the same series? *Id.*

---

F.3d at 1112. As such, the Court did not rely on the e-mail to which Defendant, the non-moving party, objects when ruling on Plaintiff's Motion for Summary Judgment. However, when ruling on Defendant's Motion for Summary Judgment, the Court assumed Plaintiff's exhibits were admissible for purposes of summary judgment only, in an effort to draw all plausible inferences in Plaintiff's favor as the non-moving party. *Id.* The Court finds Defendant suffered no prejudiced by virtue of the Court's consideration of those exhibits given the Court's ultimate ruling in Defendant's favor.

Plaintiff relies on the November 10, 2020 Report of its Expert, Leslie Baxter, to support its argument that the S3Y-HP-0001 is representative of the S Series of Products, but Mr. Baxter contradicted that report during his subsequent deposition.  Def. Oppo. at 18:5-26.   In his report, Mr. Baxter stated "[t]he S3Y-HP-0001 UDE 2xN ICM is Representative of UDE 2xN ICMs that begin with 'S.'"  *See* Baxter Report, ECF No. 143-8 at 37.  He elaborated that "[t]he exemplary S3Y-HP-0001 device (charted above) is a multi-gig UDE 2xN ICM with a substantially similar structure to other UDE 2xN ICMs that begin with 'S,'" which included but was not limited to the following critical characteristics for infringement: (1) "[a] molded housing with 2xN (here, 8) ports"; (2) "internal light pipes, as well as an optical isolation element for each insert assembly"; and (3) "[m]ultiple terminal insert assemblies comprised of: [a] an insert bodies with respective sets of upper and lower terminals, [b] electronic components within the two cavities of each insert body (for respective ports), [c] a noise shield between the two cavities, within the body, [d] a top substrate that interfaces with the upper set of insert body terminals, and [e] surface mount upper and lower terminal sets (for respective ports)."  Baxter Report, ECF No. 143-8 at 37.

At his December 22, 2020 Deposition, Mr. Baxter testified he was given samples for the S Series by Plaintiff's counsel[18] and based his decision to treat the S3Y-HP-0001 model as representative of the S Series on the fact that (1) it was the only sample he was given and (2) counsel told him it was representative.  Exhibit 5 to Def. Oppo., December 22,

---

[18]    To the extent the samples creating the basis for infringement in the SAC were secured by Plaintiff's counsel, as Defendant alleges and Plaintiff admits, *see* Declaration of Robert G Gazdzinski in Support of Plaintiff's Opposition, ECF No. 149-1 at 3, ¶ 2 (declaring that he personally purchased the models on which Plaintiff relies), the Court expresses concern over Plaintiff's ability to lay foundation for and authenticate such samples unless Plaintiff intends to call its own counsel as a witness.  However, "[u]nder the advocate-witness rule, a lawyer cannot serve as an advocate in a trial in which the lawyer is likely to testify as a witness, unless an exception applies."  *Legacy Villas at La Quinta Homeowners Ass'n v. Centex Homes*, 626 Fed. App'x 679, 682 (9th Cir. 2015) (citing Model Rules of Prof'l Conduct R. 3.7; Cal. R. of Prof. Conduct 3.7).

2020 Deposition of Plaintiff's Expert, Leslie A. Baxter, ECF No. 151-7 ("Baxter Dep. Trans. I") at 4, 51:15-21.  He also admitted that while the S3D-AR-0001 is a member of the S Series, he had never examined it.  Baxter Dep. Trans. I at 6, 59:2-13.  More importantly, Mr. Baxter testified that although he never examined the S3D-AR-0001, from the images he was shown at his deposition, it did not have the characteristics for infringement such as: (1) internal light pipes as well as an optical isolation element for each insert assembly, (2) a noise shield between the two cavities, (3) a top substrate that interfaces with the upper set of insert body terminals, or (4) a surface mount upper and lower terminal sets (for respective ports).  *Id.* at 6, 58:21-61:1-20.  In other words, Mr. Baxter's Expert Report opined that all products in the S Series had eight characteristics, and because the S3Y-HP-0001 had all eight characteristics, it was representative of that series.  At Mr. Baxter's deposition, however, he testified that (1) the S3D-AR-0001 product is a member of the S Series, and (2) it does not have four of the eight features he indicated are critical features of the S Series, based on his review of the S3Y-HP-0001.  *See* Baxter Dep. Trans. I at 6, 58:21-60:13, 61:1-20.  In fact, Mr. Baxter further testified that the S3Y-HP-0001 product "appears to be somewhat different" from the S3D-AR-0001 product, and that he was unaware that the S3D-AR-0001 model accounted for ninety-four percent (94%) of all S Series sales.  *Id.* at 7, 64:2-64:11.

At a minimum, this testimony indicates the S3Y-HP-0001 is not, in fact, representative of all products in the S Series given Mr. Baxter's testimony that it is not representative of the S3D-AR-0001, another model in the S Series.  *See* Baxter Dep. Trans. I at 7, 63:19-64:1.  If Defendant is correct that the S3D-AR-0001 model is representative of the S Series of Products (rather than the S3Y-HP-0001), Mr. Baxter's testimony suggests there is no genuine issue of fact as to the fact that the S Series of Products does not infringe on Plaintiff's Patents-in-Suit.  However, the Court does not conclude the S3D-AR-0001 is not representative at this time as the issue of non-infringement of the S Series is addressed by Defendant's motion.

Defendant also argues that even if a representative product is representative of

-40-

whether other products in the series meet the limitations, it is not representative of whether those other products are also sold in the U.S.  Def. Oppo. at 19:25-20:4.  Thus, even if Plaintiff had shown Defendant sells the S3Y-HP-0001 in the U.S., which it has not, it does not establish that Defendant sold other products in the S Series in the U.S.  *Id.* at 20:4-10.  Defendant reiterates that "there is . . . an absence of evidence altogether with regard to whether UDE Commits any domestic acts with regard to the 'S' Series products."  *Id.* at 20:8-10.  Defendant also argues that Mr. Baxter's deposition testimony that the S3D-AR-0001 product does not infringe the asserted claims creates a genuine issue of fact as to whether the S Series of products infringe on the asserted patents.  Def. Oppo. at 20:11-18.  Plaintiff responds that its expert (1) "was not required to analyze the representativeness of the 'S3Y-HP-0001' ICM, because UDE explicitly represented to Pulse that the 'S3Y-HP-0001' was representative," and (2) "[t]o the extent UDE argues Mr. Baxter's expert report is not evidence, Pulse has provided its amended infringement contentions that show a similar analysis as shown in Mr. Baxter's expert report."  *Id.* at 9:3-13.  In other words, Plaintiff argues that its infringement contentions should be enough to prove the S3Y-HP-0001 is representative.  In a similar vein, Plaintiff argues that Defendant and its expert failed to rebut Plaintiff's infringement analysis regarding the S3Y-HP-0001, and instead, analyzed the S3D-AR-0001.  Reply at 10:12-13.  Plaintiff argues that by virtue of Defendant's failure to provide evidence rebutting the direct infringement of the representative S3Y-HP-0001, Defendant failed to show a genuine issue of fact as to whether the "S" Series of ICMs infringes on the 318 and 840 Patents.  Reply at 10:15-17.

As outlined in the following section, Plaintiff's Expert Report and Infringement Contentions do not show the absence of a genuine issue of fact as to whether the S3Y-HP-0001 is representative.

### 3.   *The Only Admissible Evidence Shows a Genuine Issue of Fact as to Whether the S Series Products Infringe*

Defendant argues that its "technical expert presented a sworn report opining, with detailed explanation, that the 'S' Series of products do not infringe the asserted patents,

-41-

1   and he maintained those positions at deposition."  Def. Oppo. at 5:25-27.  As such,
2   Defendant contends that even if Plaintiff made a sufficient showing that the S3Y-HP-0001
3   was representative and infringed, "which it did not, the analysis of UDE's technical expert
4   establishes, at minimum, genuine issues of material fact as to whether the "S" Series of
5   products even practice the asserted patents."  Def. Oppo. at 5:25-27.

6          First, even if Plaintiff had proven the S3Y-HP-0001 is representative of the "S"
7   Series of Products, the S3Y-HP-0001 could only be used to show that other products meet
8   the limitations of a patent claim, not "whether an accused product arrives in the United
9   States or whether UDE has conducted acts of direct infringement in the United States."
10  Def. Oppo. at 19:28-20:4.  Thus, "[e]ven if Pulse had shown that UDE sells S3Y-HP-0001
11  in the United States, that does nothing to show whether UDE sells any of the other 'S'
12  Series products in the United States," *Id.* at 20:4-6, which Plaintiff would need to establish
13  to show infringement of the other S Series products.  Second, even if Mr. Baxter's Expert
14  Report established an initial showing of infringement for the S Series of products, the
15  contrary opinions of Defendant's own non-infringement expert, Dr. Michael Lebby ("Dr.
16  Lebby"), "show that there is a genuine issue of material fact as to infringement by the 'S'
17  Series of products."  *Id.* at 20:11-14.

18         Dr. Lebby's opinions analyzed the S3D-AR-0001 product as representative of the S
19  Series of Accused Products and found that the S Series does not infringe any of the claims
20  of the Patents-in-Suit.  *See* Exhibit 6 to Def. Oppo., December 8, 2020 Rebuttal Expert
21  Report of Michael Lebby, ECF No. 151-8 at 45-74.  Thus, the Court agrees that, especially
22  in light of the opinions of Dr. Lebby, there is a genuine issue of fact as to whether (1) the
23  S3Y-HP-0001 is representative of the S Series of Products and (2) whether the S Series of
24  Products infringe on the asserted patents.

25         **4.    _The 318 Patent Claims_**

26         Both parties spend a significant portion of their briefing addressing the fact that
27  Plaintiff amended its infringement contentions in violation of the Court's instructions.
28  Plaintiff also uses its Reply Brief as an opportunity to argue the Motion to Amend Its

-42-

1    Infringement Contentions, which the Court explicitly told Plaintiff it could not file.

2    Defendant argues Plaintiff's Motion should be rejected as to the 318 Patent because the

3    claims related to the 318 Patent asserted against the S Series Products "are not properly

4    presented in this case."  Def. Oppo. at 20:21-23.  Defendant points out that since this case

5    was filed in February 2018, Plaintiff only asserted claims 14 and 17 of the 318 Patent, and

6    as a result, those were the only claims subject to claim construction.  *Id.* at 20:23-25.  Yet,

7    on November 4, 2020, in direct violation of the Court's instructions, Plaintiff asserted

8    Claims 1, 3-7, and 11 of the 318 Patent for the first time in this lawsuit, even though the

9    time for amendments as of right had passed.  *Id.* at 20:26-21:6.  Defendant indicates that

10   the only reason it knew Plaintiff filed the Amended Infringement Contentions in violation

11   of the Court's instructions was because Plaintiff told Defendant the Court had prohibited

12   Plaintiff from filing the Amended Infringement Contentions.  Def. Oppo. at 21:7-24.

13        Indeed, when Plaintiff filed its SAC, on July 16, 2020, well over two years into this

14   case, the amended complaint included an entire count of infringement pertaining to the 318

15   Patent, which only identified Claims 14 and 17 as being infringed.  SAC at 22, ¶ 71.

16   Accordingly, on July 30, 2020, when the Court undertook claim construction in this case,

17   the construction was limited to Claims 14 and 17.  *See* Claim Construction Order, ECF No.

18   107 at 1:28.  For the reasons outlined below, the Court agrees that Plaintiff's Motion should

19   be rejected as to the 318 Patent because the claims asserted beyond Claims 14 and 17 are

20   not properly before the Court.  The Court also disregards Plaintiff's Amended Infringement

21   Contentions when considering both parties cross-motions for summary judgment.

22             a.    *Infringement Contentions Are Not Evidence That Can Support
                     Summary Judgment.*

23        "[I]nfringement contentions, plainly, are not evidence standing on their own."

24   *MediaTek Inc.*, 2014 WL 2859280 at *8.  Rather, "[i]nfringement contentions provide

25   notice to the alleged infringer as to the patent owner's theory of infringement; they are not

26   evidence for purposes of summary judgment."  *See, e.g.*, *Infinity Headwear & Apparel,*

27   *LLC v. Jay Franco & Sons, Inc.*, No. 15-CV-1259 (JPO), 2017 WL 3309724, at *3-4

28   (S.D.N.Y. Aug. 2, 2017) (denying the plaintiff's motion for summary judgment that the

-43-

plaintiff was liable for patent infringement).  Thus, "a plaintiff cannot prove infringement based on contentions alone, and must proffer sufficient evidence supporting the allegations set forth in the infringement contentions." *Google Inc. v. Beneficial Innovations, Inc.*, No. 11 Civ. 229, 2014 WL 4215402, at *4 (E.D. Tex. Aug. 22, 2014).  This is because infringement contentions are not "particular parts of materials in the record," which a patent owner must put forth in order to demonstrate that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c)(1)(A).

In the Southern District of California, the local patent rules require parties to serve their infringement contentions on each other (but not file them with the Court).  Patent L. R. 3.6.  "The purpose of . . . the local patent rules in general . . . is to 'require parties to crystallize their theories of the case early in the litigation' so as to 'prevent the shifting sands approach to claim construction.'"  *Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1035 (Fed. Cir. 2015).  In a similar situation, the Southern District of New York in *Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, drawing all reasonable factual inferences in favor of the non-moving party, denied the plaintiff's motion for summary judgment that the defendant was liable for infringement of the patent-in-suit, where the plaintiff relied on infringement contentions accompanied by images of the accused products to support its motion for summary judgment.  2017 WL 3309724, at *3-4.  It reasoned that "[n]either the infringement contentions nor the images of the accused products demonstrate whether the accused products, . . . are blankets under the Court's construction."  *Id.* at *4 (internal quotations and citations omitted).  As a result, the plaintiff failed to meet "its burden to "supply sufficient evidence to prove that the accused product or process meets every element or limitation of a claim," resulting in the Court denying summary judgment.  *Id.*

As in *Infinity Headwear*, to the extent Plaintiff relies on its Amended Infringement Contentions to support its Motion for Summary Judgment, not only are the Amended Infringement Contentions improper for the Court to consider for the reasons outlined below, but they also do not qualify as evidence that could support summary judgment.

-44-

1    2017 WL 3309724, at *4.

2               b.    *Plaintiff's Attempts to Amend Were Untimely*

3         Local Patent Rule 3.1 also requires a party claiming patent infringement to serve

4    "Disclosure of Asserted Claims and Infringement Contentions," fourteen (14) days after

5    the *Initial* CMC.  In this case, the CMC took place on August 27, 2020, meaning Plaintiff's

6    Original Infringement Contentions needed to be served by Thursday, September 10, 2020.

7    Neither party has provided the original, unamended contentions or indicated whether they

8    were timely filed.   For purposes of this motion, the Court will assume the original

9    contentions were timely filed.

10        On January 14, 2020, Magistrate Judge Butcher issued the Amended CMO

11   Regulating Discovery and Other Pretrial Proceedings, providing that "[t]he deadline for

12   filing, as of right, Amended Infringement Contentions by a party claiming infringement is

13   February 13, 2020."  *See* ECF No. 58 at 2:1-2 (citing (Patent L. R. 3.6(a)).[19]  Additionally,

14   pursuant to Rule 3.6, "[a]s a matter of right, a party asserting infringement may serve

15   Amended Infringement Contentions no later than the filing of the parties' Joint Claim

16   Construction Chart," which in this case was filed on February 14, 2020.  ECF No. 70.

17        After claim construction, absent undue prejudice to the opposing party, a party

18   asserting infringement may only amend its infringement contentions, (1) within thirty (30)

19   days of the court's Claim Construction Ruling and upon a good faith belief that amendment

20   is necessitated by a claim construction that differs from that proposed by such party or (2)

21   upon a timely motion showing good cause.  S.D. Cal. Pat. R. 3.6.  In this case, the Claim

22   Construction order was issued on Thursday, July 30, 2020, meaning that any amended

23   infringement contentions needed to be served by Monday, August 29, 2020, well before

24   _____

25   [19]    Judge Butcher's CMO provided that all "[a]ll discovery, including expert discovery,
     shall be completed by all parties on or before **December 8, 2020**," defining "completed"
26   as meaning "that interrogatories, requests for production, and other discovery requests must
     be served at least thirty (30) days prior to the established cutoff date so that response thereto
27   will be due on or before the cutoff date."  Order, ECF No. 113 at 1:23-28.  This meant
     discovery requests needed to be served, at the latest, by November 8, 2020.

28

-45-

Plaintiff attempted to amend in November.

On October 14, 2020, a Status Conference took place in this case, during which the Court set trial for February 17, 2021.  ECF No. 123.  During this hearing, Plaintiff made no mention of seeking to amend infringement contentions.

Approximately, two weeks later, on November 4, 2020, just short of three years after filing this case, Plaintiff admits that it "attempted to seek leave from the Court to amend the infringement contentions but was informed by Court . . . when Pulse sought a hearing date for that motion, that such a motion would not be heard."  ECF No. 151-9 at 7, 27-28. The Court explicitly denied Plaintiff leave to amend its infringement contentions (by denying a hearing date) for the below reasons.

First, the deadline for rebuttal expert reports was November 17, 2020, ECF No. 113 at 1:23-28, meaning by the time Plaintiff's requested motion would have been heard, the deadline for rebuttal expert reports would have passed.  This is because separate and aside from the high risk of prejudice to Defendant presented by allowing Plaintiff to file Amended Infringement Contentions three months before trial, even if Plaintiff filed a motion on November 4, 2020, according to Local Rule 7.1(e)(1), the earliest such a motion could be heard was December 2, 2020, well after the rebuttal expert report deadline.  *C.f. HID Glob. Corp. v. Farpointe Data, Inc.*, No. SACV1001954JVSAJWX, 2012 WL 13018379, at *4 (C.D. Cal. Feb. 6, 2012) (denying amendment to infringement contentions sought after claim construction as well as the deadline for rebuttal expert reports had already passed); *Abbot Diabetes Care Inc. v. Roche Diagnostics Corp.,* 2007 WL 2221029 at *2 (N.D. Cal., July 30, 2007) (finding prejudice to the non-moving party where less than two months remained before discovery cutoff, and "addition of new products would likely derail the case management schedule, require additional claim construction, and delay trial").  Even if the Court granted the motion on December 2, 2020, Defendant would be unable to propound discovery on the amended infringement contentions as responses would be due after the discovery and motion cut-off deadline.  *Compare* Fed. R. Civ. P. 33(b)(2) (providing that answers to interrogatories must be served within 30 days of being

served with interrogatories) *with* Order on Joint Motion for Continuance, ECF No. 115 at 1:23-28 (extending, at the request of the parties, the discovery cut-off deadline from December 8, 2020 to December 22, 2020); *see also West v. Jewelry Innovations, Inc.*, No. C071812JFHRL, 2008 WL 4532558, at *3 (N.D. Cal. Oct. 8, 2008) (rejecting plaintiff's request to file amended infringement "fewer than forty days remain between the hearing date on the instant motion and the discovery cut-off date").

Second, Local Rule 7.1(b), governing "Motion Hearing Dates," requires that "[a]ll hearing dates for any matters on which a ruling is required must be obtained from the Clerk of the judge to whom the case is assigned." *See also* FED. R. CIV. P. 78 (providing that courts "may establish regular times and places for oral hearings on motions" as well as "provide for submitting and determining motions on briefs, without oral hearings"); Patent L.R. 1.3 (vesting the Court with discretion to "accelerate, extend[,] **eliminate**, or modify the obligations or deadlines in these Patent Local Rules based on the Court's schedule or the circumstances of any particular case, including, without limitation, the complexity of the case or the number of patents, claims, products, or parties involved") (emphasis added). Here, Plaintiff requested a hearing date and was informed the Court would not grant one. This is, in part, because Local Patent Rule 3.6(a)(2) only allows for Amended Infringement Contentions to be served "[u]pon a **timely** motion showing good cause." (Emphasis added). Plaintiff's Motion was not timely.

### c. *Plaintiff Lacks Good Cause to Amend Its Infringement Contentions*

Good cause requires acting with diligence in seeking to amend. *See, e.g.*, *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1367-68 (Fed. Cir. 2006) (refusing to consider the issue of prejudice having determined there was no good cause for amending infringement contentions). "Decisions enforcing local rules in patent cases will be affirmed unless clearly unreasonable, arbitrary, or fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence." *Id.* at 1367. For instance, in *O2 Micro*, the Federal Circuit concluded the district court did not abuse its discretion in finding

a lack of diligence by the plaintiff in moving to amend infringement contentions, and therefore, lack of good cause justifying amendment.  467 F.3d at 1367-68.  Thus, it affirmed the decision of the district court, which had "excluded the evidence because of the failure to comply with the disclosure deadlines required by the local patent rules and the case management order." *Id.* at 1369. It stated that "[w]hile there may be circumstances in which the exclusion of evidence as a sanction for the failure to comply with a case management order would be an abuse of discretion, both the Ninth Circuit and this court have concluded that the exclusion of evidence is often an appropriate sanction for the failure to comply with such deadlines." *Id.*  Accordingly, it also affirmed the district court's grant of summary judgment of non-infringement in favor of the defendant and held the district court did not err by denying leave to amend the infringement contentions. *Id.* at 1356-57.

Plaintiff uses the last page and a half of its Reply Brief as a backdoor effort to argue the Motion for Leave to Amend Plaintiff's Infringement Contentions that this Court explicitly instructed Plaintiff not to file.  To the extent Plaintiff attempts to "sneak" those arguments in now, this attempt is not well-taken.  However, even after reviewing Plaintiff's attempts to establish good cause, the Court finds none.  The first prerequisite for showing good cause is that it must be timely.  Plaintiff simply cannot establish this initial hurdle. Plaintiff was not diligent in seeking to amend its contentions.

First, Plaintiff conclusorily argues that "[g]ood cause existed for Pulse to amend its infringement contentions because (1) Pulse had been diligent in pursuing its proposed amendments and (2) UDE would not suffer any prejudice."  Pltff. Reply at 11:1-3.  On the contrary, the Court finds Plaintiff was not diligent in seeking the proposed amendments, and Defendant would have suffered great prejudice if the Court allowed Plaintiff to amend Plaintiff's infringement contentions as discovery was closing.

Second, Plaintiff argues that it "was unable to amend its infringement contentions until (1) UDE provided the nonpublic information for the representative 'S' Series ICMs and (2) UDE agreed to representative products for each Series of UDE ICMs."  Pltff. Reply at 11:10-12.  However, parties to a patent case are not required to agree to a representative

-48-

product, and Plaintiff's infringement contentions are not conditional on whether Defendant agrees to a representative product.

Third, Plaintiff speculates that "[i]n hindsight, given the highly accelerated trial schedule, UDE may have intentionally waited until the 'eleventh hour' to prevent Pulse from amending its infringement contentions by not producing the relevant nonpublic discovery and engaging in an unfruitful 'month-long negotiation.'" Pltff. Reply at 11:16-19 (internal citation omitted). The Court finds this argument grossly speculative and improper such that it merits no further discussion.

> ### d. *Allowing Plaintiff to Rely on the Improperly Amended Infringement Contentions Would Prejudice Defendant*

Defendant enumerates the various ways in which Plaintiff's behavior prejudices Defendant, but the Court finds it need not analyze them because the prejudice in filing amended infringement contentions, three months before trial, six days before expert reports are due, and within a month of the discovery cut-off is obvious. More importantly, like the *O2 Micro* court, this Court finds analysis of prejudice is unnecessary given the complete absence of good cause. 467 F.3d at 1369. For the reasons below, the Court orders that Plaintiff shall not seek to rely on its Amended Infringement Contentions during this case.

"The purpose of preliminary infringement contentions as required by Patent Local Rule 3.1 is to assist the court and guide the parties in focusing on potentially dispositive issues, providing a framework for discovery and generally facilitating the proceedings." *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1329 (Fed. Cir. 2014). They are merely meant to help streamline the discovery process rather than provide a forum for litigating substantive issues. *Id.* As part of the discovery process, local patent rules must be consistent with the Federal Rules of Civil Procedure governing discovery. *O2 Micro*, 467 F.3d at 1365; *see also* Patent L.R. 1.3. 2.5 (explaining the relationship of the local patent rules to the Federal Rules of Civil Procedure, including Rule 26(a)(1)); *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1024 (N.D. Cal. 2010) ("Rule 3-1 performs the traditional role of contention interrogatories."). Rule 37(c)(1) of the Federal

-49-

Rules of Civil Procedure allows courts to prohibit a party from providing information or "evidence on a motion, at a hearing, or at a trial," where the party failed to provide that information in discovery and the failure is not substantially justified or harmless. This rule provides the Court with the authority and discretion to refuse to consider or admit Plaintiff's Amended Infringement Contentions both with respect to considering this motion as well as at trial. That being said, this should not prejudice Plaintiff given infringement contentions are not evidence. *See, e.g.*, Patent L.R. 2.4 ("Statements, disclosures, or charts governed by these Patent Local Rules are admissible to the extent permitted by the Federal Rules of Evidence or Federal Rules of Civil Procedure.").

Plaintiff's Amended Infringement Contentions were improper and filed in bad faith. The Court disregards these contentions when considering this motion and orders that they are inadmissible. Because Plaintiff largely relied on expert opinions for conclusions of law, which the Court is not required to adopt, and Amended Infringement Contentions, which even if they had been proper, are not evidence that can support a motion for summary judgment, the Court denies Plaintiff's Motion for Summary Judgment as to direct infringement of the 318 and 840 Patents.

**B.** **Defendant's Motion for Summary Judgment as to Direct Infringement of the GX-X Series, N Series, and S Series as well as Induced Infringement**

Defendant argues that the Court should grant summary judgment in its favor for the following four reasons: First, Plaintiff has no evidence from non-party EMSs or branded companies that the accused ICMs, which Defendant manufactures and sells overseas, were imported into the U.S. Def. Mot. at 5:23-26. Second, Plaintiff cannot prove Defendant "intended direct infringement by its sales to EMS outside the U.S." because Defendant "never cared where its ICMs ultimately wound up—it just wanted to sell the ICMs." *Id.* at 6:8-10. Third, separate and aside from Defendant's inability to prove inducement, Defendant should be granted summary judgment of non-infringement[20] as to "the GX-X

---

[20] Defendant notes explicitly in the section of its brief addressing induced infringement that it "is only moving on Pulse's indirect infringement allegations, not its direct

-50-

1   series as Defendant never sold those ICMS anywhere, worldwide." Def. Mot. at 6:13-15.

2   Fourth, the Court should grant Defendant summary judgment as to the S and N Series ICMs

3   because Plaintiff's infringement expert failed to present testimony indicating infringement

4   as to those series. *Id.* at 6:16-20.

5        Plaintiff opposes by arguing first, that the invoices produced by Defendant "show

6   sales within the U.S, offers for sale within the U.S., or importation into the U.S, [which]

7   constitute more than 12% of UDE's reported sales." Pltff. Oppo. at 4:4-6. Second, Plaintiff

8   disputes Defendant's argument that Plaintiff failed to obtain evidence from non-party EMS

9   or branded companies, contending that it secured evidence of U.S. sales from both EMS

10  companies, including ██████ and ██, as well as branded companies, such as ██████,

11  ██, ██, ██, and ██████. *Id.* at 4:7-11. Third, Plaintiff argues Defendant's

12  contention that it should receive summary judgment for the GX-X series because it was

13  never sold in the U.S. should fail because Plaintiff's counsel "has been in possession of" a

14  product containing that series ICM, so Defendant must have imported that device into the

15  U.S. *Id.* at 5:14-24. Fourth, as to the S and N Series Accused Products, Plaintiff argues its

16  expert only examined one product from each series because the parties were working

17  towards a representative product stipulation, and Defendant provided only two products

18  for inspection. *Id.* at 6:1-25.

19       Defendant responds that first, the evidence on which Plaintiff's relies to show

20  infringing conduct within the U.S. fails under relevant case law holding that the overseas

21  manufacture and sale of components later incorporated into products sold by downstream

22  sellers in the U.S. fails to establish induced infringement, including because it fails to

23  account for multi-sourcing. Def. Reply at 6:7-28. Second, Defendant points out that none

24  of the evidence on which Plaintiff relies shows Defendant knew, much less intended, its

----

25  infringement allegations that purport to rely on the invoices." Def. Mot. at 12:24-28.

26  However, it is unclear whether Defendant intended to limit its first grounds for summary

27  judgment to the issue of inducement but not the remaining grounds, as appears it be the

    case. Regardless, this issue should be addressed by Defendant in its additional briefing

28  requested by the Court.

products would end up in the U.S. *Id.* at 9:7-17.  Third, as to the GX-X Series, Defendant argues that Plaintiff repeatedly mentions its counsel obtained a sample of this product without elaborating when, where, and how it obtained the sample, leaving the Court bereft of proof of infringing acts. *Id.* at 13:10-16.  Defendant also notes that the data sheet relied on by Plaintiff provides information about a product but in no way constitutes an offer to sell or sale that would be probative of infringing acts. *Id.*  at 13:17-14:9.  Fourth, as to the S and N Series of Accused Products, Defendant responds that it "provided Pulse with multiple members of the series for analysis," but "[i]n both cases, Pulse's expert could not even perform the analysis required to show representativeness, because  Pulse chose ***not to provide more than one samples to its infringement expert***." *Id.* at 14:11-22.

As set forth below, the Court grants summary judgment in Defendant's favor because Plaintiff has failed to show evidence creating a genuine issue of fact as to induced infringement as well as direct infringement as to the GX-X, S, and N Series of Products.

### 1.   *Defendant Has Shown the Absence of a Genuine Issue of Fact as to Induced Infringement for Products Sold Outside the U.S.*

Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).   "Section 271(b) provides a potential mechanism to assert liability against a foreign party who induces an infringing sale into the United States."  Nanda, Ved P., et al., 2 *Litigation of International Disputes in U.S. Courts*, § 8:53. Foreign inducement of U.S. infringement (Dec. 2020 Update).  Thus, "where a foreign party, with the requisite knowledge and intent, employs extraterritorial means to actively induce acts of direct infringement that occur within the United States, such conduct is not categorically exempt from redress under § 271(b)." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302-03 (Fed. Cir. 2012).

In order to defeat a motion for summary judgment as to induced infringement, a patent holder must come forward with evidence of (1) acts of direct infringement (by the defendant or third-party) of a patent, (2) the defendant knowingly inducing infringement by taking "affirmative steps to bring about the desired result," and (3) the defendant's

knowledge that the induced acts it induced would result in patent infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760-61, 766 (2011) ("Accordingly, we now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."); *see also MEMC*, 420 F.3d at 1378. "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Id.* (quoting *Water Techs. Corp v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed. Cir. 1988)). However, in *Global-Tech*, the Supreme Court elaborated that Section 271(b) requires that for acts to qualify as "induced acts," the inducer must know the induced acts "constitute infringement," which requires "knowledge of the relevant patent." 562 U.S. at 765. Instead of proving actual knowledge that the induced acts infringe, the Supreme Court also held that "willful blindness" could satisfy the knowledge requirement, where the defendant (1) subjectively believed there was a high probability that a fact exists and (2) takes deliberate actions to avoid learning of that fact. *Id.* at 769.

Defendant argues that with respect to the Accused Products that it indisputably sold outside the U.S., Plaintiff cannot produce evidence creating a genuine issue of fact as to the elements required for induced infringement. Def. Mot. at 12:21-13:8. Plaintiff responds that the Court must deny Defendant's Motion for Summary Judgment because "there is ample evidence of (1) direct infringement for ICMs sold outside the U.S. and (2) that UDE takes affirmative steps to encourage others to imports its ICMs into the U.S." Pltff. Oppo. at 10:18-22. In Reply, Defendant argues that not only does the evidence Plaintiff seeks to rely on prove "Defendant's active steps to encourage direct infringement" fail under the law—including because it's inadmissible, but it also fails to prove Defendant "***knew*** its products were destined for the U.S., or took any affirmative steps encouraging that to happen." Def. Reply at 5:1-7:21.

As outlined below, the Court finds it appropriate to grant Defendant's Motion for Summary Judgment on the issue of induced infringement because Defendant has shown the absence of evidence creating a genuine issue of fact as to (1) products sold in the U.S. and (2) Defendant's knowledge that its products would end up in the U.S.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     a.  *Plaintiff has failed to show evidence of a genuine issue of fact as to induced infringement for ICMs sold by outside the U.S.*

   Defendant argues the Court should grant summary judgment in its favor on induced infringement because a party cannot prove induced infringement without proving direct acts of infringement by some party, and Plaintiff cannot prove the accused ICMs sold by Defendant ever entered the U.S. (e.g., an act of direct infringement). Def. Mot. at 13:10-15. Defendant further contends that despite Plaintiff's "emphatic speculation that 35-40% of the accused ICMs" entered the U.S. within a branded device, and even after serving subpoenas on numerous alleged importers (either EMS or branded companies), Plaintiff remains unable to point to any evidence that "a single accused ICM has ended up in a branded device in the U.S." *Id.* at 13:15-23. As detailed below, the Court agrees that Plaintiff's evidence fails to establish the first element of induced infringement: direct infringement by Defendant or a third-party within the U.S.

   The *Largan* case, which Defendant argues "is directly on point," Def. Mot. at 16:27-18:18, applied the *Global-Tech* standard to a case almost factually indistinguishable from the present case. In *Largan*, the district court held that even though the defendant's products met the elements of the plaintiff's patents as alleged, "all but a sliver of the accused conduct took place outside the territorial reach of the United States patent laws." 86 F. Supp. 3d 1105, 1107 (N.D. Cal. 2015). Thus, the court granted in part the defendant's motion for summary judgment of (1) no direct or contributory infringement for the accused products (a) sold into the Apple or Motorola supply chains and (b) sent directly into the U.S. and (2) no induced infringement for products sold into the Apple and Motorola supply chains. *Id.* at 1120-21. Consequently, the court also denied the plaintiff's motion for partial summary judgment of direct infringement with respect to the defendant's lenses sold abroad into Apple and Motorola's supply chains. *Id.* at 1113.

   Just as both Plaintiff and Defendant supply ICMs to EMS and branded companies for incorporation into electronics, the *Largan* plaintiff and defendant were both Taiwanese companies that represented the first link in Apple's four-part supply chain by supplying camera lenses for eventual incorporation into various Apple phones and tablets. 86. F.

Supp. 3d at 1107; *see also* 646 Fed. App'x at 947.  Like UDE, the *Largan* defendant argued that even though it practiced the plaintiff's patents, "its conduct [was] beyond the geographic coverage of the United States patent laws and consequently cannot amount to infringement under section 271(a)."  86 F. Supp. 3d at 1110.  However, unlike this case, where there are no supply agreements between UDE and its EMS or branded companies, the *Largan* defendant had a supply agreement governing the sale of its products to Apple. *Id.* at 1108.  The defendant's employees also negotiated prices with Apple's Global Supply Managers in Apple's office located in Cupertino, California, which, at times, involved the defendant's employees traveling to the U.S.  *Id.*  However, the defendant manufactured the lenses in Asia, sold them to Asian module integrators, who then, built the cameras and sold them to system integrators, also located in Asia.  646 F. App'x at 947.  Then, the system integrators incorporated the cameras into phones and tablets, which were then sent to Apple for sale to end users worldwide.  *Id.*  Apple did not track where either supplier's lenses were sold.  *Id.*  The defendant's employees also stated that they did not know "and have never discussed where Genius lenses incorporated into Apple or Motorola products ultimately end up."  86 F. Supp. 3d at 1109.

On these facts, the court held that "the undisputed facts establish that the majority of Genius's accused lenses are not sold or offered for sale in the United States, and that it cannot be liable for direct infringement with respect to those lenses."  *Id.* at 1110.  In determining the defendant's "relationship with U.S.-based downstream consumers like Apple and Motorola, in combination with its sales into a supply chain that terminates in (among other places) the U.S., [was not] sufficient to deem those sales 'within the United States,'" the *Largan* court relied heavily on *Halo I*, where Pulse advanced the same arguments Defendant now advances.  *Id.* at 1111 (citing *Halo I*, 769 F.3d at 1379).  The *Largan* court noted that even though in *Halo I*, Pulse met with Cisco engineers and sent product samples for pre-approval in the U.S., three facts precluded direct infringement liability, which also precluded liability in *Largan*: (1) the products were manufactured, shipped, and delivered to buyers abroad; (2) the defendants received the actual purchase

-55-

orders for those products abroad; and (3) the defendants were paid abroad.  *Id.* at 1111-12 (citing *Halo I*, 760 F.3d at 1379).

The court also noted that not only did the defendant's sales into the supply chains fail to qualify as sales within the U.S., but they also failed to qualify as "offers to sell" within the U.S.  *Id.* at 1113.  The court reasoned that "[a]n offer to sell, in order to be an infringement, must be an offer contemplating sale in the United States."  *Id.*  "If a sale outside the United States is not an infringement of a U.S. patent, an offer to sell, even if made in the United States, when the sale would occur outside the United States, similarly would not be an infringement of a U.S. patent."  *Id.*  Because nothing in the supply agreement between the defendant and Apple governed "where sales are to take place, and . . . they in fact do take place outside the U.S.," the defendant's "foreign sales into the Apple and Motorola supply chains [were] not sales in the United States, any associated offer to sell would not be infringing."  *Id.*

Finally, on the issue of induced infringement, the defendant conceded that it knew of the plaintiff's patents-in-suit, and that Apple and Motorola's end products incorporating the defendant's lenses met every element of the asserted claims.  *Id.* at 1117-18.  However, the defendant argued that it had no "insight into Apple and Motorola's supply chain after it sells its lenses to the module integrators" and "no idea whether its lenses go into products sold in the United States."  *Id.* at 1118.  The Court concluded that "[f]or all Genius knows, . . . all of the Apple and Motorola end products that are sold in the United States incorporate only lenses sold by Largan or other suppliers, rather than Genius."  *Id.*  It reasoned that even if the defendant induced Apple and Motorola to use its lenses, "it lacked the requisite 'knowledge that the induced acts constitute patent infringement,' because the patented Apple and Motorola end products using its lenses could all be sold outside the United States, where they would not infringe Largan's United States patents."  *Id.*  The court noted that "[c]ases denying summary judgment of no induced infringement for foreign sales have pointed to evidence, either direct or circumstantial, that showed that the accused infringer likely knew and intended for its products to be used in the United States."  *Id.*  (citing

-56-

1    *Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp.,* 531 F. Supp. 2d 1084,

2    1113 (N.D. Cal. 2007) (citing testimony from defendant's customers along with the fact

3    that defendant had "designated return and repair centers in the United States" as evidence

4    that it knew its products would be sold in the U.S.); *Halo Elecs., Inc. v. Pulse Eng'g, Inc.,*

5    810 F.Supp.2d 1173, 1208-09 (D.Nev.2011), *aff'd* 769 F.3d 1371 (Fed. Cir. 2014) (citing

6    testimony from defendant's corporate representative that "he believed at least some of the

7    accused products end up in the United States" and evidence that defendant provided

8    customer service support to U.S. entities to deny summary judgment of no inducement)).

9    However, the *Largan* plaintiff offered no such evidence.  *Id.*

10          The plaintiff appealed the judgment of no induced infringement to the Federal

11   Circuit, which affirmed the district court in an unpublished Memorandum Opinion.  *See*

12   *Largan Precision Co. v. Genius Elec. Optical Co.*, 646 Fed. App'x 946, 947-50 (Fed. Cir.

13   2016).  It held "that the district court properly granted summary judgment of no induced

14   infringement because Largan failed to offer evidence of direct infringement by Apple."  *Id.*

15   at 948.  Rather, the plaintiff had only presented evidence that (1) some of the defendant's

16   lenses were incorporated in some Apple products manufactured in Asia and (2) some of

17   Apple's products were sold in the U.S.  *Id.*  As a result, given the record—including the

18   volume of the plaintiff's and defendant's lenses supplied for Apple's ***worldwide***

19   distribution of products, which showed the plaintiff supplied a large volume of lenses in

20   the relevant Apple products, it could be possible "that all of those products sold in the

21   United States could contain Largan lenses."  *Id.* at 948.  It reasoned that "Largan only

22   presented evidence that Genius lenses are incorporated in some Apple products

23   manufactured in Asia and that some Apple products are sold in the United States."  *Id.*

24   Conversely, "there [was] no evidence in th[e] record that a single Apple product sold in the

25   United States contained an accused Genius lens."  *Id.*  The plaintiff also "did not present

26   any evidence from the supply chain to establish what process the module integrators and

27   system integrators used to select lenses in the products destined for the United States."  *Id.*

28   at 949.

Finally, the plaintiff argued that "the supply chain randomly selects lenses," so a reasonably jury could not find the proportion of Apple phones and tables sold in the U.S. with the defendant's lenses would equal the proportion of Apple phones and tables sold worldwide with the defendant's lenses, meaning a reasonable jury could find infringement. 646 Fed. App'x at 949. However, even though circumstantial evidence may prove infringement, the plaintiff's "theory require[d] Apple's supply chain selection to be random, and Largan failed to produce evidence that it is random." *Id*. Where "Apple's corporate representative testified that Apple does not track where a given supplier's lenses are sold," such "testimony alone does not prove randomness in the supply chain." *Id*.

Defendant argues that first, like the *Largan* defendant, it does not know where its ICMs will end up once it ships them to EMS companies, and Pulse, like the *Largan* plaintiff, has not obtained discovery from third-party EMS or branded companies about the supply chain for Defendant's products. Def. Mot. at 18:8-10. Second, Defendant argues that the present case is even weaker than in *Largan*, because the *Largan* defendant had a direct supply agreement with a branded company (Apple) and went to Cupertino, California to negotiate with Apple. *Largan*, 86 F. Supp. 3d at 1108. Here, however, neither Plaintiff nor Defendant know what branded end devices incorporate the accused ICMs, and no supply agreement exists. Def. Mot. at 18:10-16. Third, unlike the *Largan* defendant, Defendant does not concede its devices infringe. *Id.* at 18:15-16. Plaintiff responds that (1) it has obtained discovery from third-party EMS and brand companies (including ▮▮▮, ▮, ▮▮▮, ▮▮▮, ▮▮, ▮▮▮, and ▮▮▮); (2) Plaintiff and Defendant know the branded devices that incorporate the accused ICMs (citing Exhibits 7 and 15 to Plaintiff's Opposition); and (3) Plaintiff *has* established direct infringement. Pltff. Oppo. at 16:14-20. Defendant replies that in *Largan*, the Federal Circuit still affirmed the district court's dismissal of induced infringement on summary judgment even though the defendant communicated with Apple regularly about the inclusion of its lenses, including through personnel in the U.S., and knew (1) its lenses were incorporated into Apple iPhones, (2) iPhones are sold in the U.S., and (3) which iPhone models incorporated its

-58-

lenses.  Def. Reply at 5-18.  Defendant notes that Plaintiff "merely argues that this case is different from *Largan* because 'UDE directly communicates with its US-based customers for, *inter alia*, the design and sale of its infringing ICMs.'"  Def. Reply at 5:19-6:2 (citing Pltff. Oppo. at 14).  However, in *Largan*, not only did the defendant also communicate with U.S.-based customers, but it even had a supply agreement and worked closely with Apple, including by negotiating the work involved and price point.  *Id.* at 6:2-6 (citing *Largan*, 86 F. Supp. 3d at 1105, 1108).

The Court agrees that *Largan* is on point for this case.  To the extent Defendant worked with its customers to design products according to their needs, visited the U.S. offices of customers, and knew that some of its customers sold products in the U.S., the defendant in *Largan* had undertaken all of the same actions, but the Federal Circuit still held it could not be held liable for induced infringement.  646 Fed. App'x 948-49.  It would simply be too speculative to infer induced infringement in this case absent evidence that the branded or EMS companies with whom Defendant works (1) randomly distribute their products throughout the world (as opposed to intentionally making sure certain product models or devices containing Defendant's products are only sold in non-U.S. countries) or (2) only ship or sell their products in the U.S.  *See id.* at 949-50; *see also M2M*, 2016 WL 70814 at *21 (dismissing on summary judgment induced infringement allegations for "component parts manufactured and shipped abroad" because the plaintiff had failed to carry its burden of proving that the accused products made it into the U.S., for purposes of proving that anyone directly infringed).

Plaintiff argues that *Cyntec Co., Ltd. v. Chilisin Elecs. Corp.* shows that courts have denied summary judgment in cases with less evidence than what Plaintiff presents in this case.  Pltff. Oppo. at 15:4-5 (citing No. 18-CV-00939-PJH, 2020 WL 5366319, at *1 (N.D. Cal. Sept. 8, 2020)).  In *Cyntec*, the patents-in-suit described the manufacture and design of chokes, which are small electronic devices used in electronic devices such as cellphones and computers.  2020 WL 5366319, at *1.  The plaintiff accused the defendant of indirectly infringing on their patents because the defendants sold the accused products to third parties

who, then, imported the infringing products for sale into the U.S.  *Id.* at *2.

On summary judgment, the *Cyntec* court found that the plaintiff had not produced direct evidence of any activities qualifying as direct infringement occurring within the U.S. because the plaintiff "did not, for example, purchase an end product, take it apart, and find an accused choke."  2020 WL 5366319, at *2; *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332-32 (Fed. Cir. 2016) ("*Power Integrations II*") (noting that the plaintiff had "presented evidence that it purchased at least three products containing infringing . . . chips in the United States").  The plaintiff also had not submitted evidence from third parties that they had imported or sold products in the U.S.  2020 WL 5366319, at *2.  However, the court held that "[d]espite the lack of direct evidence, plaintiff has produced circumstantial evidence of direct infringement in the United States by third parties to create a genuine dispute of material fact."  *Id.*  As an example, the court noted how the plaintiff had cited evidence that the defendant used "'design codes' to track samples and sales to end customers located in the United States."  *Id.*  Even though the defendants argued that they had no way of knowing where their products were ultimately sold or which end products ultimately included their products, the plaintiff had still "introduced sufficient factual matter to preclude a finding of summary judgment with respect to direct infringement by a third party in the United States."  *Id.*  The court reasoned that "[a] jury could find that knowing the identity of U.S.-based recipients demonstrates direct infringement in the United States."  *Id.*

Plaintiff argues that as in *Cyntec*, Defendant "not only knows the identity of the U.S.-based recipients (i.e., ███, ███, ████, ██, etc.)," but it also "knows the corresponding end customer part numbers for its ICMs." Pltff. Oppo. at 15:19-21.  Plaintiff contends that "Flex (a second EMS company subpoenaed by Pulse) produced a detailed spreadsheet of UDE's ICMs with the end customer products with various 'Facility' and 'Sub Region Description' identifiers for 'Americas' and CALIFORNIA.'" *Id.* at 15:23-26 (citing Exhibit 11 to Plaintiff's Opposition).  Defendant responds that unlike the *Cyntec* defendant, which used design codes to track samples and sales to end customers located in

-60-

the U.S., Defendant "has done no such thing." Def. Reply at 6:24-26. The Court finds that like the *Cyntec* defendant, in some (but not all) cases, Defendant knows which EMS or brand company products contain its products. However, unlike *Cyntec*, Defendant does not know which of those products end up in the U.S. as evidenced by the fact that neither party in this case can prove which products, if any, containing Defendant's ICMs are sold in the U.S. Further, while Plaintiff's evidence suggests Defendant may know how much of its worldwide sales stem from the sale of U.S. products, it does not show that those sales pertain to Accused Products. As such, the Court finds that separate and aside from the fact that *Cyntec* is not binding on this Court, *Cyntec* does not warrant this Court finding a genuine issue of fact exists as to induced infringement.

Finally, Plaintiff responds that "EMS companies produced evidence of the accused products imported into the United States." Pltff. Oppo. at 3:25-26 (citing Exhibits 5, 7, 9, 10, and 11[21] to Plaintiff's Opposition). Plaintiff asserts that Exhibits 2, 5, 6, 7, 8, and 10-13 evidence UDE ICMs making it into the U.S. Pltff. Oppo. at 10:27-11:4. Plaintiff also argues that Exhibit 9 shows "sales of ICMs within the U.S., offers for sale within the U.S., or importing into the U.S. . . . constitute more than 12% of [Defendant's] sales." *Id.* at 11:5-8. However, Exhibit 9, which contains the invoices showing Defendant's sales with a "Bill to" address in the U.S. have already been addressed by the Court and do not establish direct or induced infringement. The Court addresses the remaining evidence, in turn, but

---

[21]     Exhibit 11, ECF No. 149-10, says it was filed under seal but appears to have been omitted, and as such, the Court was unable to consider this document. However, Plaintiff's counsel describes it as screenshots from the Flex0001 Excel file produced by Flex. ECF No. 149-1 at 7, ¶ 30. That being said, Defendant indicates that Exhibit 11 shows "the only products listed with Region Description 'Americas' (touted by Pulse's opposition, Opp. at 12) are for the GMG-PA-0001, which is a product that was exclusively shipped to ████ in the U.S. according to invoices (Ex. 14), and thus is not a subject of this motion, as all sales of the GMG-PA-0001 are included in Pulse's direct infringement claim." Def. Reply at 8:14-18. However, "[t]he other products are all for ████ matching the part numbers from evidence produced by ████ discussed above, and indicate they were destined for Singapore, not the U.S., with a Region Description of 'South Asia.'" *Id.* at 8:19-21 (citing Exhibit 11).

1    finds it does not establish a genuine issue of fact.

2                          i.      Products Purchased by Plaintiff's Counsel

3           Defendant argues that there is no evidence Plaintiff identified an accused ICM in the

4    U.S. through purchasing and inspecting branded devices to confirm its speculation.  Def.

5    Mot. at 16:1-3 (citing Exhibit 23 to Def. Mot., Baxter Deposition Transcript, ECF No. 144-

6    26 ("Baxter Dep. Trans. II") at 4, 14:17-19 (responding, "No," when asked, "Did you,

7    during your analysis, ever remove a UDE ICM from an end-consumer product?").  Plaintiff

8    responds that "Pulse, through counsel, has purchased network switches from 'branded

9    companies' in the United States that include the accused products and other UDE

10   products."  Pltff. Oppo. at 3:27-28 (citing Exhibits 2, 6, 12, and 13 to Plaintiff's

11   Opposition).  Exhibits 2, 6, 12, and 13 show photographs of a ████, ████, ████

12   ████, and ████ switches, respectively, purchased by Plaintiff's counsel in the U.S.

13   Gazdzinski Decl., ECF No. 149-1 at 2, ¶ 2, 7, ¶ 25, 8, ¶¶ 31-32; *see also* ECF No. 150-9;

14   ECF No. 150-15; ECF No. 150-16.  However, separate and aside from the Court's concerns

15   about relying on a declaration by Plaintiff's counsel seeking to authenticate evidence

16   Plaintiff intends to rely on at trial, the Court finds these photographs prove nothing

17   dispositive to the instant motion.  They do not prove that Plaintiff's counsel purchased or

18   imported the product *from Defendant* in the U.S.  They also do not prove Defendant knew

19   its product would end up in the U.S.  That a device containing an infringing product may

20   end up in the U.S. does not *per se* establish direct or induced infringement.  *See Largan*,

21   646 Fed. App'x at 948-50.

22          Further, while Plaintiff's SAC refers to having "purchased the exemplary Juniper

23   EX4300-48MP Ethernet Switch in San Diego, CA (i.e., the United States) to confirm the

24   infringement of UDE manufactured ICMs within Juniper's product," SAC at 33:12-15,

25   Defendant asserts that "this allegation has been shown to be false because the ICM in the

26   Juniper switch shown has LED indicator lights on each port, whereas UDE's GMG-ZZ-

27

28

0004[22] does not have any."  Def. Mot. at 16:3-9 (citing SAC at 33:16-25 (showing a green LED indictor light in the Juniper EX4300-48MP)).   Moreover, the SAC also described "port markings A through K that Pulse trumped . . . as indicative of an accused ICM," but Defendant states such markings "are in fact an industry standard that are used by many manufacturers of ICMs, such as Molex, who uses the same port markings for a 2x6 gigabit ICM *with* LED indicator lights."  *Id.* at 16:9-13; *see also* Exhibit 12 to Def. Mot., ECF No. 144-15 at 13 (showing port markings A through K in the Molex Product Specification); Baxter Dep. Trans. II at 6, at 23:18-27:17 (testifying that "the ICM shown in the Juniper switch has the same markings as shown in the Molex ICM" and port markings alone "are not a reliable indicator that that's actually a UDE ICM").   Defendant also states that its products are marked on the top with its internal product number, "and no such product number is described in the complaint, which Pulse would have surely noted if it was there." Def. Mot. at 16:17-20.  Thus, Defendant argues Plaintiff cannot authenticate the ICM found in the Juniper switch described in the SAC.  *Id.* at 16:20-26.  During his deposition, Mr. Baxter also testified that the product described in the SAC does not have the same markings as the sample provided by Defendant and described by Defendant.  *See* Baxter Dep. Trans. II at 5, 19:1-24.  At a minimum, the issues described by Defendant cast serious doubt on the infringement allegations in the SAC, which were primarily based on a Juniper switch Defendant contends did not contain its product.

Defendant also argues that the "two switches allegedly purchased by Pulse's counsel" leaves "Pulse no way to admit these products as evidence at trial."  Def. Reply at 9:18-21.  Defendant points out that "[w]hile Pulse's counsel has submitted a declaration stating he personally 'purchased the Juniper EX4300-48MP switch and Cisco MS355 switch in the U.S.' (Gadzinski Decl. ¶ 20), no further information is provided as to the

---

[22]    Mr. Gazdzinski's declaration states that he purchased Juniper EX4300-48MP, which shows an Aquantia AQX-N3S64-MTN-U31 device present within it, and Aquantia sells the AQX-N3S64-MTN-U31, which includes UDE's MPN GM6-AQ-0005.  Gazdzinski Decl., ECF No. 149-1 at 3, ¶ 2.  Thus, Plaintiff argues that the Juniper Switch, contains an Aquantia device, which, in turn, incorporates UDE ICM MPN GMG-ZZ-0004.  *See id.*

1    circumstances of those purchases, including where, when, and for how much." *Id.* at 9:21-

2    25.  "No documentary evidence such as receipts were produced, so Pulse's entire basis for

3    those switches being purchased in the U.S. is the ***inadmissible*** statement of its own

4    counsel."  Def. Reply at 9:25-10:3 (citing FED. R. CIV. P. 56(c)(4).  However, this means

5    that because Plaintiff is relying on devices purchased by its own counsel, "Pulse's counsel

6    would need to testify as a fact witness at trial to explain this, especially if he purchased the

7    'special-order devices' from a foreign vendor." *Id.* at 9:26, 10:24-26.

8         In sum, the devices purchased by Plaintiff's counsel fail to establish a genuine issue

9    of fact as to whether Defendant induced infringement.

10                         ii.    Third-Party Discovery Showing Sales of EMS or Brand
11                                Company Products

12        Exhibits 5, 7, 8, 10, and 11 pertain to third-party discovery relied on by Plaintiff to

13   show induced infringement.

14        Exhibit 5, on which Plaintiff also relies, shows sales of Juniper products throughout

15   the U.S. but does not indicate which, if any, of those Juniper products had Defendant's

16   ICMs in them.   ECF No. 149-5.  Absent proof the products shown all contained

17   Defendant's products and were sold in the U.S., this exhibit proves nothing more than that

18   Juniper used Defendant's ICMs but not necessarily that all Juniper products were sold in

19   the U.S. or that Defendant knew Juniper Ethernet switches containing its ICMs would be

20   sold in the U.S. *See, e.g.*, *Largan*, 646 Fed. App'x at 948 (holding that evidence that some

21   of the defendant's products were incorporated into Apple products, and some of Apple's

22   products were sold in the U.S. did not establish induced infringement).

23        Plaintiff also relies on Exhibit 7 to prove infringement, which contains documents

24   produced by Cisco responsive to requests from Plaintiff for the volume and amount of sales

25   in the U.S.  Pltff. Mot. at 14:17-20.  However, even though Exhibits 7 indicates it was

26   responsive to a subpoena asking for information addressing U.S. sales, the letter from Cisco

27   does not indicate the sales shown are, in fact, U.S. sales or worldwide sales, and some EMS

28   companies were unable to separate worldwide sales from U.S. sales in this case.  *See* ECF

No. 149-6 at 3.  Similarly, Plaintiff argues that Sanmina (an EMS company) produced the documents in Exhibit 8 that reflect quantities of end customer products "shipped to the U.S. with UDE's corresponding ICMs."  Pltff. Mot. at 14:28-15:3; *see also* ECF No. 149-7 at 2.  However, even though an HPE product number is listed, Defendant argues that the product numbers in Exhibit 8 do not match any of the HPE product numbers or project names disclosed in HPE's production.  Def. Reply at 8:8-13.  As a result, Defendant contends "it is unclear what this product is or where it has been shipped, not to mention the fact that Pulse chose not to depose Sanmina, or even obtain a declaration explaining the document, which appears to be litigation created."  *Id.*  In sum, this exhibit also fails to establish that Defendant knew its products would be incorporated into a device that would be sold in the U.S.  Rather, the November 10, 2020 Damages Report of Plaintiff's damages expert, Arthur Cobb, also states "there are no reasonably accurate records establishing actual United States sales or the actual percent of United States to worldwide sales of the accused ICMs."  Exhibit 6 to Def. Mot., ECF No. 142-5 at 29.  Mr. Cobb testified to the same effect during his deposition.  *See* Exhibit 22 to Def. Mot., Arthur Cobb Deposition Transcript, ECF No. 142-15 ("Cobb. Dep. Trans.") at 4, 20:4-6 (testifying Defendant's invoices "don't identify that sales are going to the U.S.").

Exhibit 10 shows a document production by ▮ in response to a subpoena from Plaintiff for "records indicating the percentage of U.S. sales of Force10 network switches greater than $3,000 in value containing Aquantia parts from January 1, 2019, through the present."  ECF No. 149-9 at 2-4.  This production does not implicate Defendant or mention its products at all.  In fact, Defendant points out that "Pulse has never identified the branded devices sold in the U.S. allegedly incorporating the 185 accused ICMs, because Pulse does ***not know***, and was apparently unable to learn this information from its belated subpoenas."  Def. Mot. at 15:7-10 (citing Cobb Dep. Trans. at 6, 44:7-25 (testifying that he had not identified any end products containing accused ICMs)).

Defendant also notes that Plaintiff only deposed one EMS, which had no knowledge of where branded customers, like Juniper and Dell, sold downstream products.  Def. Mot.

at 15:10-12 (citing Exhibit 24 to Def. Mot., December 18, 2020 Deposition of John Bergen, non-party Marvell Semiconductor's corporate designee, ECF No. 142-16 ("Bergen Trans.") at 5, 48:20-49:1 (testifying that he did not know where Dell was selling products when he worked at Aquantia); *see also id.* at 7, 59:16-20 (testifying that Aquantia's design win "was for a single port access point," which are not at issue in this case). Defendant further points out "[f]or ████ (Opp. Ex. 5), ████ (Opp. Ex. 7), and ██ (Opp. Ex. 10)," Plaintiff (1) "only attaches sales spreadsheets at least some of which were created in response to Pulse's subpoenas," (2) "chose **not** to depose these customers to explain or authenticate this information," and (3) "has no context for the sales data, which either does not mention UDE products at all (████, ██), or is not specific to the U.S. and is instead worldwide (████)." Def. Reply at 7:26-8:6. Thus, Defendant argues these spreadsheets fail to "establish an accused UDE ICM exists in a branded end-product that wound up in the U.S." *Id.* at 8:6-7. As a result, absent proof that all network switches from a particular brand contained Defendant's ICMs, and thus, Defendant knew if those switches were sold in the U.S., the sale would be an infringing sale, this third-party discovery pertaining to sales by EMS and brand companies does not prove induced infringement.

### iii.   Discovery Showing U.S. Offices

Exhibit 17 contains documents produced by Defendant during discovery. *See* Gazdzinski Decl., ECF No. 149-1 at 8, ¶ 36. Plaintiff relies on UDE 0092346, ECF No. 149-13 at 5, which shows Defendant's sales breakdown by territory for the year 2015, stating that sales in the U.S. were 40%. ECF No. 1491-13 at 5. However, this exhibit does not indicate whether the sales made were sales by (1) others with Defendant's products in it or (2) Defendant but of non-infringing or non-accused products. *See id.* Plaintiff also points out that UDE 0092347 shows a branch office and 4 representatives or agents in the U.S. *See* ECF No.149-13 at 6. Likewise, Exhibit 16 shows that Defendant has a U.S. office, located at 2430 Camino Ramon, Suite 355, San Ramon, California 94563. ECF No. 149-12 at 2. Plaintiff also notes that UDE's corporate representative, Chris Chen, testified at his January 5, 2021 deposition, that Defendant has a U.S. office because it is a small

Asian company, and the U.S. office lets its U.S. customers know there is someone available to answer their calls or questions during business hours in the U.S.  Exhibit 18 to Pltff. Oppo., January 5, 2021 Deposition Transcript of Chris Chen, UDEs' Corporate Designee, ECF No. 149-14 at 6, 14:17-16:6.

While Exhibits 16, 17, and 18 establish Defendant had a U.S. office, which does not appear to be a disputed issue, merely having a U.S. office or visiting the U.S. does not prove infringing acts or induced infringement.  *See, e.g.*, *Power Integrations II*, 843 F.3d at 1334 (holding that while evidence the defendant maintained a technical support center in the U.S. "that provided support *for the infringing controller chips* to" U.S. customers "may not individually be sufficient to establish liability" it might when "as a whole" along with other evidence).  Rather, intent to infringe will not be inferred from the mere maintenance of a U.S. office as the intent to sell in the U.S. must pertain only to accused products.  Here, Defendant points out that it sells other products, which are not at issue in this case, so the U.S. office could support non-accused products.

### iv.   Communication with EMS or Brand Companies

Plaintiff also argues that Defendant "communicates directly with end customers to sell its products in the U.S."  Pltff. Oppo. at 11:19-20 (citing Exhibit 15 to Plaintiff's Opposition); *but see Largan*, 86 F. Supp. 3d 1111-12 (communicating and working with Apple on end-consumer products did not establish induced infringement).  As an example, Plaintiff argues that Defendant works with ███ to sell many of its allegedly infringing ICMs, including the same ICM found in the Juniper EX4300-48MP, by creating new product numbers, data sheets, and 3D design drawings.  *Id.* at 12:9-11 (citing Exhibit 27 to Plaintiff's Opposition).  Plaintiff states, "as ███ testified, UDE sells many of its ICMs to ███ in the U.S."  Pltff. Oppo. at 12:16-28 (citing Baxter Dep. Trans. II); *but see Largan*, 646 Fed. App'x at 948 (holding that even though the defendant knew that Apple, which used its lenses, sold Apple's devices in the U.S., induced infringement had not been establish because all Apple devices in the U.S. could have contained the plaintiff's lenses rather than the defendant's).  However, Exhibit 23 only shows testimony from Mr. Baxter,

in which he stated that when he says Defendant branded its ICMs for ████, he means that "[t]he products that were sold by ████ [and] had ████ product numbers, beginning with AQX." *Id.* at 12:25-26 (citing Exhibit 23 13:13-24, 17:2-8). The other testimony from Mr. Baxter likewise describes nothing more than how ████ operates and in no way proves infringing acts by Defendant. *See Id.* at 13:4-29 (citing Exhibit 23 at pages 4:3-14, 16:4-14, 10:17-11:3, 58:1-8, 43:14-22). Plaintiff also argues that Defendant and ████ "share a master spreadsheet that cross references the ████ and UDE parts with corresponding descriptions." *Id.* at 14:3-4 (citing Exhibit 13). Again, this does not prove infringement because the evidence shows ████ did not know where its products went, so Defendant likewise could not be held to know they would end up in the U.S. *See* Bergen Dep. Trans. at 5-6, 48:10-49:1.

v.   <u>Multi-Sourcing</u>

Defendant's most persuasive argument is that "[e]ven if Pulse had been able to trace the accused ICMs into an end device in the U.S., Pulse makes no effort to account for multi-sourcing of ICM products, at either the EMS or brand company level." Def. Mot. at 14:14-16.

On February 27, 2020, Defendant's Marketing Manager, Greg Loudermilk, submitted a declaration, under penalty of perjury, that "even if UDE knew what OEM product contained one of its own products, UDE would not be able to determine which instances of the OEM product contained UDE's product." Exhibit 13 to Def. Mot., ECF No. 144-16 at 9, ¶ 17. He elaborated that "because an OEM product can be distributed in many different geographic markets, it is not feasible for UDE to determine which of its products go where." *Id.* While the Court takes this statement from a party-employee with a grain of salt, Plaintiff's own damages expert, Arthur Cobb, testified similarly:

> **Q.** **Is it common in the electronics industry to single source suppliers?**
>
> A.   No.

Cobb. Dep. Trans. at 6, 26:6-10.

Plaintiff admits that it "does not dispute that ICMs are multi-sourced in some

-68-

1    instances." Pltff. Oppo. at 19:13.  However, Plaintiff argues that it "obtained evidence that

2    ███ uses a 100% allocation of UDE 'G' Series and 'N' Series ICMs for its—and—projects

3    as shown in . . . [a] screenshot from an Excel file produced by ███." *Id.* at 19:13-25 (citing

4    Exhibit 26 to Plaintiff's Opposition (screenshot of HPE39529)).  Plaintiff asserts that

5    Exhibit 26 proves that ███ uses a 100% allocation for specific UDE ICMs, including but

6    not limited to the GM4-HP-0003, GM4-HP-0004, GM8-HP-0001, GM8-HP-0002, ND-

7    HP-0003, and ND-HP-0005.  *Id.* at 19:26-20:2 (citing Exhibits 15 and 26 to Plaintiff's

8    Opposition).  Plaintiff also asserts that "multi-sourcing is irrelevant because Pulse's

9    damages opinions only account for the ICMs sourced from UDE." Pltff. Oppo. at 19:9-10.

10   However, while the opinion of Plaintiff's damages expert becomes relevant if Plaintiff can

11   prove causation (e.g., that sales of Accused Products occurred in the U.S.), that opinion

12   cannot in and of itself establish causation.

13        Defendant responds that Plaintiff's argument that ███ had a 100% allocation of

14   Defendant's products is false because ███ told Defendant that it had a policy against 100%

15   allocation because it needed "to dual source everything and give supplier fair share.'" Def.

16   Reply at 7:1-4 (citing Exhibit 25 at 00065) (internal citations omitted).  However,

17   Defendant admits that Plaintiff's evidence "does indicate a single project (listed as

18   '███') for which UDE was allegedly allocated 100% for four accused G-Series ICMs."

19   *Id.* at 7:7-10 (citing Exhibit 15 to Plaintiff's Opposition).  That being said, Plaintiff's

20   evidence "refers only to internal project names and part numbers, and not publicly

21   identifiable finished-product names or numbers, meaning Pulse has no evidence that any

22   of these part numbers or project names were ever sold in the U.S." Def. Reply at 7:19-14.

23   In fact, Defendant states that other evidence produced by EMS companies "indicates these

24   products were exclusively for Singapore, and were ***never destined for the U.S***." *Id.* at

25   7:14-16 (original emphasis).  Finally, Defendant notes that Plaintiff "did depose one EMS,

26   Aquantia, but that evidence fares little better, as there is no indication as to what percentage

27   of products incorporate UDE accused ICMs, as opposed to other suppliers." *Id.* at 9:7-9.

28        At his deposition, the corporate designee of the only EMS company deposed, Mr.

-69-

1    Bergen, testified that when he worked for Aquantia, ███████████████████

2    ██████████, Aquantia did not know where ███ high-speed products would end up

3    going.  Bergen Trans. at 5-6, 48:20-49:1.  Just as multi-sourcing prevented the *Largan*

4    court from finding induced infringement, it prevents this Court from finding induced

5    infringement as well.  Plaintiff has not provided evidence showing Defendant had actual

6    knowledge its products would end up in the U.S., subjectively believed there was a high

7    probability they would end up in the U.S,, or took deliberate actions to avoid learning such

8    facts.  *Global-Tech*, 562 U.S. at 769.  More importantly, "mere allegation and speculation

9    do not create a factual dispute for purposes of summary judgment."  *Nelson v. Pima Cmty.*

10   *Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).  Although Plaintiff sought discovery from

11   other companies in the ICM supply chain, such as EMS and brand companies, about

12   whether Defendant's Accused ICMs were incorporated into devices sold by those

13   companies within the U.S., "none of those subpoenaed companies were able to provide any

14   evidence beyond a generic indication of their percentage of sales in the U.S. for all

15   products" as opposed to just Accused Products.  Def. Mot. at 14:7-14 (citing Cobb Dep.

16   Trans. at 14, 116:7-24, 15, 117:5-119:10 (testifying that the information produced by Dell,

17   Juniper, and Cisco did not show that Dell, Juniper, or Cisco "products contain the accused

18   ICMs" entering the U.S.)); *see also Largan*, 86 F. Supp. 3d at 1118 (where the downstream

19   sellers relied on both the plaintiff and the defendant to supply lenses, even if the defendant

20   induced its suppliers to use its lenses, summary judgment of no induced infringement was

21   appropriate because the end-products using the lenses could all (1) be sold outside the U.S.

22   or (2) use the patent-holder's lenses for the products sold within the U.S.).

23      "Even indirect infringement, which can encompass conduct occurring elsewhere,

24   requires underlying direct infringement in the United States."  *Power Integrations I*, 711

25   F.3d at 1371 (internal citations omitted); *see also Brown v. Duchesne*, 60 U.S. 183, 195-96

26   (1856) (providing that the use of a patented invention "outside of the jurisdiction of the

27   United States is not an infringement of his rights, and he has no claim to any compensation

28   for the profit or advantage the party may derive from it").  Defendant has shown the

-70-

1   absence of evidence showing U.S. sales sufficient to warrant summary judgment.

2           b.    *There is no evidence Defendant took affirmative steps to*
3                 *encourage importation of ICMs into the U.S.*

4           Even *assuming arguendo*, Plaintiff had established third-party U.S. sales of Accused

5   ICMs, "intent to induce infringement cannot be inferred even when the defendant has

6   actual knowledge that some users of its product may be infringing the patent." *Vita-Mix*

7   *Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009).  As a result, even if

8   Defendant knew the actions of EMS and brand companies would result in infringement,

9   that alone will not create liability for induced infringement.  *See, e.g.*, *Enplas Display*

10  *Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407 (Fed. Cir. 2018) ("Mere

11  knowledge of infringement is insufficient."); *Enplas Display Device Corp. v. Seoul*

12  *Semiconductor Co., Ltd.*, 909 F.3d 398, 408-09 (Fed. Cir. 2018) (noting that "mere

13  knowledge of possible [or even actual] infringement is not enough").  Rather, Plaintiff must

14  show Defendant knew both (1) of the Patents-in-Suit and (2) that the acts by the EMS or

15  brand companies that Defendant induced—either making, using, selling, offering for sale,

16  or importing devices containing Accused Products—constituted infringement.  *Id.* This

17  requires Plaintiff to provide evidence of affirmative steps to bring about infringement.  *See,*

18  *e.g.*, *Global-Tech*, 563 U.S. at 771 (affirming the judgment of the Federal Circuit because

19  "[t]aken together, this evidence was more than sufficient for a jury to find that Pentalpha

20  subjectively believed there was a high probability that SEB's fryer was patented, [and] that

21  Pentalpha took deliberate steps to avoid knowing that fact").

22          "Intent is a factual determination particularly within the province of the trier of fact."

23  *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988).  "The requisite

24  intent to induce infringement may be inferred from all of the circumstances."  *See id.*

25  (holding that the defendant's "activities provide sufficient circumstantial evidence for this

26  court to affirm the district court's finding that he intentionally induced Calco's and the

27  public's direct infringement").  However, courts have held that the following activities may

28  (but not necessarily must) induce another's direct infringement sufficient to create liability

-71-

for induced infringement: (1) instructing purchasers to use the product sold in an infringing manner, *see, e.g.*, *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014) (holding that "[p]roviding instructions to use a product in an infringing manner is evidence of the required mental state for inducing infringement"); (2) "advertising an infringing use," *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009); (3) exerting control over the accused product's manufacturing, *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988); or (4) designing of an infringing product, *see id.*

Defendant argues that Plaintiff's interrogatory responses assert that Defendant "took and continues to undertake affirmative acts to induce third parties to import its products into the United States."  Def. Mot. at 19:27-20:2; *see also* SAC at 20:11-14.  However, Defendant argues this claim is unsubstantiated by the evidence for the below reasons:

> First, UDE is far removed from branded companies like Cisco and HPE that sell in the U.S.  The supply chain proceeds as follows: (1) UDE receives purchase orders from EMS companies at UDE's headquarters in Taiwan; (2) UDE fulfills those purchase orders by shipping ICMs to the EMS companies which almost always occurs outside the U.S., and typically in Asia; (3) after shipment to the EMS, UDE has no knowledge or involvement with the ultimate destination of its ICMs; (4) the EMS incorporate the ICMs into a device, like a network switch, that the EMS manufacture outside the U.S. for a branded company like Cisco or HPE; (5) the EMS ship the manufactured network device to a branded company overseas, typically in Asia; (6) the branded company or even a further downstream company working on its behalf ships the network device to countries all over the world which may or may not include the U.S.

Def. Mot. at 20:2-14 (citing Exhibit 3 to Def. Mot., Defendant's Responses and Objections to Plaintiff's Second Set of Interrogatories, ECF No. 144-6 at 11-13; Exhibit 13 to Def. Mot., Declaration of Greg Loudermilk in Support of Joint Motion for Determination of Discovery Dispute, ECF No. 144-6 at 16 at 6-8, ¶¶ 11-16).

Defendant argues that its lack of concern for where its ICMs end up makes this case resemble the case of *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1466

(Fed. Cir. 1990), where the Federal Circuit affirmed the district court's judgment that the defendant had not actively induced infringement of a patent.   In *Hewlett-Packard*, the plaintiff patent-holder filed suit against the defendant after the defendant sold one of its corporate divisions to a third-party, accusing the defendant of inducing infringement for all periods subsequent to the sale.  *Id.* at 1467.   However, the court affirmed the summary judgment of no induced infringement because it found the totality of events surrounding the sale showed that the defendant "was merely interested in divesting itself of Houston Instruments at the highest possible price."  *Id.* at 1469.   The defendant had no interest in what the buyer did with the division "and certainly did not care one way or the other" whether the division continued to make the potentially infringing products.  *Id.*   Even though the sale agreement for the division had an indemnification provision requiring the defendant to indemnify the buyer for any infringement of the patent-in-suit, the court founds this insignificant.  *Id.* at 1470.   It showed nothing more than proving what the defendant "really wanted out of this agreement was the sale of Houston Instruments at the greatest possible price" even if it required the defendant to bear the risk of products ultimately being found to infringe.  *Id.*

Defendant argues that Plaintiff's "inducement argument has more flaws than HP's argument."  Def. Mot. at 21:12.   Defendant points out that like the *Hewlett-Packard* defendant, Defendant "is interested only in selling its ICMs to EMS companies."  *Id.* at 21:12-13.  "What the EMS companies do with the ICMs after receiving them from UDE 'is in some sense extraneous information to UDE, because [UDE's] sales transaction begins and ends with the EMS company.'"  *Id.* at 21:13-16.   Indeed, even if Defendant knew third-parties could infringe Plaintiff's Patents-in-Suit, which Defendant denies, that is still not enough to establish induced infringement.  *Hewlett-Packard*, 909 F.3d at 1470.   In fact, Defendant argues the facts of this case are even more favorable to Defendant than those in *Hewlett-Packard* for three reasons: First, the sale in *Hewlett-Packard* involved a direct sale to the infringing party (e.g., from the defendant to the entity to whom it sold the division that made the infringing products), 909 F.3d at 1467, whereas in this case, Defendant "is

-73-

the beginning of a multi-step supply chain, in which the alleged direct infringers, branded companies like Cisco and HPE, or perhaps companies importing devices on their behalf, are at the end." Def. Mot. at 21:19-22. Second, the *Hewlett-Packard* defendant admitted infringement, 909 F.2d at 1467, whereas Defendant contests infringement. *Id.* at 21:23-26. Third, the *Hewlett-Packard* defendant agreed to indemnify the direct infringer, reflecting it understood the end result of the sale would potentially result in continued infringement, 909 F.2d at 1467, whereas Defendant has no relationship—much less an indemnification agreement—with branded companies. Def. Mot. at 21:26-22:2. The Court agrees that like the defendant in *Hewlett-Packard*, the evidence suggests Defendant's only concern was selling its products, and where those sales took place did not matter to UDE.

Plaintiff responds by arguing that if Defendant "is 'far removed from branded companies like ███ and ███,' then why did ███ produced [sic] over 43,280 documents in response to Pulse's subpoena?" Pltff. Oppo. at 17:12-15 (citing Exhibit 15 to Plaintiff's Opposition). However, sheer volume of documents produced in response to a subpoena proves nothing, and as a result, this argument is insignificant. Plaintiff also argues that the fact that Defendant works with its customers for the design in U.S. proves intent to induce infringing acts. *Id.* at 18:4-8 (citing Exhibit 20 to Plaintiff's Opposition, February 24, 2016 E-mail from Greg Loudermilk to KB Ong at Pulse, ECF No. 150-23 at 5 (stating that "UDE works closely with Accton, however, for the design in U.S." of products for Defendant's clients, Brocade). However, first, the e-mail on which Plaintiff relies where Defendant discusses working closely with Accton/Brocade does not prove this work is directed to towards making any of the Accused Products. Second. *Largan* demonstrates that working with downstream sellers, even by visiting the U.S., does not establish induced infringement, especially where those sellers sell products worldwide. 646 Fed. App'x 948.

Next, Plaintiff argues that in February 2016, Greg Loudermilk e-mailed Plaintiff's CEO to explain that Defendant "is taking more footprint from our competitors" including "10% from Pulse" annually over the past three years in the North American Market." Pltff. Oppo. at 18:13-16 (citing Exhibit 28 to Plaintiff's Opposition). However, North America

includes more than the U.S., and as such, this e-mail still does not prove intent to infringe within the U.S., particularly because again, Defendant is allowed to sell products in the U.S. so long as those products do not practice Plaintiff's Patents-in-Suit or are not accused in this case.

In sum, Plaintiff argues the above actions show Defendant encouraging, marketing, and promoting its ICMs to Defendant's customers, including numerous companies based in the U.S. and selling multi-gigabit ICMs in the U.S., which reflects "an affirmative intent on behalf of UDE which actively aids the infringement by UDE's customers." Pltff. Oppo. at 18:21-24. While Plaintiff has, in fact, provided evidence that Defendant encourages, markets, or promotes the sale of *some* products targeted towards the U.S., Plaintiff has failed to "connect the dots" by showing the products discussed in the evidence on which Plaintiff relies are also products not just accused in this case but also sold or imported into the U.S. As a result, Plaintiff has failed to come forward with evidence in the record showing Defendant took affirmative steps to cause the accused ICMs to be imported or sold within the U.S. sufficient to create a genuine issue of fact as to induced infringement. Thus, the Court grants summary judgment in Defendant's favor on the issue of induced infringement as to all Accused Products sold by Defendant outside the U.S.

### 2. *Summary Judgment is Appropriate for the GX-X Series which Defendant Has Never Sold Anywhere*

Defendant argues that Plaintiff "continues to accuse a series of products (GX-X) that UDE *has never sold anywhere*." Def. Mot. at 22:5-8. Plaintiff responds that it need not prove sales to prove infringement; rather, infringement for the GX-X series can be proven by other acts. Pltff. Oppo. at 5-15-20, 21:2-5. Thus, Plaintiff argues it "is entitled to an infringement judgment based on UDE's importation of the 'GX-X' series product into the U.S., at least based upon the physical UDE ICM 'GM-41000VJ84-1' that Pulse and/or its counsel has been in possession of in the U.S. since before the suit was filed." *Id.* Plaintiff also argues that "the English language data sheets for highly similar 'GX-X' series devices such as the GM-80000VR14-1 . . . are currently present on UDE's website," and as such,

infer those products are sold.  *Id.*  at 5:20-24; 21:6-28.  Defendant responds that while Plaintiff argues it examined a product from the GX-X series, Plaintiff conveniently fails to inform the Court how it secured that product.  Def. Reply at 13:10-16.  Defendant points out that Plaintiff "has not presented any evidence indicating that anyone other than Pulse ever used, imported, etc. that GX-X sample in the U.S.," and Defendant believes Plaintiff obtained the sample outside the U.S." *Id.* at 13:12-16.  Defendant also argues that the data sheet on which Plaintiff relies does not represent an offer to sell, import, or use the GX-X series in the U.S.  *Id.* at 13:22-14:9.

Exhibit 14 to Defendant's Opposition shows Defendant UDE's related sales transactions worldwide for the period of 2015 through September 30, 2020 and shows no sales of the GX-X Series.  *See* ECF No. 142-10.  When Plaintiff's damages expert, Mr. Cobb, was asked directly, "Are you aware of any evidence that GX-X has ever been offered for sale in the United States?," he responded with a succinct, "No."  Cobb. Dep. Trans. at 13, 110:11-13.  Thus, separate and aside from whether the GX-X Series infringes, Plaintiff has failed to point to any evidence in the record showing Defendant ever used, sold, offered for sale, or made the GX-X Series products within the U.S.  *See also id.* at 109:13-20 (testifying that he has not seen any evidence refuting the fact that GX-X has never been sold).  Other courts have granted summary judgment in the absence of evidence of evidence of sales during the time period covered by the relevant patent.  *See, e.g.*, *Largan*, 86 F. Supp. 3d at 1120 (granting the defendant's motion for summary judgment of no infringement as to a product the defendant stopped selling before the patent pertaining to that accused product issued; thus, there were no sales once the patent issued).

Because Plaintiff failed to produce evidence creating a genuine issue of fact as to whether the GX-X Series of Accused Products were ever sold, used, made, or imported in the U.S., and therefore, infringe on Plaintiff's Patents-in-Suit, the Court finds it appropriate to grant summary judgment in Defendant's favor as to the GX-X Series.  The Court dismisses all of Plaintiff's claims directed towards this series of products.

///

### 3.   *A Summary Judgment of Non-Infringement is Appropriate for the S-Series and N-Series Products that Plaintiff Never Analyzed*

Defendant argues that despite being provided multiple samples from each series for analysis, Mr. Baxter "analyzed only a single model number for both the S-series and N-series, and then, simply declared the model he analyzed for each series is 'substantially similar' to all other models in that series, without bothering to adequately prove that is correct."   Def. Mot. at 22:17-20.   Defendant contends Plaintiff cannot assume all of Defendant's products are like the one Mr. Baxter chose to test, and thereby, shift the burden of proof to Defendant prove otherwise.   *Id.* at 22:20-22.   According to Defendant, because Mr. Baxter only analyzed products which are not representative of the Accused Products, Plaintiff's claims should be dismissed as to the Accused Products Mr. Baxter did not analyze. *Id.* at 23:4-5.   Plaintiff opposes by relying on general authority that allows parties to chart representative products to argue that because it charted representative products for the S and N Series of Accused Products, Defendant "has failed to show that no genuine issue of material fact exists as to the S-Series and N-Series representative products."   *Id.* at 11:5-16.   However, Defendant responds that Plaintiff's "Opposition makes no headway in showing what Pulse is required to [show to] survive summary judgment: that the analyzed products are in fact representative of each of the other products Pulse tries to cover."   Def. Reply at 14:11-14.

"When a patentee with the burden of proof seeks summary judgment of infringement, it must make a prima facie showing of infringement as to each accused device before the burden shifts to the accused infringer to offer contrary evidence."   *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (holding that the defendant "failed to satisfy its burden of showing that there is no genuine issue of material fact on the issue of infringement").   While representative products may be charted to show infringement, a patent holder may only rely on charts of a representative product where the representative products are "supported by adequate analysis showing that the accused products share the same critical characteristics."   *See Cap Co. v. McAfee, Inc.*, No. 14-CV-

-77-

1   05068-JD, 2015 WL 4734951, at *2 (N.D. Cal. Aug. 10, 2015).

2        For the reasons outlined below, the Court finds Plaintiff's analyzed products were

3   not, in fact, representative of the series they sought to cover.  Because Plaintiff did not

4   present evidence of infringement for any unanalyzed products, Defendant has shown the

5   absence of a genuine issue of fact as to whether the unanalyzed S-Series and N-Series

6   Accused Products infringe.

7            a.   *The analyzed S3Y-HP-0001 is not representative of the S Series*

8        This Court has already held that Plaintiff failed to show the absence of a genuine

9   issue of fact as to whether the S3Y-HP-0001 MPN, which is the only product Mr. Baxter

10   examined, is representative of the "S" Series of Accused Products.  Defendant argues

11   Plaintiff rejected Defendant's proposal of the S3D-AR-0001 as representative and chose,

12   instead, to analyze the non-representative S3Y-HP-0001 because "the S3D-AR-0001

13   product cannot infringe the '840 or '318 Patents, and Pulse knows that, but wanted to

14   accuse all the S-Series sales despite lacking the technical basis to do so."  Def. Mot. at

15   23:11-17.  Defendant elaborates that because Mr. Baxter did not analyze the other products

16   in the series, "[t]here simply is no *prima facie* showing of infringement by the other S-

17   series devices that Mr. Baxter did not analyze." *Id.* at 24:5-7.  Plaintiff attempts to defeat

18   Defendant's Motion for Summary Judgment as to the "S" Series of Accused Products

19   solely by summarily arguing that the S3Y-HP-0001 is, in fact, representative.  Pltff. Oppo.

20   at 22:17-23:8.  This argument fails in light of the Court's ruling on that issue in response

21   to Plaintiff's Motion for Summary Judgment.  The Court finds Defendant has shown the

22   absence of a genuine issue of fact as to whether the unanalyzed "S" Series of Accused

23   Products infringe.  However, the Court finds a genuine issue of fact remains as to whether

24   the S3Y-HP-0001 infringes, but this issue may not be relevant if Plaintiff cannot come

25   forward with evidence of infringing acts within the U.S.

26            b.   *A genuine issue of fact exists as to whether the N42-ZT-0001 is*

27                 *representative*

28       Defendant argues that as to the N-Series of Accused Products, Mr. Baxter also only

-78-

1    analyzed a single ICM from the series, and the ICM he chose to analyze was not the ICM

2    Defendant had proposed as representative of the series.   Def. Mot. at 24:25-25:3.

3    Defendant elaborates that Mr. Baxter "trie[d] to argue the N42-ZT-0001 is representative

4    of other unanalyzed N-series ICMs solely by reference to documents apparently for a

5    product number N40-MA-0004, *which is not even accused in this case*."  Def. Mot. at

6    25:3-8 (internal citations omitted) (original emphasis).  Defendant also contends that other

7    than Mr. Baxter's comparison of Plaintiff's proposed representative product to a non-

8    Accused Product, Plaintiff has no other evidence that its proposed "N42-ZT-0001 ICM is

9    representative in any way of the other accused N-series ICMs, including the N60-AQ-0008

10   that Dr. Lebby explains does not infringe." *Id.* at 25:8-11.  Thus, according to Defendant,

11   if the only product Mr. Baxter analyzed, which is the N42-ZT-0001, is not, in fact,

12   representative of other products in the N Series, then, the evidence pertaining to that

13   product cannot apply to the other products in the N Series, meaning Plaintiff is left with no

14   evidence of infringement as to the other Accused Products in the series.  *Id.* at 25:8-15.

15          Plaintiff responds by arguing it should be allowed to prove infringement based on

16   the N42-ZT-0001 as representative because Defendant only provided two products from

17   the N Series for Plaintiff to examine, and the N42-ZT-0001 was the only UDE-branded

18   device, so the Court should allow Plaintiff to rely on it.  Pltff. Oppo. at 23:9-23.  Plaintiff

19   also relies on its improper Amended Infringement Contentions.  *See id.*

20          Mr. Baxter testified the structure of the N60-AQ-0008, which is another product in

21   the N Series, "does appear to be somewhat different" from the structure of the N42-ZT-

22   0001.   Baxter Dep. Trans. II at 15, 71:5-11.  When asked, "So, N42-ZT-0001 is not

23   representative of N60-AQ-0008, right?," Mr. Baxter responded, "Not from what I could

24   see here." *Id.* at 71:12-16.  The Court finds that Defendant has shown the absence of a

25   genuine issue of fact as to whether the N42-ZT-0001 is representative of the N Series of

26   Accused Products.  If the N42-ZT-0001 is not representative of all other Accused Products

27   in the N Series, and Plaintiff only has evidence of infringement pertaining to the N42-ZT-

28   0001, then, Plaintiff lacks evidence that any other Accused Products within the N-Series

infringe on Plaintiff's Patents-in-Suit.  Thus, the Court dismisses all N-Series Products other than the N42-ZT-0001.

## C.   Defendant's *Daubert* Motion

Defendant asks the Court to exclude the opinion of Plaintiff's damages expert, Arthur Cobb, estimating UDE's U.S. sales of accused ICMs as a percentage of its sales of products outside the U.S. as improperly based on speculative data.  Def. Mot. at 25:18-22. Plaintiff responds that Defendant's disagreement with Mr. Cobb's testimony should be settled on cross-examination at trial.  Pltff. Oppo. at 25:13-17.  Defendant replies that Plaintiff's attempts to argue the Court should admit Mr. Cobb's opinion fail because the case law on which it relies involve cases where the opinions were substantially more reliable.  Def. Reply at 11:7-13:4.  As set forth below, the Court finds exclusion of Mr. Cobb's opinion appropriate given it relies on speculative information, and as such, is unreliable.

During Mr. Cobb's deposition, he testified that he estimated the royalty base by estimating "total sales of accused products to 30 percent of the total [sales] to reflect [sic] discount for the nonpatented features and United States sales."  Cobb. Dep. Trans. at 10-22, 96:13-19.  He based his "reduction for US sales," which he stated "would likely be in the range of 35 to 40 percent" on documents identifying "the United States and North American sales for UDE's leading brand end clients in networking and servers, ranging from 32 to 74 percent."  *Id.* at 97:3-11.  However, Mr. Cobb also admitted he had no evidence that the products covered by the sales data he used to calculate his opinions actually incorporated Defendant's accused ICMs.  *Id.* 19, 144:22-25.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court held that a trial judge's jobs under the Federal Rules of Evidence is to "ensure that any and all [expert] evidence admitted is not only relevant, but reliable."  509 U.S. at 589.  At the same time, a court may not exclude expert testimony simply because it finds the testimony unpersuasive. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Cases applying *Dabuert* have used it to exclude unreliably, but not unpersuasive expert opinions.  For example, in *Power Integrations I*, 711 F.3d at 1373-74, the Federal Circuit held that the district court's decision to admit the plaintiff's expert's opinion constituted an abuse of discretion warranting a new trial because the expert's damages testimony was unreliable for two reasons.  711 F.3d at 1373-74.  First, the source on which the expert relied for his estimate of Samsung's worldwide sales was unclear.  *Id.* at 1373.  Second, the document on which he relied to estimate damages showed worldwide shipments of mobile phones; however, the infringing products (*i.e.*, power circuits) were found in mobile phone chargers, not mobile phones.  *Id.*  Thus, even though the court acknowledged it would be reasonable to assume phones would be shipped with chargers, the document on which the expert relied did not provide a reliable link indicating the shipped phones necessarily included chargers in each shipment.  *Id.*  Without more, it was improper to assume all shipments included a charger.  *Id.* at 1373-74.  Additionally, the expert's opinion assumed not only that each shipment included a phone charger but also that each phone charger contained an infringing circuit.  *Id.* at 1374.  However, the document on which the expert relied did not have any model numbers or other indicia which would allow an inference that the chargers all included the defendant's infringing power circuits, and several other companies sold competing power circuits to Samsung.  *Id.*  Thus, the expert "had no way to distinguish between infringing and noninfringing chargers, and his assumption that all chargers incorporated an infringing power circuit was speculation."  *Id.*  As a result, the Federal Circuit held that because the opinion "derived from unreliable data and built on speculation," it lacked "the hallmarks of genuinely useful expert testimony."  *Id.*

Defendant argues that just like the opinion in *Power Integrations I*, Mr. Cobb's opinion fails to distinguish between accused products and non-accused products or even limit itself to Defendant's customers.  Def. Mot. at 27:9-21.  Defendant argues that Mr. Cobb "has no evidence that these UDE customers [on the list he uses] are customers for the ***accused products*** because he admits he simply identified certain customers from a UDE

-81-

1    presentation that was for *all* of UDE's products, as opposed to UDE's sales for the accused

2    ICMs." *Id.* (original emphasis).  Plaintiff responds by noting that "[t]he opinion in *Power*

3    *Integrations I* was based on the speculative assumption that each phone was sold with an

4    infringing charger, but the documents relied on by the expert did not support that

5    assumption." Pltff. Oppo. at 25:3-8.  In this case, however, Plaintiff argues that Mr. Cobb's

6    opinion uses "actual data produced by UDE for the infringing ICMs and has documented

7    the support for the 30%." *Id.* at 25:8-9.  Plaintiff also argues that Defendant's motion

8    "appears to intentionally ignore the decision in *Power Integrations II*, 843 F.3d at 1315,

9    1333-34, but that case did not involve a *Daubert* motion.[23]  *Id.* at 25:25-26:5.

10

---

11    [23]    To the extent Plaintiff appears to argue that *Power Integrations II* stands for the

12    proposition that Defendant's "argument that it allegedly 'does not know' where its ICMs
      end up is . . . not adequate for either Partial Summary Judgment or *Daubert*," *id.*, the Court

13    finds this argument unavailing.  In *Power Integrations II*, the Federal Circuit held that the
      plaintiff had "introduced significant—though not necessarily overwhelming—evidence

14    that would allow a jury to find that Fairchild took affirmative acts to induce third parties to
      import its products into the United States."  843 F.3d at 1333.  However, the *Power*

15    *Integrations II* plaintiff presented evidence that the defendant (1) designed its controller
      chips to meet certain U.S. energy standards, (2) competed for business it knew was directed

16    to the U.S., (3) "provided demonstration boards containing the infringing controller chips
      to customers and potential customers in the United States," (4) maintained a website that

17    enabled customers to locate a U.S.-based distributor that sold the defendant's infringing
      controller chips, (5) "maintained a technical support center in the United States that

18    provided support *for the infringing controller chips* to customers based in the United

19    States," and (6) had "standard terms and conditions [that] indemnified customers against
      claims for infringement of United States patents."  *Id.* at 1333-34.

20
             While Plaintiff attempts to argue the same evidence in this case supports a finding

21    of infringement and exclusion of Mr. Cobb's opinion, this case differs from *Power*

22    *Integrations II* in the following ways: First, there is evidence that Defendant designed
      products pursuant to customer requests, but there is no similar evidence that those requests

23    were targeted towards U.S. standards, or if they were, that Defendant knew that.  Second,

24    while there is evidence Defendant competed for business with companies it knew sold
      products within the U.S., there is no evidence Defendant competed for business with any

25    EMS or brand companies and knew they intended to sell Defendant's their products,

26    containing Defendant's ICMs, within the U.S.  Third, even though there is evidence

27    Defendant had data sheets on its products on its website, there is no evidence Defendant's

28    website allowed customers to locate distributors of its products in the U.S., as in *Power*

Next, Defendant argues the Court must exclude Mr. Cobb's opinion just as the court in *Eidos Display, LLC v. Chi Mei Innolux Corp.*, 262 F. Supp. 3d 424, 426-28 (E.D. Tex. 2017) excluded the same type of opinion also offered by Mr. Cobb.  In *Eidos*, which also involved alleged patent infringement, Mr. Cobb started with a base of accused products sold worldwide, just as he did in this case, and applied a percentage to estimate sales in the U.S.  *Id.* at 426.   The court held that "the critical problem with Mr. Cobb's application of his 25% [estimate] is that he has no opinions or testimony to support a conclusion that such a percentage would be an appropriate representation of the number of each Defendants' *accused infringing products* that were shipped into the United States."  *Id.* at 426.  The court also reasoned that unlike *Power Integrations I*, where the expert at least had some data specific to U.S. customers, Mr. Cobb had no such data.  *Id.*  Further, while the plaintiff argued Mr. Cobb's opinions were admissible because he can provide a "hypothetical negotiation analysis for a U.S. license to the patent-in-suit," the Court reasoned that "given that Mr. Cobb's damages opinions as to indirect sales have been deemed inadmissible, these third party licenses cannot stand alone to support damages for indirect infringement in the context of a hypothetical negotiation."  *Id.* at 427.  While such "licenses may be informative and comparable, they do not reliably support an estimate of indirect sales of each Defendants' accused infringing products in the United States."  *Id.* at 427.  As a result, the court held that "Mr. Cobb has yet to provide opinions that would be permissible under *Daubert*," found his "use of a 25% portion of U.S. sales speculative and inadmissible," and prohibited from providing such opinions at trial.  *Id.*  The court also prevented him from relying "on third party licenses to testify to indirect damages."  *Id.*

Plaintiff argues that Defendant "ignores widely cited case law to argue that Mr. Cobb needs to apply weight to each customer or otherwise complete a damages analysis for each customer."  Pltff. Oppo. at 26:6-15.  Plaintiff is correct that "[p]laintiffs who identify an entire category of infringers (e.g., the defendant's customers) may cast their theories of

---

*Integrations II*.  Fourth, even though Defendant maintained a U.S. office, there is no evidence it offered technical support for *Accused Products* within the U.S.

-83-

vicarious liability more broadly, and may consequently seek damages or injunctions across the entire category." *Id.*  However, Plaintiff also argues that it "conducted third party discovery on what Pulse believed were the largest customers of UDE," and Mr. Cobb's opinion was appropriately based on that customer data even if it excluded some of Defendant's customers.  Pltff. Oppo. at 25:17-21.  While Plaintiff may rely on categories of evidence, it must establish that those categories first show at least some Accused Products entered the U.S.  Here, Mr. Cobb admits the invoices in this case do not show any Accused Products shipped directly to the U.S., Cobb. Dep. Trans. at 4, 19:23-20:6, and he does not have evidence of sales by Defendant's clients in the U.S. involving products incorporating accused ICMs., *id.* at 19, 144:22-25.  Next, Plaintiff argues that in *Eidos*, the "court . . . reconsidered the reliability of Mr. Cobb's testimony after *Power Integrations II* was decided" and "was prepared to admit Mr. Cobb's testimony, <u>including the indirect royalty base</u>," but the case settled before Mr. Cobb could testify.  Pltff. Oppo. at 25:1-12.  However, Defendant responds that "[w]hile it is true that the *Eidos* court severed the indirect infringement allegations, no order in that case overturned the exclusion of Mr. Cobb's speculative estimate."  Def. Reply at 12:17-19.  Regardless of any subsequent history in *Eidos*, the Court finds the *Eidos* court's original order persuasive.

Finally, Plaintiff argues that in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 900 F. Supp. 2d 1160 (D. Nev. 2012) ("*Halo II*"), the court found a 30% royalty base admissible and that any challenge should be made on cross-examination.  Pltff. Oppo. at 24:11-20.  *Halo II* involved a patent infringement case brought against Pulse, where Pulse filed a motion to exclude the opinions of the plaintiff's expert.  *Id.* at 1162.  Pulse argued that (1) its sales of the accused products outside the U.S., including total worldwide sales, were irrelevant, (2) the plaintiff's royalty base analysis was unsupported by proper evidence, and (3) the plaintiff should not be allowed to rely on a patent licensing agreement to which Pulse was not party when determining the royalty rate.  *Id.*  The *Halo II* court held that the expert had "based his royalty base analysis on sufficient facts considering the evidence available."  *Id.* at 1164.  It reasoned that "[a]n estimation was necessary given the lack of specific data

showing how much of Pulse's sales of accused products outside the U.S. were eventually imported back into the U.S." *Id.* at 1164. The expert had been able to approximate the amount of Pulse's accused products because Pulse and a company to which it sold its products "admitted that, in addition to the accused products Pulse sold directly into the U.S., some of the accused products sold outside of the U.S. are incorporated into end-products and then imported back into the U.S." *Id.* at 1163-64. In other words, some evidence of infringing acts within the U.S. had been established providing a basis for the expert's opinion, and any shortcomings in that opinion could be addressed on cross-examination. *Id.* at 1162.

Defendant responds that *Halo II* is distinguishable because the expert there "narrowed his inquiry to the end-products that could contain the accused products, as well as companies that bought from Pulse's customers and sold those end-products in the U.S." Def. Reply at 11:24-12:3. Here, on the other hand, Defendant argues that Mr. Cobb not only fails to identify any end products containing Accused Products but specifically includes products like monitors, notebooks, and LCD televisions that cannot possibly incorporate the Accused Products because they use single port ICMs that are no longer at issue in this case. *Id.* at 12:3-8. The Court agrees. Mr. Cobb's opinion estimating Defendant's U.S. sales of accused ICMs as a 30% of its sales of its worldwide sales for all products, including non-Accused Products, is improperly based on speculative data, particularly given neither party has established infringing acts within the U.S.

## V.   **CONCLUSION**

For the above reasons, the Court rules on the motions as follows:

1.     Plaintiff's Motion for Summary Judgment is **DENIED**. The evidence in this case shows that at a minimum, a genuine of issue of fact exists as to whether the S3Y-HP-0001 is representative of the "S" Series of Products, which was the only series of products on which Plaintiff moved for summary judgment. Plaintiff also failed to produce admissible evidence showing the absence of a genuine issue of fact as to whether the "S" Series of Accused Products directly infringe, much less whether any infringing acts took

place domestically.

2.    Defendant's Motion for Summary Judgment is **GRANTED** as follows:

a.    Defendant has shown the absence of evidence creating a genuine issue of fact from non-party EMSs or branded companies that Defendant's accused ICMs, which Defendant manufactures and sells overseas, were imported into the U.S., such that summary judgment in Defendant's favor on the issue of induced infringement is proper. *See, e.g.*, FED. R. CIV. P. 56(c)(1)(B) (providing that "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . showing that the materials cited do not establish the . . . presence of a genuine dispute").

b.    Defendant has shown the absence of evidence creating a genuine issue of fact as to direct infringement of the GX-X series as well as all products in the S and N Series except for the MPNs analyzed by Mr. Baxter, for which the Court finds existence of a genuine issue of fact: MPNs S3Y-HP-0001 and N42-ZT-0001.

c.    The Court dismisses *with prejudice* (1) all of Plaintiff's claims for induced infringement of all Accused Products and (2) Plaintiff's claims for direct infringement of the GX-X series as well as all Accused Products in the S and N Series except for MPNs S3Y-HP-0001 and N42-ZT-0001.

3.    While Plaintiff's claims for contributory infringement as to all Accused Products and direct infringement as to the G Series along with MPNs S3Y-HP-0001 and N42-ZT-0001 remain in this case, the Court, *sua sponte*, issues an Order to Show Cause to as to why the Court should not grant a summary judgment of non-infringement in Defendant's favor as to all remaining claims. *See* FED. R. CIV. P. 56(e)(1) (providing that where "a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may . . . give an opportunity to properly support or address the fact). Plaintiff must come forward with evidence of infringing acts occurring within the U.S. by the only named defendant in this case, UDE, not evidence as to third parties. The briefing should be limited to whether infringing acts took place domestically (as opposed to whether the Accused Products infringe on the Patents-in-Suit) given infringement is irrelevant if the

allegedly infringing acts did not occur domestically.  The briefing should comply with the following requirements:

      a.    With respect to the invoices referenced by both parties showing a "Bill to" address within the U.S. but a "Ship to" address outside the U.S., the briefing should address what law (e.g., the Uniform Commercial Code, U.S. law, Taiwanese law, the C.I.S.G., or some other international law) applies to determining the place of sale.  Each party should address where the offer to sell or sale took place.

      b.    Plaintiff is directed to provide the Court with briefing on the above issues only within seven (7) calendar days of this order, or by Tuesday, March 23, 2021. This briefing is limited to twenty (20) pages.

      c.    Defendant is directed to file its opposition brief within six (6) calendar days after Plaintiff's brief is due, or by Monday, March 29, 2021, which is also limited to twenty (20) pages.

      d.    Because the issue of whether Defendant's actions qualify as infringement have been addressed in large part—other than addressing what law should apply to the determination of where the sale took place—in the briefing already contained within the record, no reply briefs will be permitted.

      e.    To the extent the Parties rely on evidence in their briefing that has already been submitted in support of the cross-motions for summary judgment addressed by this order, the Parties are asked to refer to the ECF No. and page number of the exhibit on which they intend to rely rather than re-submitting the exhibit with the briefing.

      f.    The Court reminds both parties that pursuant to Section 2(e) of the Electronic Case Filing Manual, all parties are required to submit courtesy copies to chambers of any filings exceeding twenty (20) pages.

      **IT IS SO ORDERED.**

 DATED:    March 15, 2021

                                                 **HON. ROGER T. BENITEZ**
                                             United States District Judge