1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PULSE ELECTRONICS, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>v.<br><br>U.D. ELECTRONIC CORP., a Taiwan corporation,<br><br>        Defendant.<br><br>U.D. ELECTRONIC CORP., a Taiwan corporation,<br><br>        Counterclaimant,<br><br>v.<br><br>PULSE ELECTRONICS, INC., a Delaware corporation,<br><br>        Counterdefendant. | Case No.:  3:18-cv-00373-BEN-MSB<br>**Related Case No.:** 3:20-cv-01676-BEN-DEB<br><br>**ORDER:**<br><br>**(1) GRANTING SUMMARY JUDGMENT, *SUA SPONTE*, FOLLOWING THE COURT'S ORDER TO SHOW CAUSE**<br><br>**(2) GRANTING MOTIONS TO SEAL**<br><br>**[ECF Nos. 160, 170, 172, 173, 175]** |

## I.    INTRODUCTION

Plaintiff/Counterdefendant PULSE ELECTRONICS, INC., a Delaware corporation ("Plaintiff" or "Pulse") brings this action for a patent infringement against Defendant/Counterclaimants Defendant U.D. Electronic Corp., a Taiwan corporation

1   ("Defendant" or "UDE").  Second Amended Complaint, ECF No. 106 ("SAC").

2       Before the Court are (1) Plaintiff's Response to the Court's Order to Show Cause,

3   ECF No. 172 ("Pltff. Brief."), and (2) Defendant's Response Thereto, ECF No. 175 ("Def.

4   Brief").  The Motions were submitted on the papers without oral argument pursuant to

5   Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF

6   No. 158, 160.

7       After considering the papers submitted, supporting documentation, and applicable

8   law, the Court **GRANTS** summary judgment, *sua sponte*, in Defendant's favor as Plaintiff

9   has failed to submit evidence of Defendant's infringing activities within the United States

10  ("U.S.").

11  **II.   BACKGROUND**[1]

12      This matter arises out of a dispute over whether Defendant is infringing on the claims

13  of U.S. Patent Nos. (1) 7,959,473 (the "'473 Patent"), (2) 9,178,318 (the "'318 Patent"),

14  and (3) 6,593,840 (the "'840 Patent") (collectively, the "Patents-in-Suit").  *See generally*

15  SAC.  Plaintiff contends that Defendant directly and indirectly infringes the Patents-in-Suit

16  including by making, using, selling, importing, and/or offering for sale—including through

17  the sale and importation by Defendant's customers, rather than Defendant itself—multigig

18  (e.g., 2.5G, 5G, 10G) 2xN[2] integrated connector modules ("ICMs") or products that contain

19  the aforementioned ICMs, including Defendant's four ICM series products: (1) the G

20  series; (2) the GX-X series; (3) the S Series; and (4) the N Series.  November 10, 2020

21  Infringement Report of Plaintiff's Expert, Lex Baxter, Exhibit 5 to Def. Mot., ECF No.

---

23  [1]    A more detailed factual and procedural history was set forth in the Court's previous
24  order on the parties' cross-motions for summary judgment and is incorporated by reference.
    Order, ECF No. 160 at 2-9; *see also Pulse Electronics, Inc. v. U.D. Electronic Corp.*, No.
25  3:18-cv-00373-BEN-MSB, 2021 WL 981123, at *1-4 (S.D. Cal. Mar. 16, 2021).  The
    Court reiterates only the most salient points in the instant order.
26  [2]    As will be addressed, 2xN refers to the number of ports on the ICM and "means that
27  there are two rows of ports, one on top of the other."  Def. Mot. at 8:22-23.  All accused
    products in this case have the "2xN" designation, and as such, this case involves only multi-
28  port, rather than single port, ICMs.

142-4 ("Baxter Report") at 7[3]; December 8, 2020, Rebuttal Expert Report of Defendant's Expert, Justin R. Blok, Exhibit 10 to Def. Mot., ECF No. 142-9 ("Blok Report") at 5.

### A.   **Factual Background**

Founded in 2005, Defendant is a Taiwan corporation that manufactures and supplies communications equipment, including RJ-45 ICMs, for integration into computer networking devices overseas.  SAC at 2:8-10, 3:26-27; *see also* Answer, ECF No. 108 at 2:8; Def. Mot. at 5:2-5; *see also* Blok Report at 5.  "Defendant is currently headquartered in Taoyuan City, Taiwan, and operates two factories in Guandong and Sichuan, China." Blok Report, at 5.  As of May 2018, Defendant held a 9% market share (by volume) of the global copper ICM market and was the second largest manufacturer of the RJ-45 ICM connectors in the world (by revenue), with Plaintiff being the fifth largest manufacturer. *See* Exhibit "M" to SAC, ECF No. 106-14 at 4, 8; *see also* Blok Report at 8.

In a typical sales transaction, Defendant receives a purchase order from an EMS company at its headquarters in Taiwan.  ECF No. 151 at 7:11-12.  Then, Defendant manufactures the ICMs in China and ships them "to the EMS company outside the United States, typically in Asia." *Id.* at 7:12-14.  After Defendant ships the ICMs to the purchaser, Defendant asserts that it "does not have knowledge or control over where the ICMs go." *Id.* at 7:14-15.  UDE claims "[t]he EMS company and the brand company control where the electronic devices will be distributed." *Id.* at 7:15-16. Both parties agree that "in some instances," ICMs are "multi-sourced," which means that even if Defendant supplies ICMs for a certain brand company's products, that brand company will also generally rely on anywhere from one to four additional suppliers when manufacturing that product.  ECF No. 150 at 19:13.

Defendant claims that its "competitive advantage is (1) proprietary technology that automates ICM manufacturing, and (2) flexibility to customize ICM designs with short lead time." ECF No. 151 at 7:18-20.  On February 24, 2016, Defendant "proposed at one

---

[3]     Unless otherwise indicated, all page number references are to the ECF generated page number contained in the header of each ECF-filed document.

point a joint venture that would use UDE's superior manufacturing capabilities with Pulse's better known name in the electronics industry." *Id.* at 7:23-26; *see also* SAC at 5:17-26.  However, Defendant argues that instead, Plaintiff used a visit to Defendant's factory to gather intelligence and conspire with one of Defendant's competitors to slow down Defendant's growth. *Id.* at 7:26-8:1; *see also* ECF No. 142-1 at 2.

While the parties disagree as to whether Defendant makes any direct sales within the U.S., both parties agree that if the invoices for Defendant's worldwide sales evidence any U.S. sales, those sales are at most twelve percent (12%) of Defendant's worldwide sales. ECF No. 150 at 4:3-6; ECF No. 157 at 5:21-28 (arguing the 12% figure incorrectly includes invoices for non-accused products, and when limited to accused products, the figure is 7.8%).  However, Plaintiff argues that even if Defendant manufactures and sells its ICMs outside the U.S., it contributes to infringement by the branded companies or their consumers because Defendant allegedly knows and even hopes its ICMs will be incorporated into network switches that eventually make their way into the U.S. *Id.* at 9:12-17.  In that vein, Plaintiff alleges Defendant substantially used the Accused Products in the U.S. for sales, by, among other activities, (1) providing samples and/or prototypes of the Accused Products to potential customers for evaluation; (2) securing "design wins" with potential customers resulting in large volume orders of the Accused Products; and (3) negotiating and entering into sales contracts involving the Accused Products.  SAC at 5:2-10.  Plaintiff argues that "[b]ut for this U.S.-based infringing activity by Defendant, such design wins would not have been achieved and Defendant would not have benefited from the resulting sales and associated revenue and profit." *Id.* at 5:10-12.

After the Court's previous order, the below series and Patents-in-Suit remain:

| UDE Multi-Gig 2xN ICMs with MPNs Starting with: | Remaining Accused Products: | Plaintiff's Asserted | | |
|---|---|---|---|---|
| | | 473 Patent Claims Involved: | 318 Patent Claims Involved: | 840 Patent Claims Involved: |
| **"G"** | All | 1, 16, 18, 33, 37, 39, and 41 | N/a | 1, 7, 10, 11, and 12 |

-4-

| | | | | |
|---|---|---|---|---|
| ~~**"GX-X"**~~ | ~~GM-41000VJ84~~ | | 14 and 17 | |
| **"N"** | N42-ZT-0001[4] | | N/a | |
| **"S"** | S3Y-HP-0001[5] | N/a | ~~1, 3, 4, 5, 6, 7,~~ ~~and 11~~[6] | |

*See* Baxter Report at 7; *see also See* SAC at 4:2-28, 8:5-9, 38:16-20; Order, ECF No. 160.

### B.   **Procedural History**

On February 16, 2018, Plaintiff filed this lawsuit against Defendant, based on the three Patents-in-Suit as well as U.S. Patent No. 6,773,302 (the "302 Patent"). *See* ECF. No. 25-1 ¶ 14. On June 11, 2018, UDE filed its Answer along with eight counterclaims for non-infringement and invalidity of the 302, 473, 318, and 840 Patents. ECF. No. 13.

On January 17, 2020, Plaintiff filed a First Amended Complaint ("FAC"). ECF No. 61. However, on July 6, 2020, the Court granted Defendant's motion to dismiss the FAC *without prejudice* and granted leave to amend. Order, ECF No. 100. The Court found Plaintiff did not allege sufficient facts to establish a plausible claim for relief under the *Twombly/Iqbal* standard as to both induced and contributory infringement. *Id.* at 4-5.

On December 17, 2018, the Court granted Defendant's motion to stay this case pending *inter partes* review of all four Patents-in-Suit. Order, ECF No. 28 at 6-7. Later that month, the Patent Trial and Appeal Board ("PTAB") granted *inter partes* review of the 302 Patent. ECF No. 45 at 4:20-28. As such, on February 14, 2020, this Court granted

---

[4]    As discussed below, it appears that the invoices on which Plaintiff relies to support its case do not show any sales of this Accused Product. Further, throughout this Order, "MPN" shall refer to "Model Product Number."

[5]    In light of the Court's previous order, refusing to permit Plaintiff to assert new claims in this lawsuit after the deadline for amended infringement contentions had passed and trial was a mere months away, these belatedly and improperly asserted claims have been removed from the case, meaning that Plaintiff no longer has any claims to assert with respect to the one product remaining from the S Series.

[6]    As stated, Plaintiff's SAC and original Infringement Contentions only asserted Claims 14 and 17, and those claims were the only claims at issue when this Court undertook Claim Construction. Thus, those are the only claims properly at issue in this case.

a joint motion for dismissal of the claims related to the 302 Patent *without prejudice*.[7]  ECF No. 72.  As to the other patents, however, the PTAB denied institution of a trial.  ECF No. 46 at 5:23-27.  Thus, on November 18, 2019, this Court granted Plaintiff's Motion to Lift the Stay that had been in place during the *inter partes* review.  Order, ECF No. 52.  As a result, the stay has been lifted for well over one year, allowing the parties ample time to complete discovery.

On July 16, 2020, Plaintiff filed the SAC, which is the operative complaint and alleges three claims for relief for direct, induced, and contributory infringement of the 473, 318, and 840 Patents.  SAC.  Shortly thereafter, on July 30, 2020, Defendant filed another answer and counterclaims.  Answer, ECF No. 108.  Defendant's operative counterclaims seek declarations of non-infringement and invalidity of the 473, 318, and 840 Patents.  *Id.*  Plaintiff filed an Answer to those counterclaims, denying the majority of the claims.  ECF No. 110.

On July 30, 2020, this Court issued its Claim Construction Order.  ECF No. 107.

On October 14, 2020, the Court held a Status Conference and set trial in this matter for February 17, 2021.  ECF No. 123.  On October 30, 2020, the parties entered into the Representative Product Stipulation, ECF No. 124, pursuant to which both parties agreed Plaintiff could "use certain representative products to prove structure and operation of a broader set of UDE products strictly for the purposes of proving, as to products accused of infringing the Patents-in-Suit, the structure and operation of the products in the 'Representative MPN' for all other products in the 'Represented Product' column of the same row in the table below":

---

[7]    As Defendant notes, the 302 Patent was the only patent asserted against Defendant's single-port and lower speed (e.g., 1G) ICMs, meaning that after the dismissal of the claims pertaining to the 302 Patent, only Defendant's multi-gigabit (i.e., high speed) 2xn ICMs remain at issue.  Def. Mot. at 8:19-22.  In other words, according to Defendant, Plaintiff may "only accuse ICMs for the niche market of high-speed networking devices," which reduces the number of accused ICMs from thousands, down to about 185 UDE product numbers."  *Id.* at 8:23-26 (citing Baxter Report at 28-29, ¶¶ 95-108).

| Representative MPN | Represented Products |
|---|---|
| GMD-AA-0002 | MPNs with first letter "G" not including MPNs with first four characters "GX-X" |

ECF No. 124 at 2-3.

On December 29, 2020, Plaintiff filed for partial summary judgment as to direct infringement pertaining to claims (1) 1, 3-7, and 11 of the 318 Patent and (2) 1, 7, and 10-12 of the 840 Patent for Defendant's S Series Accused Products. *See* Pltff. Mot. That same day, Defendant filed a motion for summary judgment and *Daubert* motion. *See* Def. Mot. Defendant asked the Court to grant summary judgment of non-infringement in Defendant's favor as to (1) all of Plaintiff's claims on the issue of induced infringement and (2) Plaintiff's claims of infringement pertaining to the GX-X, N, and S-Series of Products.[8] Def. Mot. at 5-6.

On January 6, 2021, the Final Pretrial Conference took place in this case, ECF No. 125, as trial in this case had been scheduled for February 17, 2021, ECF No. 123. However, due to the COVID-19 pandemic, and Orders of the Chief Judge Nos. 56, 60, this Court vacated the jury trial indefinitely until one could be safely conducted. *See* ECF No. 145.

On March 16, 2021, this Court granted Defendant's motion for summary judgment and dismissed *with prejudice* (1) all of Plaintiff's claims for induced infringement of all Accused Products[9] and (2) Plaintiff's claims for direct infringement of the GX-X series as

---

[8]     In the Court's previous order, the Court noted that Defendant's Motion for Summary Judgment was ambiguous as to whether it sought summary judgment on all claims as to the GX-X, N, and S-Series of Products or just Plaintiff's claims for direct and induced infringement. Order, ECF No. 160 at 50, n.20 (quoting ECF No. 144 at 12:26-28). Defendant now clarifies that it had intended to seek relief for the GX-X, N, and S-Series of Products as to all types of infringement (*i.e.*, direct, induced, and contributory). Def. at 8:26-28. However, given neither party addressed the issue of contributory infringement in their previous briefing and Defendant's request failed to clearly state the relief it sought, the Court did not grant summary judgment on any of Plaintiff's claims for contributory infringement. *Id.* 86:14-22.

[9]     The Court found that Defendant had "shown the absence of evidence creating a genuine issue of fact from non-party EMSs or branded companies that Defendant's accused ICMs, which Defendant manufactures and sells overseas, were imported into the U.S., such

-7-

well as all Accused Products in the S and N Series except for MPNs S3Y-HP-0001 and N42-ZT-0001. Order, ECF No. 160 at 86:14-17. While Plaintiff's claims for contributory infringement as to all Accused Products and direct infringement as to the G Series along with MPNs S3Y-HP-0001 and N42-ZT-0001 remained in this case, the Court, *sua sponte*, issued an Order to Show Cause to as to why the Court should not grant summary judgment of non-infringement in Defendant's favor as to those remaining claims. *Id.* at 86:18-24. Having concluded that Plaintiff had failed to show infringing acts by third-parties necessary to substantiate the induced infringement claims, the Court ordered Plaintiff to "come forward with evidence of infringing acts occurring within the U.S. by the only named defendant in this case, UDE, not evidence as to third parties." *Id.* at 86:24-26. It noted that "[t]he briefing should be limited to whether infringing acts took place domestically (as opposed to whether the Accused Products infringe on the Patents-in-Suit) given infringement is irrelevant if the allegedly infringing acts did not occur domestically." *Id.* at 86:26-87:1. The Court also explicitly requested that both parties brief the following issue: "With respect to the invoices referenced by both parties showing a 'Bill to' address within the U.S. but a 'Ship to' address outside the U.S., the briefing should address what law (e.g., the Uniform Commercial Code, U.S. law, Taiwanese law, the C.I.S.G., or some other international law) applies to determining the place of sale." ECF No. 160 at 87:3-7. (elaborating that "[e]ach party should address where the offer to sell or sale took place").

In accordance with the briefing schedule set by this Court, on March 23, 2021, Plaintiff submitted its Response to the Court's Order to Show Cause, ECF No. 172, along with a Motion for Leave to File Documents Under Seal, ECF No. 170, lodging the proposed documents for sealing as ECF No. 171. On March 29, 2021, Defendant submitted its

---

that summary judgment in Defendant's favor on the issue of induced infringement is proper." Order, ECF No. 160 at 86:3-6. It also ruled that Defendant had "shown the absence of evidence creating a genuine issue of fact as to direct infringement of the GX-X series as well as all products in the S and N Series except for the MPNs analyzed by Mr. Baxter, for which the Court finds existence of a genuine issue of fact: MPNs S3Y-HP-0001 and N42-ZT-0001." *Id.* 86:10-13.

-8-

1   Response to Plaintiff's Briefing in Response to the Court's Order to Show Cause, ECF No.

2   175, along with its own Motion for Leave to File Documents Under Seal, ECF No. 173,

3   lodging the proposed sealed documents as ECF No. 174.  In compliance with the Court's

4   previous order, no reply briefs were permitted due to the quantity of briefing already

5   provided to the Court in response to the previous cross-motions for summary judgment.

6   ## III.   LEGAL STANDARDS

7   ### A.   Summary Judgment

8       Where "there is no genuine dispute as to any material fact," the Court must grant

9   summary judgment.  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

10  322 (1986).  A fact is material if it could affect the outcome of the case under governing

11  law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact

12  is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such

13  that a reasonable jury could return a verdict for the non-moving party."  *Id*.  The party

14  seeking to defeat summary judgment must come forward with affirmative evidence from

15  which a reasonable jury could render a verdict in that party's favor.  *Id.* at 252, 255, 257.

16  However, the nonmoving party's mere allegation that factual disputes exist between the

17  parties will not defeat an otherwise properly supported motion for summary judgment.  *See*

18  FED. R. CIV. P. 56(c); *see also Phytelligence, Inc. v. Washington State Univ.*, 973 F.3d

19  1354, 1364 (Fed. Cir. 2020) ("Mere allegation and speculation do not create a factual

20  dispute for purposes of summary judgment.") (quoting *Nelson v. Pima Cmty. College*, 83

21  F.3d 1075, 1081-82 (9th Cir. 1996)).  Additionally, while the Court will draw all reasonable

22  inferences in the non-moving party's favor and believe the evidence of the non-moving

23  party, the Court will not draw unreasonable inferences and cannot believe evidence that

24  does not exist.  *Cf. Anderson,* 477 U.S. at 255.

25      Rule 56(f) of the Federal Rules of Civil Procedure allows the Court to grant summary

26  judgment for a nonmovant or on grounds not raised by the parties provided the Court gives

27  notice and a reasonable time to respond.  *See, e.g.*, *Auto. Body Parts Ass'n v. Ford Glob.*

28  *Techs., LLC*, 930 F.3d 1314, 1325 (Fed. Cir. 2019), *cert. denied,* 140 S. Ct. 1298 (2020)

1   (affirming the decision of the district court, which "announced its intention to enter

2   judgment in favor of Ford sua sponte pursuant to Federal Rule of Civil Procedure 56(f)(1),"

3   and entered summary judgment in the defendant's favor after providing notice and an

4   opportunity to respond); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir.

5   2019), *cert. denied,* 140 S. Ct. 1108 (2020) ("Accordingly, we see no error in the sua sponte

6   nature of the district court's order and we affirm the summary judgment of no

7   anticipation."); *United States v. Grayson*, 879 F.2d 620, 625 (9th Cir. 1989) (holding that

8   *sua sponte* summary judgment may be granted as long as the losing party has had a "full

9   and fair opportunity to ventilate the issues involved in the motion") (internal quotation

10  marks omitted); *In re Harris Pine Mills*, 44 F.3d 1431, 1439-40 (9th Cir. 1995) (entering

11  summary judgment for the non-movant).

12      ### B.   <u>Motion to Seal</u>

13      Except for certain documents "traditionally kept secret," federal courts begin a

14  sealing analysis with "a strong presumption in favor of access to court records."  *Foltz v.*

15  *State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  A party seeking to

16  seal a judicial record then must "articulate [] compelling reasons supported by specific

17  factual findings," *id.*, that outweigh the general history of access and the public policies

18  favoring disclosure, such as the "public interest in understanding the judicial process,"

19  *Hagestad v. Tragesser,* 49 F.3d 1430, 1434 (9th Cir. 1995).  The Court "conscientiously

20  balance[s] . . . the competing interests" of the public and the party who seeks to keep certain

21  judicial records secret.  *Foltz,* 331 F.3d at 1135.  After considering these interests, if the

22  Court decides to seal certain judicial records, it "base[s] its decision on a compelling reason

23  and articulate[s] the factual basis for its ruling, without relying on hypothesis or

24  conjecture."  *Hagestad*, 49 F.3d at 1434; *see also Kamakana v. City & Cnty. of Honolulu*,

25  447 F.3d 1172, 1179 (9th Cir. 2006) (applying compelling reasons standard to dispositive

26  motions).

27      A party must satisfy the compelling reasons standard even if the motion, or its

28  attachments, were previously filed under seal or protective order.  *Foltz*, 331 F.3d at 1136

-10-

("[T]he presumption of access is not rebutted where . . . documents subject to a protective order are filed under seal as attachments to a dispositive motion."). A party's failure to meet the burden of articulating specific facts showing a "compelling reason" means that the "default posture of public access prevails." *Kamakana*, 447 F.3d at 1182. In ruling on motions to seal, this Court has recognized that "compelling reasons sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such court files might . . . become a vehicle for improper purposes, such as the use of records to . . . release trade secrets." *Id.* at 1179. Similarly, other "sources of business information that might harm a litigant's competitive standing" may also constitute a compelling reason to seal, *see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978), such as a company's confidential profit, cost, and pricing information, which if publicly disclosed could put the company at a competitive disadvantage, *see Apple, Inc. v. Samsung Elec. Co.*, 727 F.3d 1214, 1225 (Fed. Cir. 2013) ("[I]t seems clear that if Apple's and Samsung's suppliers have access to their profit, cost, and margin data, it could give the suppliers an advantage in contract negotiations, which they could use to extract price increases for components.").

## IV.   **DISCUSSION**

This case involves Plaintiff's allegations of infringement of its utility patents. Section 271 of the Patent Act of 1952, which was later revised by the Leahy-Smith America Invents Act ("AIA"), defines infringement to include (1) direct infringement, 35 U.S.C. § 271(a), and (2) indirect infringement arising out of either induced infringement, where a party actively induces a third-party to infringement a patent, 35 U.S.C. § 271(b), or contributory infringement, where the accused party supplies a component or material used to infringe on a patent, 35 U.S.C. 271(c). Plaintiff's SAC claims Defendant committed acts of direct infringement, induced infringement, and contributory infringement. However, this Court recently dismissed all claims of induced infringement. Order, ECF No. 160 at 86:14-17. Consequently, only Plaintiff's claims for contributory infringement as to all Accused Products and direct infringement as to the G Series along with MPNs 3Y-

-11-

HP-0001 and N42-ZT-0001 remain in this case (the "Residual Claims").  However, both parties' previous motions for summary judgment raised a serious defect in Plaintiff's case: Even *assuming arguendo* that Defendant's products infringe on Plaintiff's Patents-in-Suit, after three years of litigation, Plaintiff appears to have no evidence whatsoever that Defendant ever undertook any infringing actions within the U.S.  On the contrary, the record indicates that Defendant, in fact, took great care to intentionally ensure that with respect to any Accused Products, all sales, offers to sell, and manufacturing took place outside the U.S.

"It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) ("*Power Integrations I*").  Thus, the AIA's definition of direct patent infringement only applies to acts taking place within the country by providing: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, ***within the United States*** or ***imports into the United States*** any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271(a) (emphasis added).  Consequently, "purely extraterritorial conduct cannot constitute *direct* infringement of a U.S. patent, as § 271(a) includes express language limiting its scope to domestic acts." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302 (Fed. Cir. 2012).  In sum, direct infringement occurs where the accused party commits one of the following acts within the U.S.: making, using, offering to sell, selling, or importing the patented invention.  35 U.S.C. § 271(a).

Similarly, contributory infringement has a territorial component providing liability for "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine . . . constituting a material part of the invention, knowing the same to be especially made . . . for use in an infringement of such patent, and not a staple . . . commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c). Thus, contributory infringement occurs where the accused infringer offers to sell, sells, or imports into the U.S. a component of a patented invention.  Establishing

contributory infringement requires the patent owner to show that (1) direct infringement of the patent-in-suit occurred; (2) the accused defendant knew of the patent holder's patent; (3) the component lacks a substantial non-infringing use; and (4) the component is a material part of the infringing invention. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). As a result, where there is no direct infringement, there can be no contributory infringement. *See, e.g.*, *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1348 (Fed. Cir. 2015) ("For contributory infringement, as for inducement, direct infringement is necessary and will typically take place later than the accused indirect infringer's act.").

In this case, *assuming arguendo* that all Accused Products infringe the Patents-in-Suit, for its direct and contributory infringement claims, Plaintiff must still prove, at a bare minimum, that Defendant made, used, offered for sale, sold, or imported a UDE ICM within the U.S. Plaintiff must also prove that Defendant both knew the EMS or brand companies to which it sold ICMs would later sell products containing its ICMs in the U.S. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033-34 (Fed. Cir. 2002).

Plaintiff argues that "[b]ased on the circumstantial evidence," as Plaintiff has no direct evidence of infringing acts in the U.S., "[a] reasonable jury could review the record in this case and conclude . . . that UDE contributorily and directly infringes [the Patents-in-Suit in the] U.S." Pltff. Brief at 5:28-6:2. However, in response to the Court's Order to Show Cause, Plaintiff seemingly admits that it knows it sued the wrong party in this case but did so because the right parties are Pulse's own customers, so suing them would have negative repercussions for Pulse's own business:

> After UDE failed to take a license to the patents-in-suit, Pulse had at least two options to recover from UDE's willful infringement. Pulse could file a single lawsuit against UDE for indirectly (inducement and contributorily) and directly infringing the patents-in-suit, or Pulse could file a lawsuit against each of UDE's customers for only direct infringement. The latter would not be efficient because it would require Pulse to file multiple lawsuits in multiple venues. Further, Pulse and UDE

-13-

share many of the same customers.  Pulse would risk business relationships by suing the customers.  Moreover, filing a single lawsuit would better serve judicial economy.

Pltff. Brief at 6:4-12.

Pulse also acknowledges that the lawsuit stemmed, in part, from Defendant's refusal to take a license to the Patents-in-Suit, and that in light of the Court's recent dismissal of many of the claims against Defendant, "Pulse must reevaluate recoupment of a reasonable royalty from UDE."[10] Pltff. Brief at 6:13-15.  However, Pulse argues that its circumstantial evidence—namely, evidence this Court already addressed and dismissed—shows that Defendant "has engaged in infringing acts domestically." *Id.* at 24:20-23.

Defendant responds that Plaintiff's attempts to create an issue of fact are unavailing for two reasons: "First, in the multitude of cases that entered summary judgment of noninfringement on facts so similar to the present case, the courts were applying the same circumstantial evidence standard, and nonetheless found that an assortment of irrelevant facts could not manufacture a triable issue of fact."  Def. Brief at 5:7-10.  Second, Defendant correctly points out that this Court not only already rejected the evidence on which Plaintiff relies to support its case, but the Court did so under the ***easier*** showing of induced infringement.  *Id.* at 5:11-12.  "Previously, Pulse merely had to show by this 'circumstantial evidence' that ***someone*** committed direct infringement in the U.S." *Id.* at 5:12-14.  Defendant also points out that "[b]eyond not making the necessary evidentiary showing, Pulse's Response also fails to answer the direct question posed by the Court: what law applies to the invoices and where did the sales take place under that law?" *Id.* at 7:17-19 (citing Order, ECF No. 160 at 87:3-7).  Defendant argues that the C.I.S.G. applies to this case, and under the C.I.S.G., "the evidence . . . shows beyond any reasonable dispute

---

[10]   This suggests an improper retaliatory motive for this lawsuit.  Again, even *assuming arguendo* Defendant's Accused Products infringe on Plaintiff's Patents-in-Suit, Defendant is not required to take a license and does not commit infringement so long as it neither knows nor intends that its sale of allegedly infringing ICMs will result in sales of products in the U.S.  Thus, a lawsuit seeking retribution for Defendant's refusal to enter into a licensing agreement would be improper.

that all of UDE's sales and offers to sell took place *outside* the U.S." *Id.* at 5:24-28.

As discussed below, after providing the parties notice and time to respond, the Court grants summary judgment in Defendant's favor as to the issue of direct infringement of the G Series and MPNs S3H-HP-0001 and N42-ZT-0001 due to Plaintiff's failure to come forward with any evidence in the record from which a reasonable jury could conclude that Defendant undertook infringing acts within the U.S. *Auto Body Parts*, 930 F.3d at 1325. Further, because claims of contributory infringement cannot proceed without some proof of direct infringement, *Suprema*, 796 F.3d at 1348, and Plaintiff has proven neither that Defendant nor any third-parties have committed acts of direct infringement, the Court must dismiss all of Plaintiff's claims based on contributory infringement.  Because the issue of which law applies to the determination of where an offer for sale or sale took place, which affects the Court's determination on the issue of whether Plaintiff has shown evidence of direct infringement, the Court begins its analysis by addressing that issue.

### A.    The Court's Request for Briefing on What Law Governs the Place of Sale

As stated, the Court's Order to Show Cause directed that "[w]ith respect to the invoices referenced by both parties showing a 'Bill to' address within the U.S. but a "Ship to" address outside the U.S., the briefing should address what law (e.g., the Uniform Commercial Code, U.S. law, Taiwanese law, the C.I.S.G.[11], or some other international law) applies to determining the place of sale."  Order, ECF No. 160 at 87:3-6.  While the Order noted that, *assuming arguendo*, the CISG or Uniform Commercial Code ("UCC") applied, the place of sale was not in the U.S., it still requested briefing from the parties on this issue to evaluate whether the parties agreed that law governed.  However, Plaintiff's briefing missed the mark entirely by failing to cite to persuasive legal authority suggesting

---

[11]    As noted in the Court's previous order, international sales contracts, like the invoices on which Plaintiff relies, are ordinarily governed by a multilateral treaty, the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), which applies to "contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States."  CISG, art. 1(1)(a), 15 U.S.C. App., 52 Fed. Reg. 6262 (March 2, 1987).

that a "Bill to" address in the U.S. but a "Ship to" address outside the U.S. equates to a sale within the U.S. *See generally* Pltff. Brief.[12]   Rather, Plaintiff conclusorily argues invoices with a "Bill to" or "Ship to" address in the U.S. equate to a U.S. sale without answering the question of what law leads to that conclusion. *See id.* This is likely because the Court's previous analysis noted that regardless of whether the CISG of UCC applies, the offer to sell or place of sale under either law is not the U.S., which is detrimental to Plaintiff's case.

As another preliminary matter, the CISG has been held to apply to "contracts to the sale of things electronic," such as computer components.   Folsom, Ralph H., 1 *International Business Transactions* § 1:6 (3d ed.) (Dec. 2020 Update); *see also* CISG, art. 3(1), 52 Fed. Reg. 6262-02 (providing that "[c]ontracts for the supply of goods to be manufactured or produced are to be considered sales unless the party who orders the goods undertakes to supply a substantial part of the materials necessary for such manufacture or production").   On the other hand, the CISG explicitly excludes the following agreements from its coverage: distribution agreements (even though separate contracts under the distribution agreements may be encompassed by the CISG) and a "'maquiladora' transaction, in which a United States party ships parts of a product to a party in Mexico (or other low-wage country) for the non-U.S. party to assemble the parts and ship the assembled product back to the United States." *Id.* at § 1:7.   Neither party has argued the CISG should not govern this case because the type of transaction does not fall within the purview of the CISG.   Thus, the Court considers any argument to that effect waived.

---

[12]     Plaintiff argues that "[t]his Court found that 'under the U.C.C. or C.I.S.G, the place of sale was in China, not the U.S., and Section 271 does not apply to create liability for Defendant for direct infringement.'"   Pltff. Brief at 15:2-4 (citing Order, ECF 160 at 34). However, Plaintiff misrepresents the entirety of the facts because the complete sentence from the Court's order stated, "As a result, ***unless some other law applies***, under the U.C.C. or C.I.S.G., the place of sale was in China, not the U.S., and Section 271 does not apply to create liability for Defendant for direct infringement."   Order, ECF No. 160, at 32:7-9 (emphasis added).   Thus, the Court made no finding on what law applied, and instead, solicited briefing from the parties on the issue while also pointing out that under the two most likely applicable authorities, the outcome would be the same.

Under Article 1 of the CISG, the CISG applies "to sales contracts where the places of business of the parties are in different States, and either (a) both states are Contracting States, or (b) only one State is a Contracting State and private international law choice-of-law rules lead to the application of the law of a Contracting State."  Folsom, *supra*, at § 1:4.  However, "a contract of sale between a United States party and another party in . . . a non-Contracting State, will not be governed by CISG, even though United States law is applicable under usual choice-of-law rules." *Id.*  "Instead of CISG, United States law for domestic sales transactions would govern, which means the Uniform Commercial Code (UCC) is applicable in forty-nine states (all but Louisiana)." *Id.*

In this case, the United States and the People's Republic of China ("PRC") have both been Contracting States to the CISG since its ratification in December 1986.  *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003); *see also* U.S. Ratification of 1980 United Nations Convention on Contracts for the International Sale of Goods: Official English Text, 52 Fed. Reg. 6262, 1987 WL 128849 (March 2, 1987). Taiwan, however, is not.  *See Golden-Legion Auto. Corp. v. LUSA Indus., Inc.*, No. cv-0905962-MMM-CWX, 2010 WL 11570941, at *4 (C.D. Cal. Oct. 4, 2010) (applying California law to a dispute between a Taiwanese company and California corporation because "Taiwan is not a signatory, and there is no provision providing for discretionary application of the treaty where only one party is a national of a signatory state"); *see also* Folsom, *supra*, at § 1:1 (3d ed.) (noting that as of mid-2016, there were over 80 contracting states, including the U.S. and PRC but excluding the United Kingdom).  Thus, the Court requested briefing from both parties addressing whether the CISG should apply to the contracts at issue which are between a Taiwan and Delaware corporation and involve goods shipped from, shipped to, and made in Hong Kong.

Plaintiff cites to various law covering how courts can evaluate where a sale took place.  While Plaintiff's legal propositions may be correct, they fail to address what law applies to that evaluation and pre-suppose the Court has already made that determination. By failing to make an argument in favor of the CISG, UCC, or some other law, Plaintiff

-17-

has waived any argument that some other law applies.  *See, e.g.*, *Taub v. Parker Jewish Inst. for Health Care & Rehab.*, No. 18-CV-07491-RS, 2019 WL 3292369, at *3 (N.D. Cal. July 22, 2019) (where a party made an argument for the first time in its reply brief that had not been presented in its initial motion, the argument was improperly presented and "effectively waived"); *see also* FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of this motion").

Defendant, on the other hand, argues that the CISG "should apply to each of the transactions referenced in these invoices," and under the CISG, "the place of sale is *outside* the U.S." Def. Brief at 8:21-24.  Defendant elaborates that "[i]n order to apply the CISG, the Court must find that UDE's place of business, Taiwan, is part of a contracting state, and that the counterparty in each invoice has its place of business in a contracting state." *Id.* at 9:7-10.  However, UDE acknowledges "[t]here is no binding or even persuasive case law on whether the CISG applies to a contract with a Taiwanese party." *Id.* at 9:11-13.

Only two courts have addressed the issue: First, in *Att'ys Tr. v. Videotape Computer Prod., Inc.*, 94 F.3d 650, 1996 WL 473755 (9th Cir. 1996) (Unpublished), a Taiwanese cross-defendant and debtor argued for the first time on appeal that the CISG should have applied to the case, which would have led to the application of Taiwan law. *Id.* at *2.  The court noted that "[a]ssuming that Taiwan is a party to the Convention, '[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice.'" *Id.* (citing Fed. R. Civ. P. 44.1).  "The failure to raise the issue results in application of the law of the forum, here California." *Id.* (citing, *inter alia*, *Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1458 (9th Cir. 1989)).  Thus, the court held that the district court did not err by applying California law. *Id.*  In this case, to the extent Plaintiff argues some law other than the CISG or UCC should apply to this case, like the party in *Att'ys Tr.*, Plaintiff never gave notice pursuant to Rule 44.1 of the Federal Rules of Civil Procedure and failed to argue what law should apply when directly asked by the Court.  Thus, as previously stated, Plaintiff has

-18-

waived argument on this issue.

Second, in *Golden-Legion Auto. Corp. v. LUSA Indus., Inc.*, the Central District of California applied California law to a dispute even though the defendant argued the CISG should govern the sales agreement between the parties because the defendant was a Taiwanese company while the other party was a California corporation. *Id.* at *3-4. The court noted that the defendant cited no authority for that proposition but merely asserted "that the United States is a signatory to the CISG, although Taiwan is not, giving the court discretion to apply the CISG." *Id.* However, the court reasoned that "even if the CISG did apply to a contract between nationals of a signatory and non-signatory state, the treaty explicitly states that it does not govern questions of contract validity, only questions of contract formation." *Id.* at *4. Because the case involved issues of contract validity as opposed to formation, "the CISG would not provide the controlling rule of law even where it applicable." *Id.* Thus, the court concluded the CISG did not govern the dispute but did not conduct a thorough analysis of the issue (as it did not need to do so). As Defendant points out, in this case, neither party contests contract validity, and thus, *Golden-Legion*'s reasoning for declining to apply the CISG does not apply. Def. Brief at 9:23-25.

Defendant argues that "[w]hen considered thoroughly, the text of the CISG in combination with Taiwan's unique legal status suggests that the CISG ***should*** be applied to contracts with a Taiwan company." Def. Brief at 9:26-28. UDE points out that "[t]he court's observation in *Golden-Legion* that Taiwan is not a signatory to the CISG is correct, but incomplete." Def. Brief at 9:28-10:1. Defendant raises a cogent point.

The CISG itself limits its application to Contracting States. CISG, art. 1(1)(a), 15 U.S.C. App., 52 Fed. Reg. 6262 (March 2, 1987). While Taiwan is not a "Contracting State," Defendant also raises the issue that "it is not the case that Taiwan is a State that has not contracted" but "[r]ather, a majority of countries do not recognize Taiwan as a State at all." Def. Brief at 10:1-4. Indeed, although the issue of the sovereign status of both Taiwan

-19-

and Hong Kong[13] remain hotly contested, the U.S. government does not recognize Taiwan as an independent State.[14]  *See* UNITED STATES DEP'T OF STATE, *U.S. Relations with Taiwan* (Aug. 31, 2018), https://www.state.gov/u-s-relationswith-taiwan/ ("The United States supports Taiwan's membership in international organizations that do not require statehood as a condition of membership . . . [.]").  Thus, Taiwan has not signed on to the CISG because it does not have the legal capacity as a non-state to do so.  VINDOBONA J. OF INT'L COM. L.& ARBITRATION 345, 351–52 (2011) ("Given that the CISG is only open for accession by sovereign states, Taiwan cannot become an independent party to the CISG.").  Because the U.S. recognizes the Chinese position that Taiwan is part of China, this "makes it impossible for Taiwan to participate in international organizations and conferences which are open only to states and to become a contracting party to international agreements, especially multilateral agreements, entered into between or among states only."  Jianming

---

[13]     "In 1997, Hong Kong became a Special Administrative Region of the People's Republic of China, and China is a Contracting State."  Gregory M. Duhl, *International Sale of Goods*, 65 Bus. Law. 1313, 1314 (2010); *see also* Jianming Shen, *Cross-Strait Trade and Investment and the Role of Hong Kong*, 16 Wis. Int'l L.J. 661, 668 (1998) (noting that since China's resumption of sovereignty over Hong Kong, the CISG "may be said to have automatically become operative in Hong Kong since the handover unless (1) the Convention itself would provide against such automatic extension of application, (2) the Convention is not compatible with the Basic Law or otherwise unsuitable to Hong Kong, or (3) China declares to the contrary").

[14]     "President Carter recognized the People's Republic of China (PRC) as the government of China, and derecognized the Republic of China, located on Taiwan."  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 27 (2015).  "As to the status of Taiwan, the President 'acknowledge[d] the Chinese position' that 'Taiwan is part of China,' but he did not accept that claim."  *Id.*  Instead, he "proposed a new law defining how the United States would conduct business with Taiwan."  *Id.*  "After extensive revisions, Congress passed, and the President signed, the Taiwan Relations Act, 93 Stat. 14 (1979) (codified as amended at 22 U.S.C. §§ 3301–3316)."  *Id.*  The Taiwan Relations Act of 1979 treats "Taiwan as if it were a legally distinct entity from China—an entity with which the United States intended to maintain strong ties."  *Id.* at 27-28 (citing 22 U.S.C. §§ 3301, 3303(a), (b)(1), (b)(7)).  "The State Department has complied with the law, but states in its Foreign Affairs Manual: 'The United States does not officially recognize Taiwan as a "state" or "country.""'  *Id.* at 78 (2015) (Scalia, J., dissenting).

Shen, *Cross-Strait Trade and Investment and the Role of Hong Kong*, 16 Wis. Int'l L.J. 661, 668 (1998).

Despite the confusing nature of Taiwan's legal status along with the fact that neither Taiwan (UDE's place of incorporation) nor Hong Kong (the place of shipment) are "Contracting States" under the CISG, the Court finds Article 93 of the CISG supports application of the CISG to this case. *Cf.* Thomas Neumann, *Is the Albert H Kritzer Database Telling Us More Than We Know?*, 27 Pace Int'l L. Rev. 121, 164, n. 92 (2015) ("Hong Kong and Taiwan are being treated as separate entities from China in both the statistics of WTO and in the list of CISG contracting states."). Article 93 provides that "[i]f a Contracting State has two or more territorial units . . . it may . . . declare that this Convention is to extend to all its territorial units or only to one or more of them, and may amend its declaration by submitting another declaration at any time." C.I.S.G., art. 93(1), 15 U.S.C. App., 52 Fed. Reg. 6262 (March 2, 1987). However, "[i]f a Contracting State makes no declaration under paragraph (1) of this article, the Convention is to extend to all territorial units of that State." *Id.* at art. 93(4). Defendant argues that "[b]ecause the PRC has provided no such declaration vis-à-vis Taiwan, the CISG should be applied [t]o contracts involving Taiwanese parties." Def. Brief at 11:2-11. The Court finds this argument persuasive. Moreover, Defendant also argues that "[t]o the extent that ambiguity remains as to whether the CISG should apply, policy reasons strongly favor its application." *Id.* at 11:12-13. These policy reasons include the fact that (1) "the CISG benefits the business community by providing predictable, uniform applications of contract law," (2) "there is at least some evidence that the PRC intends for the CISG to apply to Taiwanese parties," and (3) the invoices on which Plaintiff relies to support its case involve other parties who are Contracting States. Def. Brief at 11:13-25, 12:8-19.

Addressing Defendant's arguments in turn, the Court agrees that the CISG applies to this case. First, "[t]he aim of the CISG is to promote worldwide uniformity in dealing with sales disputes arising from international sales." *See, e.g.*, *Electrocraft Arkansas, Inc. v. Super Elec. Motors, Ltd.*, No. 4:09CV00318 SWW, 2009 WL 5181854, at *3 (E.D. Ark.

Dec. 23, 2009) (applying the CISG to a dispute between a Delaware corporation and a Hong Kong corporation with manufacturing facilities located in China because the PRC "ratified the CISG in 1986," "Hong Kong is a Contracting State under the CISG," and neither party "opted out of the CISG with respect to the contract at issue in this action and both parties have their places of business in different Contracting States under the Convention"); *but see Innotex Precision Ltd. v. Horei Image Prod., Inc.*, 679 F. Supp. 2d 1356, 1359 (N.D. Ga. 2009) (in a dispute between a Hong Kong corporation and two Georgia corporations, the court held that "consistent with the position held by the Chinese government, the Hong Kong Department of Justice, the Supreme Court of France, and numerous commentators, the Court finds that the CISG does not apply here because Hong Kong is not a Contracting State"); *see also Food Team Int'l, Ltd. v. Unilink, LLC*, 872 F. Supp. 2d 405, 414–15 (E.D. Pa. 2012) (refusing to apply the CISG in a dispute between a New Jersey and Pennsylvania corporation where the produce was shipped from China and the defendant negotiated the contracts with an employee based in Hong Kong). The Court agrees that the CISG intended to create uniformity under the law, and particularly given Plaintiff has failed to advance any argument as to why it should not apply, application of the CISG serves to promote that uniformity.

Second, "under current PRC law and legal practice, court cases and arbitral awards have decided that commercial cases related to Hong Kong, Macao, and Taiwan Regions are 'foreign-related' cases." Fan Yang, *CISG in China and Beyond*, 40 No. 3 UCC L. J. Art. 5 (Winter 2008). In such a foreign-related case involving a dispute between a Taiwan seller and Chinese buyer known as the *Chemical cleaning product equipment case*, "[t]he parties did not select any law in the contract, but, during the hearing, they explicitly agreed to apply PRC laws in general and the CISG as gap filler where there was no applicable provision under PRC laws." *Id.* As a result, the tribunal applied the CISG. While this case is distinguishable in that the parties have not both agreed to the application of the CISG, the *Chemical cleaning product equipment case* suggests that application of the CISG is not in direct contravention of either China or Taiwan's desires. *Id.*

Third, "[b]esides Taiwan being subject to the CISG, the other parties to the sales transactions referenced by the invoices must also be subject to the CISG."  Def. Brief at 12:8-9.  Defendant points out that the invoices on which Plaintiff relies involve entities with billing or shipping addresses from China, Sweden, Mexico, Singapore, and the U.S., all of which are CISG Contracting States  *Id.* at 12:11-19; *see also* https://uncitral.un.org/en/texts/salegoods/conventions/sale_of_ goods/cisg/status  (listing all current signatories to the CISG on the United Nations website along with the dates of ratification and entry into force and showing that China, Mexico, Singapore, Sweden, and the U.S. are all CISG Contracting States).  As such, the CISG applies to the invoices.

In sum, the Court agrees with Defendant's argument that "Taiwan is subject to the CISG because it is part of China, a Contracting State."  Def. Brief at 11:2-3.  Plaintiff argues that "[a]lthough the U.C.C. and C.I.S.G. are relevant authorities, the most relevant inquiry is whether UDE's invoices provide enough circumstantial evidence for purposes of § 271(a)  to survive summary judgment."  Pltff. Brief at 15:4-6.  Plaintiff misses the point.  In order to determine whether the invoices provide circumstantial evidence of sale or offer to sell within the U.S., the Court needs to know what law to apply in order to interpret the evidence (*i.e.*, the invoices) and determine where the offer to sell or sale occurred.   Having failed to argue what law to apply, and thereby, waiving the issue, the Court applies the CISG to the determination of the place of sale as it finds it be the appropriate law under the CISG's terms as well as for public policy reasons.[15]

**B.**   **Order to Show Cause as to Why the Court Should Not Dismiss the Remaining Claims for Lack of Evidence of Domestic Infringing Acts**

Plaintiff's Remaining Claims allege (1) direct infringement as to the G-Series of

---

[15]   As noted in the Court's previous order, even if the CISG does not apply to this case, the UCC would likely apply in its place.  Order, ECF No. 160 at 32:7-9.  Under the UCC, the outcome of the determination of the location of the offer to sell or sale would not change.  *Id.*; *see also* Def. Brief at 18:5-19 (explaining that in the absence of application of the CISG, federal choice of law provisions would lead to the application of either the law of the People's Republic of China or Taiwan, both of which "allow the parties to specify when the transfer of ownership and risk of loss  will occur").

-23-

Accused Products and MPNs S3Y-HP-0001 and N42-ZT-0001 and (2) contributory infringement as to the G, GX-X, S, and N Series of Accused Products.  Plaintiff argues that "[b]ased on the circumstantial evidence, a reasonable jury could review the record in this case and conclude UDE directly and contributory infringed the patents-in-suit."  Pltff. Brief at 8:12-14.  The Court analyzes direct infringement first as without direct infringement, the contributory infringement claims cannot survive.  *Suprema*, 796 F.3d at 1348.

### 1.   *Plaintiff Failed to Show a Genuine Issue of Fact Exists as to Whether Defendant Committed Acts of Direct Infringement within the U.S.*

Plaintiff contends that "[a] jury could find the accused products were sold or offered for sale from the evidence that includes: UDE invoices, UDE testimony, UDE samples, UDE's website, UDE's joint enterprise with ▇▇▇, and devices purchased in the U.S. with UDE's infringing ICMs."  Pltff. Brief at 8:14-17.  However, Plaintiff's briefing makes two facts clear to the Court: First, Plaintiff does not have any additional evidence that would allow a reasonable jury to conclude a sale took place in the U.S.  The two new exhibits Plaintiff attaches to its brief are merely additional portions of the November 4, 2020 Deposition of Christopher Chen, UDE's corporate designee ("Mr. Chen"), and the November 13, 2020, Transcript of Greg Loudermilk, another UDE employee.  ECF No. 172-1 at 2, ¶¶ 2-3.  Plaintiff does not have any additional invoices that were not previously provided to the Court, which show sales within the U.S.  *See id.*  Second, Plaintiff ignores the fact that with respect to many of the arguments on which it now relies, the Court already ruled they were either unpersuasive or not determinative of this case.  The Court finds that Plaintiff does not have evidence of infringing acts within the U.S.  As detailed below, Plaintiff has failed to carry its burden of coming forward with evidence that would allow a reasonably jury to conclude Defendant commits acts of infringement within the U.S. *Microsoft Corp. v. AT & T Corp.,* 550 U.S. 437, 441 (2007).

Plaintiff argues that "[i]nfringement can be proven by circumstantial evidence."  Pltff. Brief at 7:13-14; *see also Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009) ("Direct infringement can be proven by circumstantial evidence.").

Plaintiff describes "circumstantial evidence" as taking "one fact that has been seen, that is produced before you by evidence, and from that fact you reason to a conclusion."  Pltff. Brief at 7:15-18 (citing *Hickory v. United States*, 151 U.S. 303, 310 (1894)).  The problem in this case is that Plaintiff has failed to establish the initial "fact that has been seen" or "produced before you by evidence" from which the Court could "reason to a conclusion."

Although Plaintiff argues that "[t]he Federal Circuit has vacated summary judgment rulings of no infringement where circumstantial evidence created genuine issues of material fact," Pltff. Brief at 7:18-21 (citing *Vita-Mix*, 581 F.3d at 1326–28), this Court agrees with other courts that have found "[c]ircumstantial evidence alone is not enough to survive summary judgment."  *Davison v. C.R. Bard, Inc.*, No. 219CV02760EFMKGG, 2020 WL 2513069, at *5 (D. Kan. May 15, 2020); *see also Card-Monroe Corp. v. Tuftco Corp.*, 270 F. Supp. 3d 967, 1027 (E.D. Tenn. 2017) (finding the defendant provided "evidence that raises a material question of fact as to infringement of at least six of the Accused Products," and thus, summary judgment in favor of the plaintiff was inappropriate because none of the cases cited by the plaintiff stood "for the proposition that summary judgment of induced infringement may be granted on circumstantial evidence alone"); *compare Mountain Club Owner's Ass'n v. Graybar Elec. Co., Inc.*, No. 2:13-1835 WBS KJN, 2016 WL 323805, at *2 (E.D. Cal. Jan. 27, 2016) ("Circumstantial evidence alone may create a genuine issue of material fact sufficient to defeat a motion for summary judgment.") (citing *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1029-1030 (9th Cir. 2006)) *with Sanchez v. Stryker Corp.*, No. 2:10-CV-08832-ODW, 2012 WL 1570569, at *7 (C.D. Cal. May 2, 2012) (arguing that "that quote is irrelevant because *Cornwell* is an employment discrimination case and does not concern a medical tort," and in *Sanchez*, "the Court gave Plaintiff an opportunity to present case law that stood for the proposition that medical causation could be proven through circumstantial evidence without expert testimony," but "Plaintiff failed to do so").

In the primary case Plaintiff relies on for its argument that it may defeat summary judgment with only circumstantial evidence, *Vita-Mix*, the Federal Circuit reversed the

-25-

district court's granting of summary judgment of no direct, contributory, or induced infringement due to a lack of "direct evidence of infringement."   581 F.3d at 1326. However, the court reasoned that the combination of testimony from the defendant's employees and the plaintiff's expert amounted to "circumstantial evidence that create[d] genuine issues of material fact regarding whether employees of [the defendant] engaged in acts of direct infringement."   *Id.*   In this case, however, there is no testimony from which the Court could draw an inference of infringing conduct within the U.S.   All testimony indicated that none of the Accused Products were sold in the U.S.

In sum, there appears to be no dispute that Defendant makes its products in China. However, the facts Plaintiff alleges would allow the Court to "reason" or "infer" that sales or offers to sell took place in the U.S.—namely, the Defendant worked with its customers on certain designs, had employees make trips to the U.S., had a U.S. office, or has a website accessible in English within the U.S.–certainly establish that Defendant may have sold *some* products in the U.S. but do not establish that Defendant sold *the Accused Products* in the U.S.   Moreover, even though Defendant has invoices with "Bill to" or "Ship to" addresses in the U.S. every single one of those invoices also clearly state the goods sold were made in China and shipped by truck from Hong Kong to Hong Kong, making it impossible for the goods to have made it to the U.S.[16]   As the Court's previous order noted, Defendant is allowed to sell products in the U.S., it simply cannot sell the *Accused Products* in the U.S., and Plaintiff has failed to come forward with any evidence showing Defendant sells the Accused Products in the U.S.   Rather, the record is replete with evidence that Defendant's customers, to whom Defendant sells its ICMs, appear to sell products that *may* contain Defendant's products and *may* be sold in the U.S.   The record also lacks any evidence showing Defendant had any way of knowing its products would

---

[16]   Geographically speaking, it would be impossible to transport the ICMs to the U.S. by truck.   If air transit or transit by boat were involved, however, this would have not only affected the price of the goods but also been reflected in the invoices.   The invoices do not indicate any of the goods were transported by air or boat.

-26-

be incorporated into products that would reasonably be expected to be sold in the U.S. as opposed to being sold in non-U.S. regions where its customers also sold products.  Most importantly, Plaintiff makes clear it recognizes Defendant's customers were the ones importing or selling allegedly infringing products in the U.S.; however, Plaintiff did not want to sue UDE's customers because those customers double as Plaintiff's customers.

The Supreme Court has reiterated that "[t]he general rule under United States patent law is that no infringement occurs when a patented product is made and sold in another country."  *Microsoft*, 550 U.S. at 441.  As set forth below, Plaintiff has failed to produce evidence that would allow the Court to deviate from this well-established general rule.  Because the evidence on which Plaintiff relies shows Defendant makes and sells its ICMs in Asia, a reasonable jury would not be able to find UDE liable for direct infringement.

a. *Invoices*

Plaintiff argues that "[t]wenty-six (26) of the 105 invoices include a 'Bill to' and "Ship to" address located in the U.S."  Pltff. Brief at 8:23-25.  Plaintiff relies on Exhibit 9 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Filed Under Seal as ECF No. 149-8 at 2-106.  Plaintiff compiled the invoices into three separate tables, and Defendant provided further analysis as to those tables, which the Court has compiled into one table set forth below[17]:

| Ex. Pgs.: | Buyer: | Products: | "Bill to" Address: | Shipped | | | "Ship to" Address Below Forwarder: | Trade Term: |
|---|---|---|---|---|---|---|---|---|
| | | | | Per: | From: | To: | | |
| 2-13 | ███████ | GMG-PA-0001; MA-ZZ-0002 | Laredo, TX, USA | Truck | Hong Kong | Hong Kong | Milpitas, CA, USA | FOB HK |
| 14-22 | ███████ | GM1-JB-0002; GM1-MA-0004; GM1-JB-0003; GMD-AA-0003; S3Y-AA-0002; S3Y-AA-0005; | San Jose, CA, USA | Truck | Hong Kong | Hong Kong | San Jose, CA, USA | Collect |

[17]    Any addresses within the U.S. have been demarcated with shading.

-27-

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | S3Z-AA-0004; S3Z-AA-0002 | | | | | | |
| 23-25[18] | S3D-AR-0001 | West Yorkshire, UK | Truck | Hong Kong | Hong Kong | Auburn, WA, USA | FOB |
| 26-27 | GM4-HP-0003; GM8-HP-0001 | Laredo, TX, USA | Truck | Hong Kong | Hong Kong | Sweden | FOB HK |
| 28-31 | GMD-AA-0002; C12-AS010004 | | Truck | Hong Kong | Hong Kong | Mexico | FOB HK |
| 32 | GMD-AA-0003 | | Truck | Hong Kong | Hong Kong | San Jose, CA, USA | FOB HK |
| 33 | GMD-AA-0002 | | Truck | Hong Kong | Hong Kong | Mexico | FOB HK |
| 34-49 | GM1-MA-0004; GMD-AA-0002; GMD-AA-0003; GM4-HP-0003; GM4-HP-0004; GM8-HP-0001; GM8-HP-0002; GM8-HP-0003; GM4-HP-0004; ND-HP-0005; S3Y-HP-0001 | Huntsville, AL, USA | Truck | Hong Kong | Hong Kong | Singapore | FOB HK |
| 50 | GMD-AA-0003 | Huntsville, AL, USA | Truck | Hong Kong | Hong Kong | San Jose, CA, USA | EX Work |
| 51 | GMD-AA-0002 | Laredo, TX, USA | Truck | Hong Kong | Hong Kong | Mexico | FOB HK |
| 52-54 | GM1-MA-0004; GM1-ZZ-0041 | Syracuse, NY, USA | Truck | Hong Kong | Hong Kong | Syracuse, NY, USA | FCA HK |

---

[18]   As Plaintiff admits, "[d]ue to the partial dismissal of Pulse's claims, direct infringement is limited to the G Series, S3Y-HP-0001, and N42-ZT-0001." Pltff. Brief at 8:26-27.  Thus, "pages 18-25 and 87-104 of ECF No. 150-12 contain invoices that are only relevant to Pulse's remaining contributory infringement claims" as they involve Accused Products for which the Court dismissed the claims of direct infringement. *Id.* at 8:27-28.

| 55-105 | ████ | GDA-AQ-0002;<br>GDA-AQ-0003;<br>GD1-AQ-0005;<br>GD1-AQ-0007;<br>GD1-AQ-0009;<br>GD1-AQ-0010;<br>GM2-AQ-0002;<br>GM2-AQ-0004;<br>GM2-AQ-0014;<br>GM4-AQ-0013;<br>GM6-AQ-0005;<br>GM6-AQ-0018;<br>GT5-AQ-0002;<br>GM8-AQ-0005;<br>GM8-AQ-0006;<br>GM8-AQ-0007;<br>GT5-AQ-0002;<br>GT5-AQ-0004;<br>GT5-AQ-0009;<br>GT5-AQ-0014;<br>L22H009-0;<br>L22T003-Q;<br>N40-AQ-0004;<br>N40-AQ-0005;<br>N60-AQ-0003;<br>N60-AQ-0007;<br>RTK-AQ-0002;<br>S14-AQ-0002 | San Jose, CA, USA | Truck | Hong Kong | Hong Kong | Hong Kong | EXW |
| 106 | ████ | GM6-ZZ-0004 | Singapore | Truck | Hong Kong | Hong Kong | San Jose, CA, USA | FOB HK |

*See* Pltff. Brief at 8:22-23, 9:1-10; Def. Brief at 12:8-19, 18:21-19:15.

The Court already concluded that the invoices on which Plaintiff relies showed "(1) Defendant's place of business is listed as being in Taoyuan City, Taiwan; (2) all goods were shown as being shipped from Hong Kong; (3) all goods were 'Made in China'; and (4) the shipment method was 'Shipped Per Truck,' making it impossible for the goods to have been shipped from their place of manufacture (e.g., China) to the U.S. as any shipment would have needed to be by boat or plane." Order, ECF No. 160 at 28:14-29:4. These invoices do not show U.S. sales, and the Court expresses concern over the fact that Plaintiff

-29-

neglected to address the "Shipped per truck" and "Shipped to: Hong Kong" portions of the invoices even though the Court previously raised those issues.  At the same time, the Court notes that one thing absent from Defendant's briefing is an explanation as to the significance of the invoices.  For instance, why some invoices include a shipping address within the U.S. even though they say "Shipped Per Truck" and "Shipped to: Hong Kong."  Despite Defendant's failure to offer any explanation or insight into this matter in it briefing, it was Plaintiff's burden to come forward with evidence of infringing actions in the U.S.  Plaintiff could have inquired about the significance of this when deposing Defendant's corporate designees but cannot point to any testimony from Mr. Chen testifying that Defendant ever shipped any **Accused** (as opposed to non-Accused) **Products** to the U.S.

### i.      Invoices with a "Bill to" Address in the U.S.

Plaintiff argues that eighty-five (85) of the 105 invoices include only a "Bill to" address located in the U.S. and show "that UDE offers to sell the accused products within the U.S. because they are evidence that the location of the future sale would take place in the U.S."  Pltff. Brief at 9:20-28, 13:20-22.  As stated, the Court already ruled that invoices with a "Bill to" address do not establish a sale within the U.S. or prove direct infringement.  Order, ECF No. 160 at 29:5-32:23.  However, because the Court has settled which law applies to the determination, the Court elaborates on why billing addresses within the U.S. fail to establish domestic acts of infringement.

First, all of the invoices in this case state the goods being sold were made in China.  As such, Defendant never "made" any products within the U.S.  *See* 35 U.S.C. § 271(a).

Second, Plaintiff has yet to establish use of any Accused Products within the U.S. as Plaintiff has not even been able to prove the switches it purchased contain UDE's ICMs or that any products containing Defendant's ICMs entered the U.S.  *See* 35 U.S.C. § 271(a).

Third, although Defendant previously argued that Defendant had imported infringing products into the U.S., the Court's previous order noted that Plaintiff had apparently confused the difference between importing and exporting.  Order, ECF No. 160 at 29:25-28; *see also Fellowes, Inc. v. Michilin Prosperity Co., Ltd.,* 491 F.Supp.2d 571,

584 (E.D. Va. 2007) (holding that where accused products were sold abroad by manufacturer "FOB China," the manufacturer was an exporter and the buyers were importers). Regardless, there is no evidence in this case that Defendant imported or exported Accused Products into the U.S., other than when Defendant delivered products to its counsel, pursuant to the Court's order, an act for which this Court held Defendant cannot be liable. Order, ECF No. 160 at 34:9-24. Thus, the invoices in this case in no way show Defendant importing any goods into the U.S. *See* 35 U.S.C. § 271(a).

The only infringing acts left for which Defendant could be held liable would be for "offering to sell" or selling the Accused Products in the U.S. When examine the offer to sell or sale of goods, title to those goods passes at the point the risk of loss passes to the buyer, meaning that the sale has taken place. *C.f.* C.I.S.G., art. 53, 66, 52 Fed. Reg. 6262-02; *see also* Pltff. Brief at 14:8-15 (quoting *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005)) (stating that the definition of a "sale" under 35 U.S.C. § 271(a) is "given ordinary meaning," which has been defined as (1) "[t]he transfer of property or title for a price" or (2) "[t]he agreement by which such a transfer takes place," which requires (a) parties competent to contract, (b) mutual assent, (c) a thing capable of being transferred, and (d) a price in money paid or promises).

Thus, determining the place of sale requires determining where title passed, which requires determining where the risk of loss passed. When a delivery term is F.O.B., the "goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer." *See, e.g.*, *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1358, n.1 (Fed. Cir. 2008) (holding that an infringing sale may occur in more than one location as a sale has both a physical and a conceptual dimension to it and does not only occur at a "single point where some legally operative act took place"). When a delivery term is F.O.B. the place of shipment, which is otherwise known as a "shipment contract," the seller must, at the seller's place of business, ship the goods by placing them into possession of a carrier while bearing the expense and risk of putting them into the possession of a carrier. CISG, art. 67(1), 52 Fed. Reg. 6262-02; *see*

-31-

*also* Anzivino, Ralph C., Lacy, Philip T., 1 *Uniform Commercial Code Transaction Guide*, § 7:17, (Oct. 2020 Update); *see also* UCC § 2509(1)(a). When the delivery term is F.O.B. the place of destination, also known as a "destination contract," the seller must bear the risk and expense of transporting the goods to the place of destination and tender delivery along with documents of title at the destination. C.I.S.G., art. 67(1), 52 Fed. Reg. 6262-02; *see also* Anzivino at § 7:17; *see also* U.C.C. § 2509(1)(b); *Wheeler Lumber Bridge & Supply Co. of Des Moines, Iowa, v. United States*, 281 U.S. 572, 578-79 (1930) (holding that where a seller "engages to deliver f. o. b., not at the place of shipment, but at the place of destination, which is the place of sale and delivery[,] [t]here is no delivery, and therefore no sale, until after the transportation is completed").

In this case, all the invoices have trade terms of either FOB HK, Collect,[19] FOB, Ex Work,[20] and FCA HK.[21] For the invoices that are "FOB" or "FOB HK," they fail to indicate whether they are shipment or destination contracts, especially because all invoices show the place of shipment and place of destination as "Hong Kong." However, under both the CISG and UCC, "[i]f the parties fail to indicate clearly whether their agreement is a shipment contract or a destination contract, the court will assume that the parties intended a shipment contract." Anzivino at § 7:17; *see also Urica, Inc. v. Pharmaplast S.A.E.*, No. CV 11-02476 MMM RZX, 2014 WL 3893372, at *2 (C.D. Cal. Aug. 8, 2014), *aff'd sub nom. Urica, Inc. v. Medline Indus., Inc.*, 669 Fed. App'x 421 (9th Cir. 2016) (applying the

---

[19]     The term "Collect" is another trade term generally used to indicate that the receiver/purchaser is responsible for freight charges. As such, this term does not have significance in the determination of the place of sale.

[20]     "Under the Incoterms Ex Works (EXW) commercial term (including Ex Factory and Ex Warehouse), the seller needs only to 'tender' the goods to the buyer by placing them at the buyer's disposal at a named place of delivery and notifying the buyer of the time and place where the goods will be at its disposal." Folsom, *supra*, § 2:25. "The risk of loss transfers to the buyer at the time the goods are placed at its disposal." *Id.*

[21]     Defendant advises that "FCA HK" stands for "Free Carrier Hong Kong," and under this trade term "risk of loss passes from buyer to seller at the designated location, here Hong Kong." Def. Brief at 19:13-15. Thus, "as with the other invoices, the sales referenced by these invoices took place in China (including Hong Kong)." *Id.*

CISG while noting that the goods at issue were shipped to the plaintiff buyer F.O.B., meaning the plaintiff "paid the freight from Egypt to Los Angeles and assumed all risk of damage to the goods during shipment"). As a result, the Court assumes a shipment contract, which results in the risk of loss, and therefore, title passing in Hong Kong. Under either a shipment contract or destination contract, title passed to the buyers of Defendant's products either at the place of destination (*i.e.*, Hong Kong) or the place of shipment (also Hong Kong). As a result, under the CISG (as well as UCC), the place of sale was in China, not the U.S., and Section 271 does not apply to create liability for Defendant for direct infringement.

While Plaintiff contends that various invoices show a "Ship to" address within the U.S., an examination of the actual invoices reveals that all those invoices show "Ship to: Hong Kong," and below this list a "Forwarder," and the U.S. "Ship to" address to which Plaintiff refers are below the forwarder. A freight forwarder is generally an agent that organizes shipments for corporations to get goods from a manufacturer, like Defendant, to a customer or final point of distribution. *See, e.g.*, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1245 (9th Cir. 1982) ("As a freight forwarder, Clipper itself ships no goods, but rather assembles and consolidates small shipments into single lots for shipment by carrier companies."). As a result, even assuming the invoices show Defendant used a freight forwarder located in the U.S.,[22] because the goods would only be passing through the U.S. as part of the process of arriving at their final destination, which all invoices indicate was Hong Kong, passing through the U.S. would not qualify as a "sale," "offer to sell," or "use" *by Defendant* within the U.S.

Plaintiff contends that "courts have denied summary judgment where contemplated sales to U.S. customers were for delivery F.O.B. to a foreign country." Pltff. Brief at 8:1-9 (citing *Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*, No. 4:13-CV-01043 SPM, 2015 WL 2179377, at *5 (E.D. Mo. May 8, 2015) (finding contemplated sales to

---

[22] This is a point that could have used clarification from Defendant, but none was provided.

U.S. customers for delivery F.O.B. China failed to establish that Defendant did not sell or offer to sell accused products in the U.S.); *see also SEB, S.A. v. Montgomery Ward & Co.*, 412 F. Supp. 2d 336, 342 (S.D.N.Y. 2006) (denying summary judgment where defendants sold deep fryers to "Fingerhut F.O.B. China" but shipped the deep fryers to Minnesota)). However, Plaintiff cites two cases for this proposition: an unreported case from the Eastern District of Missouri and a non-binding case from the Southern District of New York. *Id.* at 8:1-9. Further, both cases, in addition to predating more recent binding authority are inapposite.

In *Emerson*, the Eastern District of Missouri denied the motion for summary judgment of non-infringement of one of the defendants, Cleva Hong Kong, a Hong Kong corporation ("CHK"). *Id.* at *5. However, CHK entered into a supply agreement pursuant to which it sold the accused products to its North American affiliate (Cleva North America), which then, sold the accused products to buyers in the U.S. *Id.* Thus, unlike UDE, CHK contracted with, shipped products to, and was paid by buyers within the U.S. *Id.* In *SEB*, the court also denied the motions for summary judgment brought by both defendants, in which one of the defendants, Pentalpha, argued it did not directly infringe the plaintiff's patent because it manufactured the deep fryers in Hong Kong and sold them "FOB China." *Id.* at 338, 340. The court held that "[s]imply because Pentalpha sold the deep dryers F.O.B. China does not mean that it did not offer to sell the deep fryers in the United States." *Id.* On the contrary, "[a] reasonable jury could also conclude that Defendants actually sold the infringing deep fryers in the United States" because the defendants actually "had the 1,290 deep fryers shipped to St. Cloud Minnesota." *Id.* at 342. Unlike the *SEB* defendant, however, Plaintiff has failed to direct the Court to any proof that Defendant actually shipped any Accused Products to the U.S.

This leaves Plaintiff's final argument for infringing acts within the U.S.: Plaintiff contends that if an offer to sale was in the U.S. or payment was made in the U.S., the place of sale or offer to sell is within the U.S. Plaintiff argues that "[f]or an offer to sell, 'the location of the contemplated sale controls whether there is an offer to sell within the United

States.'"  Pltff. Brief at 7:25-28, 13:24-28 (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.,* 617 F.3d 1296, 1309 (Fed. Cir. 2010)).  Plaintiff contends that "it is possible that the offer to sell or sale took place in China, Hong Kong, and/or the U.S." because "[t]he standards for determining where a sale may be said to occur do not pinpoint a single, universally applicable fact that determines the answer, and it is not even settled whether a sale can have more than one location."  Pltff. Brief at 7:22-25, 14:16-22 (citing *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1308 (Fed. Cir. 2015); *see also Asia Vital Components Co. v. Asetek Danmark A/S*, Case No. 16-cv-07160-JST, 2019 WL 1369908, at *21 (N.D. Cal. Mar. 26, 2019)).  On that basis, Plaintiff asserts that "[a] jury could deduce that an invoice with a billing address in the U.S. means that money paid for the accused products is coming from the U.S.**—at a minimum this is circumstantial evidence—**that a sale or offer for sale occurred within the U.S." Pltff. Brief at 14:22-25.

In *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1380 (Fed. Cir. 2014), *vacated and remanded,* 136 S. Ct. 1923 (2016) ("*Halo I*"), the court held on nearly identical facts that "[a]n offer to sell, in order to be an infringement, must be an offer contemplating sale in the United States."  "Otherwise, the presumption against extraterritoriality would be breached." *Id.*  The court reasoned that "[i]f a sale outside the United States is not an infringement of a U.S. patent, an offer to sell, even if made in the United States, when the sale would occur outside the United States, similarly would not be an infringement of a U.S. patent." *Id.*  As a result, the *Halo I* court held "that Pulse did not offer to sell the products at issue within the United States for purposes of § 271(a)." *Id.* Thus, it affirmed the district court's "summary judgment of no direct infringement with respect to those products that Pulse manufactured, shipped, and delivered abroad." *Id.*

In a last-ditch effort to argue for the U.S. as the place of sale, Plaintiff attempts to distinguish the cases of *M2M Sols. LLC v. Motorola Sols., Inc.*, No. CV 12-33-RGA, 2016 WL 70814, at *22 (D. Del. Jan. 6, 2016) and *Halo I* a second time by arguing they "did not address whether invoices with a 'Bill to' address provide enough evidence to survive

1  summary judgment." Pltff. Brief at 15:7-9. Again, the Court already ruled that a "Bill to"
2  address is not enough to establish infringing acts with the U.S. However, even considering
3  Plaintiff's "Bill to" arguments as applies to *Halo I* and *M2M*, Plaintiff's attempts to
4  distinguish each case remain unavailing.

5         First, Plaintiff argues that in *M2M*, where the court granted the defendants' motion
6  for summary judgment of non-infringement by products made and shipped outside the
7  U.S., "the plaintiff 'failed to offer a shred of evidence that a single product shipped
8  abroad, let alone all of them, made it into the U.S.'" Pltff. Brief at 15:9-13; *see also* 2016
9  WL 70814, at *22 (emphasis added)). However, in this case Plaintiff has likewise "failed
10 to offer a shred of evidence that a single product shipped abroad, let alone all of them,
11 made it into the U.S." As the Court has noted, Plaintiff has established that the products
12 of Defendant's customers have made it into the U.S. Yet, Plaintiff fails to establish any
13 evidence proving the critical link required for this case: That the products sold by
14 Defendant's customers in the U.S. contained Defendant's ICMs rather than the ICMs of
15 some other supplier used by that company.

16        Second, Pulse attempts to distinguish *Halo I* by arguing that in that case, the products
17 were manufactured, shipped, and delivered to buyers abroad while Pulse also received the
18 actual purchase orders as well as payment for the products abroad. Pltff. Brief at 15:13-24
19 (citing *Halo I*, 831 F.3d at 1378). Pulse argues that "[h]ere, the U.S. 'Bill to' address is
20 evidence that payment is made by an entity in the U.S." *Id.* at 15:22-24. First, this ignores
21 the Court's previous ruling that invoices with a U.S. "Bill to" address do not establish a
22 sale within the U.S. Second, a "Bill to" address within the U.S. does not mean "payment
23 is made by an entity in the U.S.," and on the contrary, Defendant has shown that many of
24 its customers are not U.S. entities. *See* Exhibits "A" through "L" to Declaration of Kyle
25 Canavera in Support of Def. Brief, ECF No. 174. In sum, while Plaintiff is correct that
26 "[n]either *M2M* nor *Halo I* addressed the issue of invoices with U.S. billing addresses,"
27 Pltff. Brief at 15:25-26, Plaintiff is incorrect in its contention that a U.S. "Bill to" address
28 can save Pulse from summary judgment.

Next, Plaintiff argues that *California Inst. of Tech. v. Broadcom Ltd.*, No. CV 16-3714-GW(AGRX), 2019 WL 11828237, at *9-10 (C.D. Cal. June 17, 2019) warrants this Court denying summary judgment "because questions of fact remain as to whether UDE's accused products are sold or offered for sale pursuant to 35 U.S.C. § 271(a)." Pltff. Brief at 16:19-25 (quoting *Broadcom*, 2019 WL11828237 at *10 ("Questions of fact remain as to whether Broadcom's chips that are never imported into the United States are sold or offered for sale pursuant to 35 U.S.C. § 271(a)")). *Broadcoam* also involved a defendant's motion for summary judgment of non-infringement as to extraterritorial sales, which the court granted in part and denied in part. *Id.* at *1. However, the court found that "[o]n the current record, factual questions relating to the exclusive nature of the supply chain and Broadcom's intent preclude[d] summary judgment as to chips that are eventually imported into the United States." *Id.* at *10 (citing *Largan Precision Co, Ltd v. Genius Elec. Optical Co.*, 86 F. Supp. 3d 1105 (N.D. Cal. 2015), *judgment entered,* No. 13-CV-02502-JD, 2015 WL 1940200 (N.D. Cal. Apr. 29, 2015), and *aff'd sub nom. Largan Precision Co. v. Genius Elec. Optical Co.*, 646 Fed. App'x 946, 949, n.2 (Fed. Cir. 2016)[23]). As a result, "[q]uestions of fact remain[ed] as to whether Broadcom's chips that are never imported into the United States are sold or offered for sale pursuant to 35 U.S.C. § 271(a)." *Id.* In

---

[23]    Both parties discuss *Largan* and *Halo I* heavily. The Court notes that its previous order analyzed both cases extensively and incorporates that analysis herein. Order, ECF No. 160 at 26:1-27:22, 54:13-59:21. However, to succinctly reiterate, in both *Largan* and *Halo I*, the Federal Circuit affirmed the decisions of the district courts granting summary judgment of non-infringement where the defendants, like UDE, manufactured components in Asia that were later sold to EMS or brand companies that incorporated those components into infringing devices and sold worldwide, including in the U.S. *Halo I*, 769 F.3d at 1374, 1381; *Largan*, 86 F. Supp. 3d at 1111-12. Even though the Federal Circuit noted that the EMS or brand companies may later sell the products containing the defendant's products within the U.S., it found the defendants could not be held liable for infringe. *Halo I*, 769 F.3d at 1374, 1381; *Largan*, 86 F. Supp. 3d at 1111-12. The court arrived at this conclusion even though the defendants, like UDE, met with customers in the U.S., sent samples for pre-approval to the U.S., worked with their customers to design the components, and sold to customers who sold products in the U.S. *Halo I*, 769 F.3d at 1379; *Largan*, 86 F. Supp. 3d at 1111-12.

this case, however, the Court has already noted that Defendant's customers multi-source, and neither party has been able to point to any exclusive agreements with UDE's customers, pursuant to which Defendant would provide all ICMs to a customer that sells only in the U.S.  In other words, the issues creating a genuine dispute of material fact in *Broadcom* do not exist in this case.

Plaintiff argues that "[a]t a minimum, the UDE invoices containing U.S. billing addresses are circumstantial evidence of UDE's offers to sell the accused products," and "courts have used billing addresses as evidence of purchase and use."  Pltff. Brief at 14:2-8.  Plaintiff cites to *WebZero, LLC v. ClicVU, Inc.*, No. CV08-0504-MRP PLAX, 2008 WL 1734702 (C.D. Cal. Apr. 4, 2008), *aff'd,* 392 Fed. App'x 863 (Fed. Cir. 2010) for the proposition that billing addresses can be used as evidence that services were purchased and used.  2008 WL 1734702, at *6.  However, in *WebZero*, the court denied in part and granted in part the defendant's motion to dismiss for, *inter alia*, lack of personal jurisdiction.  The plaintiff patent-owner's complaint was for patent infringement and unfair business practices.  *Id.* at *6.  The court noted that other "[c]ourts have used the evidence of purchases in the forum, even in the context of online services, as demonstrating purposeful availment."  *Id.*  It reasoned that because WebZero had made a prima facie case that California residents had "both bought and utilized services from ClicVU, given that 4.2% of its members list California billing addresses, and ClicVU ha[d] asserted that users with such billing addresses accounted for $1200 in sales in 2007."  Evidence relevant to the purposeful availment analysis for establishing personal jurisdiction is entirely inapposite and does not establish that a mere "Bill to" address on an invoice for products made, shipped, and delivered in Asia prove that a sale took place within the U.S. for purposes of proving territorial acts in a patent infringement case.

Finally, Plaintiff argues that "[i]n order for an offer to sell to constitute infringement, the offer must be to sell a patented invention within the United States."  Pltff. Brief at 13:22-24.  Here, as to the issue of direct infringement, Plaintiff can only seek to hold Defendant liable for an offer to sale the patented invention (*i.e.*, ICMs), not for the

-38-

1  subsequent secondary sale of switches within the U.S. that may or may not contain
2  Defendant's ICMs.  The products which contain the ICMs are a different product.  In this
3  case, the offer to sell the ICMs occurs in Asia.

4       In sum, the Court does not take its decision to dismiss this matter lightly and
5  carefully considered all evidence and case law raised by Plaintiff, but Plaintiff's invoices
6  with a "Bill to" address simply do not establish a genuine issue of fact from which a
7  reasonable jury could conclude a sale took place in the U.S. in light of relevant case law
8  (e.g., *Halo I* and *Largan*) as well as the fact that the products sold were made, shipped, and
9  delivered in China.

10                    ii.    <u>Invoices with a "Ship to" Address in the U.S.</u>

11      Plaintiff argues that separate and aside from the invoices with a "Bill to" address in
12  the U.S., (1) "[a] reasonable jury could conclude that UDE's invoices with a 'Ship to'
13  address within the U.S. trigger application of § 271(a)" and (2) "UDE testified that it sold
14  the accused products to U.S. customers (i.e., ████████ ) and a 'very, very small quantity'
15  was 'sent to the US.'"  Pltff. Brief at 12:18-19, 13:3-5 (citing Exhibit 18 to Plaintiff's
16  Opposition to Defendant's Motion for Summary Judgment, January 5, 2021 Deposition
17  Transcript of Chris Chen, ECF No. 149-14 ("Chen Dep. II") at 14-15, 44:6-48:23).

18      Plaintiff notes that "[c]ourts have found defendants liable where similar admissions
19  were made."  Pltff. Brief at 13:5-13 (citing *Semitool v. Dynamic Micro Sys. Semiconductor*
20  *Equip.*, No. 3:01-CV-01391-WHA, 2002 WL 34213426, at *5-6, n.11 (N.D. Cal. Sept. 5,
21  2002)).  Plaintiff argues that in *Semitool*, the court held "that despite the F.O.B. Germany
22  designation, the defendant was liable under § 271(a) because the defendant's top executive
23  admitted that the defendant offered to sell and sold the infringing product in the U.S."  *Id.*
24  However, *Semitool* involved a patent dispute between a Montana corporation and German
25  corporation where the purchase order stated the freight terms were "F.O.B. Germany."
26  However, because the court found that the defendant's top executive had made
27  "conclusive" admissions that he had offered to sell or sold infringing products within the
28  U.S., the court found it was "unnecessary to reach the legal question presented by the

-39-

F.O.B. freight terms" and held that the defendant was liable for direct infringement.  *Id.*  In this case, however, Plaintiff's arguments misrepresent the status of both the evidence as well as the testimony of Defendant's Rule 30(b)(6) witness, Chris Chen ("Mr. Chen"). There are no "conclusive admissions" as there were in *Semitool*.

First, as previously discussed, there are no invoices with a U.S. "Ship to" address. Second, Mr. Chen never testified that Defendant sends any Accused Products to the U.S. Rather, he testified that with respect to Defendant's transactions with ███, the "vast majority of it was delivered to Hong Kong, whereas," it was possible that "only a very, very small quantity would be sent to the U.S."  Chen Dep. II at 46:18-47:12.  However, Mr. Chen testified that most of the products UDE delivered or made for ███ "were one-port products," which are not at issue in this case, and that all information "regarding the 2xN multi-giga product pertaining to" ███ was produced to Plaintiff.  *Id.*  In fact, Plaintiff later admits that Mr. Chen's testimony does not establish sales in the U.S., *see, e.g.*, Pltff. Brief at 12:13-15 (admitting that "it is not clear from UDE's testimony whether UDE's invoices constitute sales or offers for sale" within the U.S.), but argues that " at a  minimum,  the invoices are circumstantial evidence that UDE sells and offers for sale the accused products in the U.S.," *see id.* at 12:14-17.  However, Mr. Chen clearly testified that UDE's "products are sold to AQ, and AQ sells the products to its customers."  Chen Dep. II at 21:16-18.  "As for the transactions done between AQ and AQ's customers, AQ does not need to tell UDE, nor does it have the obligation to tell UDE."  *Id.* at 21:18-20. Rather, "the products are shipped or delivered to AQ's warehouse in Hong Kong."  *Id.* at 23:1-3.  "AQ then sells those products to AQ's customers."  *Id.* at 23:3-4.  As a result, there was no admission by UDE's "top executive" as there was in *Semitool*.

Third, the corporate designee for the customer to which Mr. Chen referred testified that it "had a warehouse in Hong Kong that would receive shipments from UDE."  ECF No. 149-17 at 6, 15:1-17.  Thus, Plaintiff has failed to show that the existence of invoices with a "Ship to" that would establish the existence of a genuine issue of fact as to whether Defendant undertook infringing acts within the U.S.  Mr. Chen also testified that UDE

does not target the U.S. for sales because even though "the United States is the largest market in the world[,] . . . the largest factory in the world is in Asia."  Chen. Dep. II at 13:6-9.  He stated that "[t]here is no manufacturing activity in the U.S." *Id.* 13:9-10.  Thus, "the target of [UDE's] dealing is mainly the EMS companies," and it does "not have sales in the U.S." *Id.* 13:16-18.

Plaintiff argues that "[a] reasonable jury could deduce that UDE must have sold or offered for sale the infringing products based on the invoices, regardless of whether the invoice includes a 'Ship to' address in the U.S., a 'Bill to' address in the U.S., or both."  Pltff. Brief at 17:9-12.  The Court disagrees.  The Court also finds that the invoices with the U.S. "Bill to" and "Ship to" address (below the forwarder address) but were shipped to Hong Kong fail to establish territorial conduct establishing direct infringement.  *See, e.g.*, *Halo I*, 769 F.3d 1371 ("Any doubt as to whether [a defendant's] contracting activities in the United States constituted a sale within the United States under § 271(a) is resolved by the presumption against extraterritorial application of United States laws").

### iii.   UDE's Testimony Regarding the Invoices

Plaintiff argues that Mr. Chen admitted "that [UDE] sells products to ████████ and has knowledge that ██████ is headquartered in the U.S."  Pltff. Brief. at 10:2-4.  Plaintiff also argues that Mr. Chen admitted in his deposition that UDE sells products within the U.S.  Pltff. Brief at 12:12-13.  Defendant responds by noting that Mr. Chen's testimony "was *not* describing any domestic act for the accused products."  Def. Brief at 22:13-14.

During his January 5, 2021 deposition, Plaintiff's counsel directly asked Mr. Chen whether Defendant considers an invoice with a "Bill to" address within the U.S. "a sale within the United States."  Chen Dep. II at 14-15, 44:6-16.  While Mr. Chen responded with an admittedly unresponsive answer,[24] he also explained that all documents pertaining

---

[24]   The Court notes that while Mr. Chen's responses, at times, appear to be intentionally evasive, Mr. Chen also required the assistance of a translator during the deposition, which may have contributed to his inability to answer questions in a straightforward manner. Moreover, to the extent Mr. Chen's answers may have been evasive, the Court notes that Mr. Chen expressed frustration during his deposition a number of times because Plaintiff's

-41-

to Accused Products that may or may not have been delivered to the U.S. were provided to UDE's counsel, who provided them to Plaintiff.  *See* Chen Dep. II at 44:17-23; *see also id.* at 46:14-18 ("If this is sent to the US, and it is also one of the accused products involved in this case, then we would have included this information in the sales list that we have produced.").  However, those documents include the invoices on which Plaintiff relies and Plaintiff is unable to point to a single document indisputably proving Defendant sold, made, offered for sale, or imported any products into the U.S.

During his deposition, Mr. Chen also examined ECF No. 149-8 at 59, which was an invoice showing "Shipped Per Truck," "From: Hong Kong," "To: Hong Kong," "Bill to: █████████" at a San Jose, California address, and showed, *inter alia*, a sale of 1,000 of Seller's Part Number of GM6-AQ-0005.  Mr. Chen confirmed that "[t]he company indicated in the 'Bill To' address is a US company, █████."  ECF No. 149, Exhibit 18 at 48:9-11.  However, he also clearly testified that "**the goods were not delivered to the US.**"  ECF No. 149, Exhibit 18 at 48:11-12.  Rather, "[t]hey were delivered to Hong Kong."  ECF No. 149, Exhibit 18 at 48:12-13.  Thus, all Mr. Chen's testimony establishes is that UDE sells its products to █████, which the Court does not find has ever been a disputed issue of fact.  It also establishes that UDE puts ███████'s logos on its products for ██████.  However, selling products to █████████ or custom-making products for its customers in Asia does not establish sales within the U.S. of Accused ICMs by UDE.

_____

counsel frequently failed to limit the scope of his questions to the Accused Products in this case.  *See, e.g.*, Chen Dep. II at 29:7-12 ("But your question was targeting at all customers.  Like I said earlier, it would involve different circumstances and different situations if you are asking about all customers. So for this case, you have to limit what customer you are asking about before I can answer.").  Indeed, many of the questions from Plaintiff's counsel to UDE at Mr. Chen's were directed towards Defendant's general business practices or general sales, which are not in dispute in this lawsuit.  Only Defendant's sales of Accused Products within the U.S. are in dispute in this lawsuit.  Unfortunately, Plaintiff's counsel's questions are prejudicial in that many of the questions asked to Mr. Chen could cover sales of products in the U.S. of non-Accused Products that would be perfectly lawful.  Even still, the questions by Plaintiff's counsel do not establish Defendant's sales of Accused Products within the U.S.

Finally, for Plaintiff to say that "UDE admits that its transactions include product 'sent to the US,' albeit 'a very, very small quantity'" is a misrepresentation. As the Court's above analysis already noted, Mr. Chen's testimony did not admit amount to an admission that Defendant ships Accused Products to the U.S., and Defendant's customer confirmed that Defendant shipped and delivered its ICMs to the customer in Hong Kong.

In sum, Mr. Chen's testimony confirms that Defendant does not sell Accused Products within the U.S., and even where invoices have a "Bill to" address within the U.S., the products sold are still delivered in Hong Kong. As such, Mr. Chen's testimony fails to establish a genuine issue of fact as to whether Defendant makes, sells, uses, offers for sale, Accused Products within the U.S. It also does not establish that Defendant imported Accused Products into the U.S.

> b. _UDE Testimony as to U.S. Offices and Customer Support_

Plaintiff argues that "[a]lthough UDE is not headquartered in the U.S., representatives of UDE have visited the U.S. office of Aquantia," and "UDE's presentation shows forty percent (40%) of its sales are in the U.S." Pltff. Brief at 17:14-16 (citing ECF No. 150-20). Defendant responds by pointing out that this Court's previous order already rejected this evidence. Def. Brief at 22:15-20; _see also_ Order ECF No. 160 at 66:18-23 (noting that even though UDE 0092346, ECF No. 149-13 at 5, showed Defendant's sales breakdown by territory for the year 2015, stating that sales in the U.S. were 40%, it "does not indicate whether the sales made were sales by (1) others with Defendant's products in it or (2) Defendant but of non-infringing or non-accused products").

In addition to the Court's previous reasons for rejecting this evidence, the Court also notes that during Mr. Chen's deposition, he clearly testified that the forty percent (40%) figure on which Plaintiff relies pre-dates Defendant's manufacturing of the Accused Products. _See, e.g._, Chen. Dep. II at 35:19-36:2 (testifying that "[t]he 2xN multi-giga product is a relatively recent, more recent product[,] [b]ut what was discussing in this [2016] email chain was something that happened prior to 2016," and therefore, "doesn't have much to do with the accused product."); _see also_ Chen. Dep. II at at 19:3-11 (testifying

-43-

that "[t]he accused product we are talking about today is the 2xN multi-giga, multi-port products," but in 2015, UDE was selling "either one-port or four-port" products, so the 40% figure "had nothing to do with the accused products we are talking about now"). Additionally, Mr. Chen also testified that because those figures were for a sales presentation, they were likely exaggerated. *See id.* at 17:19-18:11 (testifying when asked about the sales presentation showing that the U.S. made up 40% of UDE's sales that "those numbers are a little bit exaggerated" for the purpose of impressing customers). He also stated that when Defendant's "salespeople prepared this, they included all the information of all the products that would touch upon the US or the definition of the United States," meaning that it covered "cover all relevant products" and had "nothing to do with the accused products in this case." *See id.* To further establish Defendant's lack of U.S. sales, when asked, "What percent of UDE's resources are focused on sales in the United States?" Mr. Chen responded, "UDE does not have any company in the United States." Pltff. Brief at 17:17-23 (citing ECF No. 150-21 9:8-16).

Finally, while this Court already found that it has been established that Defendant had a U.S. office, Order, ECF No. 160 at 67:5-11, the Court also noted that merely having a U.S. office or visiting the U.S. does not prove infringing acts or induced infringement. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1334 (Fed. Cir. 2016) ("*Power Integrations II*") (holding that while evidence the defendant maintained a technical support center in the U.S. "that provided support *for the infringing controller chips* to" U.S. customers "may not individually be sufficient to establish liability" it might when "as a whole" along with other evidence). "Rather, intent to infringe will not be inferred from the mere maintenance of a U.S. office as the intent to sell in the U.S. must pertain only to accused products." Order, ECF No. 160 at 67:11-13. "Here, Defendant points out that it sells other products, which are not at issue in this case, so the U.S. office could support non-accused products." *Id.* at 67:13-14.

Although Plaintiff argues that "[a] reasonable jury could conclude from UDE's testimony that UDE has engaged in domestic activities that infringe the patents-in-suit,"

-44-

Pltff. Brief at 18:23-24, the Court finds that on the contrary, Mr. Chen's testimony still confirms the absence of evidence of domestic infringing activities. For a jury to conclude otherwise would require the jury to speculate that Defendant's U.S. office or sales pertain to Accused Products despite direct testimony by Mr. Chen that Defendant does not sell Accused Products in the U.S. *Phytelligence*, 973 F.3d at 1364 ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

### c.    *UDE's Corporate Structure*

Plaintiff argues that (1) "Mr. Greg Loudermilk, a UDE U.S. salesperson, states 'UDE works closely…for the design in the US' and states sales in the tens of millions of dollars," Pltff. Brief at 19:2-4 (citing ECF No. 150-23), and (2) "UDE by its own admission specifically designs its ICM products for the United States," *id.* at 19:4-5 (citing ECF No. 150-23 at 5). Defendant responds by reiterating that the Court also previously rejected this same evidence. Def. Brief at 22:21-24.

"To the extent Defendant worked with its customers to design products according to their needs, visited the U.S. offices of customers, and knew that some of its customers sold products in the U.S., the defendant in *Largan* had undertaken all of the same actions, but the Federal Circuit still held it could not be held liable for induced infringement." Order, ECF No. 160 at 59:8-12 (citing *Largan Precision Co, Ltd v. Genius Elec. Optical Co.*, 86 F. Supp. 3d 1105 (N.D. Cal. 2015), *judgment entered,* No. 13-CV-02502-JD, 2015 WL 1940200 (N.D. Cal. Apr. 29, 2015), and *aff'd sub nom. Largan Precision Co. v. Genius Elec. Optical Co.*, 646 Fed. App'x 946, 948-49 (Fed. Cir. 2016)). As such, it would simply be too speculative to infer infringement in this case absent evidence that the branded or EMS companies with whom Defendant works (1) randomly distribute their products throughout the world (as opposed to intentionally making sure certain product models or devices containing Defendant's products are only sold in non-U.S. countries) or (2) only ship or sell their products in the U.S. *Id.* at 59:12-21 (citing *Largan*, 646 Fed. App'x at 949-50; *M2M*, 2016 WL 70814 at *21).

Plaintiff again relies on a February 2016 e-mail from Greg Loudermilk to Plaintiff's

-45-

CEO, explaining "that 'UDE is taking more footprint from our competitors' including '10% from Pulse' annually over the past three years <u>in the</u> <u>North American Market</u>" to establish acts of domestic infringement.  Pltff. Brief at 19:6-9 (citing Exhibit 28 to Plaintiff's Opposition, ECF No. 150-31) (original emphasis); *but see* Order at 74:25-28 (referring to the same e-mail).  However, as the Court already noted, "North America includes more than the U.S."  Order, ECF No. 160 at 74:28-75:4.  Thus, this e-mail still does not prove intent to infringe within the U.S., particularly because again, Defendant is allowed to sell products in the U.S. so long as those products do not practice Plaintiff's Patents-in-Suit or are not accused in this case.  *Id.*  Defendant may also sell products that practice Plaintiff's Patents-in-Suit in portions of North America outside than the U.S. without violating U.S. patent law.

Plaintiff also argues that the following aspects of Defendant's "corporate structure" establish circumstantial evidence of acts of domestic infringement: (1) "UDE's website has enabled and continues to enable customers to locate one or more U.S. based distributors," Pltff. Brief at 19:9-11 (citing ECF No. 150-19); (2) Defendant "claims it was 'World No. 2 in ICM revenues' with approximately $150,000,000 USD for 2016," *Id.* at 19:12-14 (citing SAC, ECF. No. 106 at ¶ 88; and ECF. No. 114 at 4); (3) Defendant's "'Company Profile' shows forty percent (40%) of UDE's sales are in the U.S.," *Id.* at 19:14-15 (citing ECF No. 150-20 at 5); (4) Defendant "has a 'Branch Office' and four 'Rep./Agent' in the U.S.," *Id.* at 19:15-16 (citing *id.* at 5); (5) Defendant "recognizes the U.S. as the largest market in the world," *Id.* at 19:16-17 (citing ECF No. 150-21 at 13:7-8); and (6) Defendant "has a corporate office in the United States for its U.S. customers," *Id.* at 19:17-18 (citing *id.* at 14:18-24; ECF No. 150-19).  However, all of the aforementioned evidence was previously analyzed and rejected by this Court as failing to create a genuine issue of fact as to whether Defendant committed domestic acts of infringement.  First, the Court noted that "even though there is evidence Defendant had data sheets on its products on its website, there is no evidence Defendant's website allowed customers to locate distributors of its products in the U.S., as in *Power Integrations II*."  Order at 82:27-28-83:27.  Second,

-46-

Plaintiff argues that Defendant is second in the world in ICM revenue but relies on Defendant's worldwide sales to establish U.S. sales without offering "a way for the Court to decipher whether any of those [worldwide] sales were made within the U.S." or were for Accused Products.  Order at 33:18-24.  Third, Plaintiff continues to argue that forty percent (40%) of Defendant's sales are in the U.S. even though Mr. Chen testified that the figure pre-dated the Accused Products in this case.  *See, e.g.*, Chen Dep. II at 17:19-18:11, 19:3-11, 35:19-36:2 (testifying that the 40% figure was from 2015, and UDE was not selling the 2xN multi-giga, multi-port products at that time).     Fourth, even though Defendant does not dispute having a U.S. branch office or agent, "merely having a U.S. office or visiting the U.S. does not prove infringing acts or induced infringement."  Order at 67:5-11.  Fifth, while Plaintiff argues that Defendant "recognizes the U.S. as the largest market in the world," Pltff. Brief at 19:16-17 (citing Chen Dep. II at 13:7-8), and while Mr. Chen did testify to the effect, the remainder of his testimony shows that regardless, Defendant intentionally does not target the U.S.  *See, e.g.*, Chen Dep. II at 13:4-10 (testifying that "it is correct that the United States is the largest market in the world" while explaining that UDE does not target the U.S. because "the largest factory in the world is in Asia," and "[t]here is no manufacturing activity in the US").

In *Power Integrations II*, the Federal Circuit held that the plaintiff had "introduced significant—though not necessarily overwhelming—evidence that would allow a jury to find that [the defendant] took affirmative acts to induce third parties to import its products into the United States."  843 F.3d at 1333.  However, the *Power Integrations II* plaintiff presented evidence that the defendant (1) designed its controller chips to meet certain U.S. energy standards, (2) competed for business it knew was directed to the U.S., (3) "provided demonstration boards containing the infringing controller chips to customers and potential customers in the United States," (4) maintained a website that enabled customers to locate a U.S.-based distributor that sold the defendant's infringing controller chips, (5) "maintained a technical support center in the United States that provided support *for the infringing controller chips* to customers based in the United States," and (6) had "standard

terms and conditions [that] indemnified customers against claims for infringement of United States patents." *Power Integrations II*, 843 F.3d at 1333-34. "While each piece of evidence may not individually be sufficient to establish . . . liability, the evidence as a whole" may provide "the jury substantial evidence upon which to find inducement." *Id.* at 1334 (internal citations and quotations omitted). Further, the plaintiff had "presented evidence that it purchased at least three products containing infringing . . . chips in the United States." *Id.* at 1333. *Power Integrations II* differed from this case, however, because that court had already found that the defendant competed with the plaintiff by reverse engineering and copying the plaintiff's products while also fostering "a corporate culture of copying" with respect to at least one of the patents-in-suit. *Id.* Further, the defendant did not dispute that the plaintiff had proven infringement of two of the patents-in-suit by third parties. *Id.* at 1332-33.

While Pulse attempts to argue that it has the same evidence as the *Power Integrations II* plaintiff, and such, this case supports a finding of infringement, this case differs in the following ways: First, although there is evidence that Defendant designed products pursuant to customer requests, there is no similar evidence that those requests were targeted towards U.S. standards, or if they were, that Defendant knew that. Second, while there is evidence Defendant competed for business with companies it knew sold products within the U.S., there is no evidence Defendant competed for business with any EMS or brand companies knowing they intended to sell their products, containing Defendant's ICMs, within the U.S. In fact, the Court's previous order noted that all evidence from third-parties in this case showed worldwide sales and did not prove that any U.S. sales of their products involved Defendant's ICMs. *See* Order, ECF No. 160 at 64:11-66:16. Third, even though there is evidence Defendant had data sheets on its products on its website, there is no evidence Defendant's website allowed customers to locate distributors of its products in the U.S., as in *Power Integrations II*. Fourth, this Court has not held that Defendant reverse engineered or intentionally copied Plaintiff's products. Fifth, unlike the defendant in *Power Integrations II*, which admitted infringement as to two of the patents-in-suit,

-48-

Defendant disputes that any of its products infringe Plaintiff's Patents-in-Suit.  Sixth, like the *Power Integrations II*, which "presented evidence that it purchased at least three products containing infringing . . . chips in the United States," 843 F.3d at 1333, Plaintiff also argues that its counsel purchased two network switches in the U.S., containing Defendant's ICMs.  However, unlike *Power Integrations II*, the Court's previous order undertook extensive analysis showing why this fails to create a genuine issue of fact in this case.  *See* Order, ECF No. 160 at 62:2-64:9.  Namely, Plaintiff's counsel claims that he purchased an exemplary Juniper EX4300-48MP and Cisco MS355 Ethernet Switch in San Diego, California.  SAC at 33:12-15; Gazdzinski Decl., ECF No. 149-1 at ¶¶ 2, 20, 25, and 31-32.

As to the Juniper Switch, the evidence in no way suggests that it contains Defendant's ICM, especially because even Plaintiff's own expert testified that the ICM in the switch "has the same markings" as shown in another brand's ICMs.  *See* Exhibit 23 to ECF No. 144, Baxter Deposition Transcript, ECF No. 144-26 ("Baxter Dep. Trans. II") at 6, at 23:18-27:17.  Second, as to both the Juniper and the Cisco switch, separate and aside from the Court's concerns about relying on a declaration by Plaintiff's counsel seeking to authenticate evidence Plaintiff intends to rely on at trial, the Court finds Plaintiff's purchase of these products proves nothing dispositive.  They do not prove that Plaintiff's counsel purchased or imported the product *from Defendant* in the U.S. so as to prove direct infringement.  In fact, if Plaintiff's counsel had purchased the products from Defendant, according to Mr. Chen's testimony, the invoices Defendant produced should have reflected the purchase.  That Plaintiff's counsel purchased the products within the U.S. also does not prove Defendant knew its ICMs would end up in switches subsequently manufactured in Asia by its customers and later sent to the U.S. That a device containing an infringing product may end up in the U.S. does not *per se* establish direct or induced infringement. *See Largan*, 646 Fed. App'x at 948-50.

d.  *UDE Samples*

Plaintiff acknowledges that "[t]his Court decided that the samples (including S3Y-

-49-

HP-0001, N42-ZT-0001, and GMD-AA-0002) UDE provided for inspection in this litigation do not constitute infringement," Pltff. Brief at 19:23-25 (citing ECF No. 160 at 34). However, Plaintiff now argues that "UDE also provides samples to its customers (including U.S. customers) for the purpose of testing," and "courts have found samples to constitute infringement." Pltff. Brief at 19:25-20:16. Defendant responds that Plaintiff is "assuming maybe at some point UDE sent samples to the U.S." based on the assumption from Mr. Chen's "testimony that [1] UDE sometimes provides samples to customers, and . . . [2] many of UDE's customers are in the U.S." Def. Brief at 22:25-28. Defendant contends "[t]his position is utter speculation," and "[t]here is no basis to conclude that UDE sent samples to the U.S., much less of the accused products." *Id.* at 22:25-23:4.

The Court agrees that where a party sends sample of an infringing product to the U.S., the party commits an act of infringement. *See, e.g.*, *Largan*, 86 F. Supp. 3d at 1117 ("Summary judgment of contributory infringement is therefore appropriate for the sample lenses sent directly into the United States"). However, Plaintiff is unable to point to a single recipient to whom Defendant sent a sample of an Accused Product and bases its assumption off the fact that Mr. Chen testified that Defendant occasionally sends samples of products to customers in the U.S. for the purposes of testing. Pltff. Brief at 19:15-20:23; *see also* Exhibit 1 to Pltff. Brief, November 4, 2020 Deposition Transcript of Chris Chen, ECF No. 172-2 ("Chen Dep. I") at 3, at 30:8-31:2. When asked, "Is there a possibility that UDE has provided samples of accused products to customers in the U.S.?" Chen Dep. I at 31:3-5, Mr. Chen responded that there was a possibility but reiterated that he could not answer the question, *id.* at 31:3-21. However, a "possibility" does not create an issue of fact, and after three years of litigation, including ample discovery, including to Defendant's customers who presumably would have received the samples, Plaintiff still has no evidence of a single sample of an Accused Product provided within the U.S. Thus, Plaintiff has failed to show a genuine issue of fact exists as to whether Defendant provided samples of infringing Accused Products within the U.S. With the pre-trial conference scheduled for April 5, 2021, and the parties' trial exhibits already submitted, Plaintiff has no evidence of

such samples being sent to the U.S beyond its mere speculation.

e.    *UDE's Agents in the U.S.*

Plaintiff argues that because Defendant has agents in the U.S., this somehow establishes acts of domestic infringement.  Pltff. Brief at 21-22.  Defendant responds that "Pulse does not explain how any domestic acts by those 'agents'—unrelated third-party companies—could somehow establish domestic acts by UDE."  Def. Brief at 23:5-9.

The evidence confirms that Defendant does have agents within the U.S., at least one of which provides customer service on behalf of UDE.  *See* Chen. Dep. 1 at 4, 45:2-46:15 (testifying that Defendant has a U.S. agent, located in the U.S., which provides customer service on Defendant's behalf, and that "there is . . . a possibility" that the agent "provides services for accused products, for customers of accused products in the United States").  However, what is not clear from this testimony is whether the recipient of the customer service who is allegedly using the infringing Accused Product is located in the U.S.  For instance, if a customer service representative instructed an individual in Japan on how to use an Ethernet switch in Japan, that would not qualify as making, selling, offering for sale, or importing an infringing product because the product containing the infringing ICM would be used outside the U.S.  Further, Defendant is allowed to offer customers service in the U.S. because, again, it can sell non-Accused Products in the U.S.  As with Plaintiff's allegations that Defendant provided samples within the U.S., Plaintiff's only evidence to support this fact is Mr. Chen's testimony that this was "a possibility."  Again, a possibility cannot create an issue of fact in the absence of any testimony or evidence showing this was anything more than a possibility.

This Court does not find the individual fact of Defendant contracting with a third-party to provide customer service to customers in the U.S. which may cover Accused Products creates a genuine issue of fact.  *See, e.g.*, *Power Integrations II*, 843 F.3d at 1334 (holding that while evidence the defendant maintained a technical support center in the U.S. "that provided support *for the infringing controller chips* to" U.S. customers "may not individually be sufficient to establish liability" it might when "as a whole" along with

-51-

other evidence).

### f.   *UDE's Website*

Plaintiff argues that the following establish circumstantial evidence of domestic infringing acts: (1) "UDE's website lists a U.S. location with contact information for sales in the U.S.," Pltff. Brief at 22:7-9 (SAC at ¶ 91; *see also* http://www.ude-corp.com/about/about/id/3/lang/en.html), (2) "UDE's website not only includes a U.S. address and telephone number, but also two specific email addresses that end with 'ude-corpusa.com,'" *id.* at 22:9-11; (3) "[o]ne of the email addresses is sales@ude-corpusa.com," *id.* at 22:11-12; and (4) "regarding the remaining contributory infringement claims, UDE publishes materials on its website that are in English and available in the U.S.," *id.* at 22:15-18 (citing SAC at ¶ 55; *see also* http://www.ude-corp.com/).  Defendant again responds by noting not only did the Court already reject this information as establishing domestic acts of infringement, but that these arguments are also "unfounded speculation."  Def. Brief at 23:10-15.

Although Plaintiff argues that "[a] reasonable jury could review the record in this case and conclude that UDE sells the infringing products in the U.S. via its sales@ude-corpusa.com email address," Pltff. Brief at 22:12-14, the Court finds this argument to be nothing more than speculation and conjecture.  Ample case law establishes that merely having U.S. offices, visiting the U.S., or maintaining a U.S. website does not establish domestic infringing acts.  *See* Order, ECF No. 160 at 67:5-11; *see also Largan*, 646 Fed. App'x 948 (holding that working with downstream sellers, even by visiting the U.S., does not establish infringement, especially where those sellers sell products worldwide).

Defendant's website does not prove infringing acts take place in the U.S. because there are non-U.S. companies that speak English, which may be the companies Defendant targets with its English website, and Defendant also sells non-Accused Products in the U.S.

### g.   *UDE's Alleged Joint Enterprise with* █████

Plaintiff attempts to establish acts of domestic infringement by arguing that Defendant and █████, which is headquartered in the U.S., have a joint enterprise, which

-52-

1   involves (1) Defendant's representatives visiting the U.S. ███████ headquarters, (2)

2   "some of the technical support provided by ██████ was in the U.S.," and (3) "UDE's

3   U.S. salesperson, Mr. Greg Loudermilk, testified that UDE created the ██████ brand

4   based on ███████'s necessity to enter the market." Pltff. Brief at 22:20-21, 23:1-4.

5   Plaintiff argues that "UDE's joint enterprise with ██████ included selling the infringing

6   ICMs that ███████ purchased from UDE that were branded for ██████." *Id.* at 22:21-

7   23:1. Plaintiff contends that "UDE's actions with U.S. based ███████ reflect contemplated

8   sales in the U.S." Pltff. Brief at 23:8-9. Defendant responds that both this Court as well

9   as the *Halo I* court have already established that "the mere existence of a relationship with

10   a U.S. company does not establish an issue of fact for infringement." Def. Brief at 23:17-

11   19. On the contrary, Defendant argues that its relationship with ███████ is not relevant

12   unless it resulted in domestic acts by Defendant, but because the invoices show Defendant

13   never engaged in domestic infringing acts when it sold products to ███████, Plaintiff's

14   argument fails. *Id.* at 23:19-21.

15       Plaintiff's argument appears to be that because ██████ has U.S. headquarters and

16   sells products in the U.S., and Plaintiff purchased and dissembled a Juniper EX4300-48MP

17   in the U.S., which was stamped with AQX-N3S64-MTN-U3I, that switch must contain

18   Defendant's ICM because "UDE works with ███████ to sell many of its infringing ICMs,

19   including the same ICM ('AQX-N3S64-MTN-U3I'/'GM6-AQ-0005') found in the Juniper

20   EX4300-48MP." Pltff. Brief at 23:10-24:4 (citing ECF No. 150-1 ¶ 2; ECF No. 150-5;

21   ECF No. 150-7; ECF No. 150-30). Thus, Plaintiff argues that "[a] reasonable jury could

22   review UDE's testimony, ███████'s testimony, Mr. Loudermilk's testimony, the UDE's

23   invoices, and the network switch purchased in the U.S. with a model product number that

24   matches the invoices to conclude that UDE infringes." Pltff. Brief at 24:4-10 (citing

25   *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1309 (Fed. Cir. 2015)

26   ("On this record, we cannot say that a jury could not find the chips to have been sold in the

27   United States…")). However, this entire argument is built upon speculation that just

28   because Defendant and ███████ work together, and some invoices show that ███████

1    ordered Defendant's GM6-AQ-000 for ███'s ███ -N3S64-MTN-U3I, that the

2    switch taken apart by Plaintiff necessarily includes Defendant's ICM.  In order to make

3    this assumption, the Court would have to engage in speculation, ignore multi-sourcing, and

4    disregard the evidence analyzed in the Court's previous order indicating the ICM contained

5    in the Juniper switch is not, in fact, Defendant's ICM.

6        The evidence indicates that Defendant (1) did not know where ███ shipped its

7    products and (2) only shipped its ICMs to ███ in Asia.  First, ███'s corporate

8    designee testified that ███ "had offices in the Netherlands, a sales office in Taiwan, .

9    . . a development office in India, Toronto, [and] . . . a number of design offices around the

10   world."  ECF No. 149-17 at 6, 15:18-16:3.  As such, ███ sells products outside of the

11   U.S., so Defendant could not assume that when ███ sold products, they would

12   necessarily be sold in the U.S.  Further, even though ███ had customers located in the

13   U.S., it provided technical support "out of various locations based on the customer

14   location."  *Id.* at 6, 16:4-14.  In other words, if a customer was located outside the U.S., the

15   customer support would presumably be provided from a location outside the U.S.  He also

16   testified that even though ███ had headquarters in the U.S., it "had a warehouse in

17   Hong Kong that would receive shipments from UDE and—from our products—and then

18   ship them out as a bundle to . . .the manufacturing companies."  *Id.* at 6, 15:1-17.  He

19   further stated that Defendant did not communicate directly with ███ "for the sale of

20   products."  *Id.* at 5, 10:24-11:3.  Rather, "[t]hey communicated in regards to us purchasing

21   the products from UDE."  *Id.*  Beyond this testimony, Plaintiff's counsel indicated that

22   ███ produced 14,715 pages responsive to Plaintiff's subpoenas in this case,

23   Gazdzinsksi Decl., ECF No. 149-1 at 6, ¶ 18; yet, Plaintiff cannot point to a single

24   document showing the sale of an ███ switch in the U.S., which contained Defendant's

25   ICM.

26       In sum, a reasonable jury would not conclude that simply because Defendant and

27   ███ work together, and ███ sells products in the U.S., that Defendant necessarily

28   knew ███ would sell ███'s switches containing Defendant's ICMs in the U.S.

-54-

1   or that any of ███████'s switches containing Defendant's ICMs would be sold in the U.S.

2   *See, e.g.*, *Largan*, 646 Fed. App'x at 948 (holding that evidence that some of the

3   defendant's products were incorporated into Apple products, and some of Apple's products

4   were sold in the U.S. did not establish induced infringement).

5                  h.   *Devices Purchased by Pulse's Counsel Within the U.S.*

6          Finally, Plaintiff attempts to establish domestic infringing acts within the U.S. by

7   again relying on two devices that its counsel allegedly purchased in the U.S., which

8   allegedly contain Defendant's ICMs. Pltff. Brief at 24: 12-13 (noting that "Pulse purchased

9   the Juniper EX4300-48MP switch that contained a G series ICM"); *see also id.* at 24:13-

10  15 (stating that Plaintiff's counsel "[a]lso purchased was the Cisco Switch Model No.

11  MS355 in the U.S.," which "contained a 'GMC-AT- 0001' ICM stamped with a 'UDE'

12  logo.") (citing ECF No. 150-1 ¶ 5; ECF No. 150-9). Plaintiff admits that "this is not direct

13  evidence that UDE directly or contributorily infringes" but argues that "the fact that two

14  switches purchased in the U.S. contain the G series infringing ICMs provides

15  circumstantial evidence that UDE engages in domestic activities." Pltff. Brief at 24:15-18.

16  However, Plaintiff not only fails to address any of the Court's concerns over how Plaintiff

17  will authenticate or lay the foundation for a product purchased by its counsel but also

18  entirely ignores the numerous reasons previously detailed by the Court casting serious

19  doubt on whether the Juniper Switch could possibly contain a UDE ICM. *See, e.g.*, Order,

20  ECF No. 160 at 62:22-63:19 (explaining numerous reasons why the Juniper Switch appears

21  to not contain a UDE ICM). Defendant responds that "Pulse finding ***third-party*** products

22  in the U.S. containing UDE components, assuming *arguendo* that is true, does nothing to

23  suggest domestic acts by UDE" because "UDE does not make, use, sell, offer to sell, or

24  import end user products in ***any*** country." Def. Brief at 23:23-26. Defendant also points

25  out that "the invoices show no transactions for GMC-AT-0001 with a 'Ship to' or 'Bill to'

26  address in the U.S. and only delivery of the GM6-AQ-0005 product to Hong Kong." Def.

27  Brief at 23:26-24:1 (citing ECF No. 149-8). In other words, the evidence in this case shows

28  that the MPN in the Cisco switch was not involved in a U.S. billing or shipping transaction,

and as such, Defendant cannot be held liable for direct infringement pertaining to Plaintiff's possession of a device containing MPN GMC-AT-0001.  Further, with respect to the MPN GM6-AQ-0005 found in the Juniper Switch, the evidence shows that that MPN was only ever shipped to Hong Kong, so Defendant cannot be held liable for direct infringement on the basis of MPN GM6-AQ-0005 either.  This Court already held that there is no evidence of third-party EMS or brand companies selling products in the U.S. containing Defendant's ICMs, and as a result, Defendant could not be held liable for induced infringement.  As a result of that conclusion, Defendant also cannot be held liable for contributory infringement either where there is no evidence any party undertook a domestic act of direct infringement.

In sum, Plaintiff's argument in response to the Court's Order to Show Cause that "[g]iven that UDE has a U.S. salesperson, a U.S. corporate office, and extensive sales worldwide, a reasonable jury could review the record in this case and conclude UDE directly and contributorily infringes the patents-in-suit" fails just as it did before.  Pltff. Brief at 19:19-21.  Plaintiff has failed to come forward with any new evidence that would allow a reasonably jury to conclude infringing acts took place within the U.S. without engaging in wild speculation.

## 2. *Contributory Infringement*

Previously, with the exception of MPNs S3Y-HP-0001 and N42-ZT-0001, the Court dismissed the direct infringement claims pertaining to the S and N series of Accused products, because Plaintiff only analyzed infringement for MPNs S3Y-HP-0001 and N42-ZT-0001, meaning Plaintiff did not present any evidence of infringement for any unanalyzed products.  Order, ECF No. 160 at 78:3-6.  As a result, Defendant had shown the absence of a genuine issue of fact as to whether the unanalyzed S-Series and N-Series Accused Products infringed on Plaintiff's Patents-in-Suit.  *Id.*

Plaintiff's briefing does not specifically address why its contributory infringement claims should not be dismissed and focuses more on reciting the evidence already reviewed and rejected by this Court.  *See generally* Pltff. Brief.  Defendant responds that "the contributory infringement claims for all S and N Series products (except S3Y-HP-0001

and N42-ZT-0001) should be dismissed" due to the Court's dismissal of the underlying direct infringement claims.[25]  Def. Brief at 7:19-20.

"For contributory infringement, as for inducement, direct infringement is necessary and will typically take place later than the accused indirect infringer's act." *Supreme*, 796 U.S. at 1348.  Defendant argues that the 318 Patent should be dismissed outright because "Pulse only asserted claims 14 and 17 against the GX-X Series, and only asserted claims 1, 3–7, and 11 against the S Series," but all claims against the GX-X Series of direct and induced infringement pertaining to those series have been dismissed, so the Court should dismiss the contributory infringement claims as well. Def. Brief at 24:6-9. For the S Series, "the Court already excluded those claims from the case for being belatedly asserted and against the instructions of the Court."  Def. Brief at 24:9-13 (citing SJ Order at 42:25–50:16).  "As such, there are no remaining allegations for the '318 Patent."  *Id.* at 24:11-12.

Second, Defendant argues that "the last N Series product, N42-ZT-0001 should be dismissed" because "[n]one of the invoices with either 'Bill to' or 'Ship to' addresses in the U.S. include the N42-ZT-0001."  Def. Brief at 24:13-15 (*See generally* citing ECF No. 149-8).  Thus, "[e]ven if the Court finds that the invoices create a genuine issue of fact, they do not do so for N42-ZT-0001."  Def. Brief at 24:15-17.

As shown in the chart below, the 318 Patent claims Defendant argues should be dismissed were effectively eliminated by the Court's previous order:

/ / /

---

[25]    The Court notes that Defendant's argument is based, in part, on whether the Accused Products actually practice Plaintiff's Patents-in-Suit.  However, the Court's previous order expressly limited the briefing to the issue of whether infringing acts took place domestically and stated that the parties should not address whether any Accused Products infringe.  As such, the Court finds it would be manifestly unfair to consider Defendant's arguments on actual infringement when Plaintiff did not address these issues (as it was instructed not to do so).  However, the Court bases its ruling—not on whether the Accused Products infringe—on whether evidence of domestic infringing exist, and as such, did not consider Defendant's arguments on the issue of actual infringement.  Thus, Plaintiff was not prejudiced by Defendant advancing arguments that the Court not only did not consider but also did not factor into the Court's decision.

| UDE Multi-Gig 2xN ICMs with MPNs that Start with: | Remaining Accused Products: | Plaintiff's Asserted | | |
|---|---|---|---|---|
| | | 473 Patent Claims Involved: | 318 Patent Claims Involved: | 840 Patent Claims Involved: |
| **"G"** | All | 1, 16, 18, 33, 37, 39, and 41 | N/a | 1, 7, 10, 11, and 12 |
| ~~**"GX-X"**~~ | ~~GM-41000VJ84~~ | | 14 and 17 | |
| **"N"** | N42-ZT-0001[26] | | N/a | |
| **"S"** | S3Y-HP-0001 | N/a | ~~1, 3, 4, 5, 6, 7, and 11~~[27] | |

Thus, all claims pertaining to the 318 Patent are dismissed *with prejudice*. The Court also agrees that in the absence of any evidence of acts of domestic infringement by Defendant or third-parties pertaining to MPN N42-ZT-0001, all claims pertaining to MPN N42-ZT-0001, whether arising out of direct, induced, or contributory infringement must be dismissed *with prejudice*. Likewise, there is no evidence the GX-X Series was ever sold anywhere, much less in the U.S. As such, the Court dismisses all claims pertaining to the GX-X Series, whether arising out of direct, induced, or contributory infringement *with prejudice*.

While this leaves the claims for contributory infringement pertaining to the G Series and under the 473 and 840 Patents along with the S Series under the 840 Patent, Defendant argues that "most of the G Series products should be dismissed" because "[t]he representative product stipulation entered by the parties only establishes representative structure and operation, not 'representative' domestic activities." Def. Brief at 24:17-20 (citing SJ Order at 11:14–12:7 (discussing ECF 124)). Thus, "[e]ven if the Court finds that

---

[26]   The invoices on which Plaintiff relies to support its case do not show any sales of this Accused Product or "Bill to" addresses within the U.S.

[27]   As stated, Plaintiff's SAC and original Infringement Contentions only asserted Claims 14 and 17, and those claims were also the only claims at issue when this Court undertook Claim Construction. Thus, those are the only claims properly at issue in this case.

the invoices create a genuine issue of fact, they can only do so with respect to the products shown in those invoices."  Def. Brief at 24:10-11.

Separate and aside from the issues raised by Defendant regarding the Representative Product Stipulation, the Court finds that in the absence of any domestic acts of direct infringement, it must dismiss the contributory infringement claims pertaining to the G and S Series as well.  *Supreme*, 796 U.S. at 1348.  Plaintiff has failed to show direct infringement for any Accused Products and fails to advance an argument on how its contributory infringement claims could remain in this case without evidence of direct infringement.  In sum, the Court dismisses *with prejudice* all claims of contributory infringement as to all Accused Products.

## C.   Motions to Seal

"Even where records do not include trade secrets, they may still be sealed where they could be a "source[ ] of business information that might harm a litigant's competitive standing."  *See, e.g.*, *Monster Energy Co. v. Vital Pharm., Inc.*, No. EDCV181882-JGB-SHKX, 2019 WL 3099711, at *2–3 (C.D. Cal. Jun. 17, 2019) (granting the plaintiff's motion for leave to file portions of exhibit under seal where the information sought to be sealed fell into two categories: "(1) non-public financial information of Monster and third-parties and (2) non-public strategic and business-making information of Monster and third-parties.") (citing *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).  Other courts have held that non-public financial, pricing, and strategy information could harm a litigant's competitive standing when deciding to grant motions to seal such information.  *See, e.g.*, *Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 13673842 at *2 (N.D. Cal. Aug. 4, 2015) (granting the defendant's "narrowly tailored" request to seal "internal, nonpublic information discussing Safeway's pricing strategy, business decision-making, customer research, and financial records, which would expose Safeway to competitive harm if disclosed"); *SteppeChange LLC v. VEON Ltd.*, 354 F. Supp. 3d 1033, 1045-46 (N.D. Cal. 2018) (granting motion to seal documents containing

-59-

nonpublic pricing terms, private bank account information, personal identification information of parties and nonparties).

Here, both parties seek to seal portions of their briefs as well as exhibits submitted in support of their briefing, which contain customer information, financial information, or "third-parties' sensitive business information," ECF No. 170 at 3:8-21; ECF No. 173 at 4:3-27. The Court notes that authority exists for sealing a majority of the records at issue, and each party's respective motion(s) to seal are unopposed. For instance, information regarding parties' profits, expenditures, and losses might allow competitors to use that information to their advantage in their own contract negotiations, resulting in harm to Plaintiff. *Apple*, 727 at 1225; *see also Fulton v. Ulta Beauty*, No. 18-CV-00889-AJB-WVG, 2020 WL 5095494, at *6 (S.D. Cal. Aug. 28, 2020) (Battaglia, J.) (finding "that despite the generally recognized right to inspect records," the defendant overcame that presumption by asserting that compelling reasons existed for filing documents under seal "because they contain[ed] detailed financial information pertaining to Defendant's business, including the dollar amounts of the profits and losses of Ulta stores."); *Avocent Huntsville, LLC v. ZPE Sys., Inc.*, No. 3:17-CV-04319-WHO, 2018 WL 1411100, at *2, n. 3 (N.D. Cal. Mar. 21, 2018), *appeal dismissed,* No. 18-1881, 2018 WL 5276289 (Fed. Cir. Aug. 3, 2018) (concluding that good cause for sealing existed whether the plaintiff sought to seal portions of a declaration covering "only highly confidential commercial information, including sales, product, and pricing data, that could harm Avocent if the information was made publicly available to its competitors."); *Brown v. Brown*, No. CV 13-03318 SI, 2013 WL 12400041, at *1-2 (N.D. Cal. Dec. 30, 2013) (granting the defendant's narrowly tailored motion to seal "information about the profits, losses, income, investments, and expenses that derive from financial statements and ledgers of two privately held companies co-funded by defendant and plaintiff," that if publicly disclosed, "could harm these companies if the information was used by its competitors").

Thus, the Court has considered each of the documents the parties designated for sealing and determines that both motions shall be **GRANTED**.

# V.  **CONCLUSION**

The Court previously granted summary judgment in Defendant's favor and dismissed *with prejudice* (1) all of Plaintiff's claims for induced infringement of all Accused Products and (2) Plaintiff's claims for direct infringement of the GX-X series as well as all Accused Products in the S and N Series except for MPNs S3Y-HP-0001 and N42-ZT-0001.

For the above reasons, the Court further rules as follows:

1.    Plaintiff has failed to come forward with evidence sufficient to allow a reasonable jury to conclude that Defendant performed directly infringing acts within the U.S. as to any Accused Products.  The Court previously found that Plaintiff had failed to come forward with evidence of infringing acts by any third-parties.  Thus, in the absence of evidence of acts of domestic direct infringement by Plaintiff or third-parties, the Court dismisses the contributory infringement claims as well.  *Supreme*, 796 U.S. at 1348.  The Court now dismisses Plaintiff's claims for contributory infringement as to all Accused Products and direct infringement as to the G Series along with MPNs S3Y-HP-0001 and N42-ZT-0001 remaining in this case.

2.    The Clerk of the Court is directed to enter judgment in Defendant's favor as to Plaintiff's three counts in the SAC for direct, induced, and contributory infringement of the Patents-in-Suit as well as Defendant's counterclaims for non-infringement.  *See* ECF No. 108.  Given the Court did not address the validity of any of Plaintiff's Patents-in-Suit, Defendant's counterclaims raising invalidity are dismissed as moot in light of the Court's determination that Defendant has not infringed the Patents-in-Suit.

3.    Because the Court has dismissed Plaintiff's claims and entered judgment in favor of Defendant on its counterclaims, Defendant is the prevailing party.  *See, e.g.*, *Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1300-09 (Fed. Cir. 2018) (affirming the district court's award of costs after the plaintiff's lawsuit for patent infringement was dismissed for lack of standing); *see also* FED. R. CIV. P. 54(d)(1) (providing that courts award costs, other than attorney's fees, should be awarded to the prevailing party in a case "[u]nless a

federal statute, these rules, or a court order provides otherwise"); S.D. Cal. Civ. R. 54.1(f) (providing that "[t]he defendant is the prevailing party upon any termination of the case without judgment for the plaintiff except a voluntary dismissal under Fed. R. Civ. P. 41(a)"); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1416-17 (Fed. Cir. 2004) (holding that "the district court still retains discretion over the award of costs under Rule 54"). As such, Defendant may submit a Bill of Costs to the Clerk of the Court. However, even though the Court deems Defendant the prevailing party, it makes no finding at this time as to whether this case is exceptional under 35 U.S.C. § 285, so as to warrant Defendant's recovery of attorney's fees. If Defendant contends attorney's fees are warranted, the parties shall separately brief this issue.

4.      In light of the Court's decision, the upcoming Pre-Trial Conference scheduled for Monday, April 5, 2021, as well as all future dates in this case are **VACATED**.

5.      Plaintiff's Motion to File Documents Under Seal, ECF No. 170, is **GRANTED**, and the clerk of the Court is directed to file under seal the unredacted version of the documents lodged under seal in ECF No. 171.

6.      Defendant's Motion to File Documents Under Seal, ECF No. 173, is **GRANTED**, and the clerk of the Court is directed to file under seal the unredacted version of the documents lodged under seal in ECF No. 174.

      **IT IS SO ORDERED.**

 DATED:    March 31, 2021

_____
**HON. ROGER T. BENITEZ**
United States District Judge

3:18-cv-00373-BEN-MSB